No. 16-12C
Judge Nancy B. Firestone

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TAYLOR ENERGY COMPANY LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

## DEFENDANT'S MOTION TO DISMISS

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

STEVEN J. GILLINGHAM
Assistant Director

JOHN H. ROBERSON
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 353-7972
Fax: (202) 514-8640
Email: John.Roberson@usdoj.gov

Dated May 24, 2016

# TABLE OF CONTENTS

**PAGES**

INTRODUCTION ................................................................................................ 2

QUESTIONS PRESENTED .............................................................................. 8

STATEMENT OF THE FACTS ........................................................................ 8

I.     Oil Drilling And Production Operations On The Outer Continental Shelf Are Highly Regulated By The Federal Government ............................................. 8

        A.    OCSLA .................................................................................. 9

        B.    Relevant BSEE Regulations ................................................ 10

        C.    Relevant BOEM Regulations ............................................... 11

        D.    Other Applicable Federal Statutes ....................................... 12

        E.    Environmental Protection Regulations ................................ 13

II.    Taylor Assumed Oil And Gas Leases In The Mississippi Canyon ..................... 14

III.   The Collapse Of Taylor's Oil Drilling Platform And The Resulting Oil Leaks ................................................................................................... 15

IV.   Taylor Enters Into The Trust Agreement To Ensure That Funds Are Available To Decommission Its Facilities And To Remediate The Contaminated Soil ............................................................................................ 16

V.    The Oil Leaks Are Continuing ........................................................................ 21

VI.   Taylor Discovers The Difficulty Of Pursuing Conventional Plugging And Abandonment Techniques Due To The Burial Of The Wellbores ............. 22

VII.  The 2009 SSEA Report Indicates That Removal Of The Contaminated Soil Would Pose Greater Environmental Risk Than Benefit ...................................... 25

VIII. The Unified Command Convenes Various Groups To Study The MC-20 Problems ........................................................................................... 26

        A.    The Technical Committee .................................................... 26

        B.    The Sheen Source Workgroup ............................................. 26

C.     The CERA Workshop And Report ........................................................... 27

D.     The Establishment Of Working Groups To Conduct Further Analyses Concerning Oil Discharge Scenarios And A Cost Estimate For Incident Response Activities ............................................... 28

E.     The FRACE Workshop And Report ......................................................... 28

IX.     BSEE, BOEM, Coast Guard, And The Department Of Justice Issue Their Views On The Status Of Taylor's Ongoing Oil Spill ................................ 31

X.     Taylor Has Attempted To Avoid Further Intervention Obligations To Stop The Oil Leaks By Requesting A Departure From The Decommissioning And Pollution Prevention Regulations And By Filing Claims In DOI's IBLA ........................................................................................................33

ARGUMENT ..................................................................................................................... 37

I.     Standards Of Review ............................................................................... 37

II.     This Court Should Not Exercise Jurisdiction Over Taylor's Action Because Taylor's Claims Are Barred By The Statute Of Limitations ................. 38

A.     Every Claim Brought In This Court Is Subject To A Six-Year Statute Of Limitations ............................................................................... 39

B.     Taylor Alleges That Its Decommissioning Obligations Only Extend To Operations That Can Be Accomplished Using The "Best Available Technology" ................................................................... 40

C.     Taylor's Allegations State That It Knew By 2008 That Existing Technology Would Not Provide A Means To Properly Plug And Abandon The Majority Of Its Wells, Which Is Why It Invented New Technology To Partially Pursue Its Decommissioning Obligations ............................................................................................... 41

D.     According To The Complaint, Taylor Also Knew In 2008 That Removing The Contaminated Soil Was Not Reasonably Feasible .......... 45

III.     This Court Should Not Exercise Jurisdiction Over Taylor's Action Because The Primary Jurisdiction Concerning The Disposition Of The Trust's Funds For Decommissioning And Remediation Efforts Belongs With The IBLA ........................................................................................................ 47

A.     The Doctrine Of Primary Jurisdiction ...................................................... 47

B.      Taylor's Complaint Should Be Dismissed Or Its Action Stayed
Pursuant To The Doctrine Of Primary Jurisdiction ................................ 50

IV.     This Court Should Dismiss All Of Taylor's Claims To The Extent They Seek
Equitable Relief ............................................................................. 53

A.      Counts Two and Three............................................................ 53

B.      Counts One and Four ............................................................ 54

V.      This Court Should Dismiss Taylor's Complaint Because Federal Law, Not
Louisiana Law, Controls The Disposition Of The Trust And Its Funds With
Respect To The Decommissioning Costs, And The Trust Agreement Is
In Accord With Federal Law ............................................................. 56

A.      Federal Law, Not Louisiana Law Controls The Disposition Of The
Trust And Its Funds With Respect To Taylor's Decommissioning
Obligations ...................................................................... 57

B.      This Court Should Dismiss Taylor's Action Because The Trust
Agreement Is In Complete Accord With Federal Law ............................ 63

CONCLUSION.......................................................................................... 66

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.,*
    988 F.2d 1157 (Fed. Cir. 1993).................................................................................38

*AGIP Petroleum Co. v. Gulf Island Fabrication,*
    920 F. Supp. 1330 (S.D. Tex. 1996) .................................................................63

*Ainsley v. United States,*
    8 Cl. Ct. 394 (1985) .................................................................................49, 50, 54

*Alleman v. Omni Energy Services Corp.,*
    434 F. Supp.2d 405 (E.D. La. 2006).................................................................63

*American Contractors Indem. Co. v. United States,*
    81 Fed. Cl. 682 (2008) .........................................................................................2

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009).......................................................................................38

*Banks v. United States,*
    741 F.3d 1268 (Fed. Cir. 2014).........................................................................37

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).....................................................................................38, 56

*BP Exploration & Prod., Inc. v. Callidus Tech's, L.L.C.,*
    No. Civ. A. 02-2318, 2003 WL 193450 (E.D. La. Jan. 27, 2003)..............59, 63

*Bradley v. Chiron Corp.,*
    136 F.3d 1317, 1322 (Fed. Cir. 1998)...............................................................55

*Caldwell v. United States,*
    No. 16-357C, 2016 WL 1178717 at *3 (March 25, 2016, Fed. Cl.)...............55

*Carnation Co. v. Pacific Westbound Conference,*
    383 U.S. 213 (1966).....................................................................................49, 53

*Cedars–Sinai Med. Ctr. v. Watkins,*
    11 F.3d 1573 (Fed. Cir. 1993)...........................................................................38

*Chisolm v. United States,*
    82 Fed. Cl. 185 (2008) .......................................................................................37

*Cities Serv. Pipe Line Co. v. United States*,
   4 Cl. Ct. 207 (1983) ..................................................................................................13

*Demette v. Falcon Drilling Co.*,
   280 F.3d 492 (5th Cir. 2002) ....................................................................................58

*Doko Farms v. United States*,
   13 Cl. Ct. 48, 60 (1987) ............................................................................................ 55

*EP Operating Limited Partnership v. Placid Oil Co.*,
   26 F.3d 563 (5th Cir. 1994) ................................................................................59, 60

*Fallini v. United States*,
   56 F.3d 1378 (Fed. Cir. 1995) .............................................................................40, 47

*Far East Conference v. United States*,
   342 U.S. 570 (1952) .............................................................................................49, 53

*Fluor Ocean Services Inc. v. Rucker Co.*,
   341 F. Supp. 757 (E.D. La. 1972) ..............................................................................59

*Fuselier v. Sea Boat Rentals, Inc.*,
   No. 06-4488, 2007 WL 2713278 (E.D. La. Sept. 14, 2007)......................................62

*Gen. Am. Tank Car Corp. v. El Dorado Terminal Co.*,
   308 U.S. 422 (1940).............................................................................................48, 53

*Golden Hill Paugussett Tribe of Indians v. Weicker*,
   39 F.3d 51 (2d Cir. 1994)...........................................................................................48

*Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*,
   589 F.3d 778 (5th Cir. 2009) ....................................................................................58

*Gulf Offshore Co. v. Mobil Oil Corp.*,
   453 U.S. 473 (1981).....................................................................................................62

*Ingham Regional Med. Ctr. v. United States*,
   No. 13-821C, – Fed. Cl. – , 2016 WL 1104399 (March 22, 2016)...................................2

*In re Deepwater Horizon*,
   745 F.3d 157 (5th Cir. 2014) ............................................................................... 12, 13

*Indium Corp. of Am. v. Semi-Alloys, Inc.*,
   781 F.2d 879 (Fed. Cir. 1985)....................................................................................37

*Higbie v. United States,*
  778 F.3d 990 (Fed. Cir. 2015).................................................................... 54

*Holmes v. United States,*
  657 F.3d 1303, 1315 (Fed.Cir.2011)......................................................... 54

*Jesko v. United States,*
  3 Cl. Ct. 730 (1983) .................................................................................. 54

*John R. Sand & Gravel Co. v. United States,*
  552 U.S. 130 (2008).................................................................................. 40

*Krossa v. All Alaskan Seafoods, Inc.,*
  37 P.3d 411 (Alaska 2001)........................................................................ 64

*KVOS, Inc. v. Associated Press,*
  299 U.S. 269 (1936).................................................................................. 37

*Land v. Dollar,*
  330 U.S. 731 (1947).................................................................................. 37

*Laredo Offshore Constructors v. Hunt Oil Co.,*
  754 F.2d 1223 (5th Cir. 1985) ......................................................... 59, 61, 62

*Legal Aid Soc. Of New York v. United States,*
  92 Fed. Cl. 285 (2010) ................................................................................ 1

*Lindsay v. United States,*
  295 F.3d 1252 (Fed. Cir. 2002)................................................................ 38

*Love Terminal Partners v. United States,*
  97 Fed. Cl. 355 (2011) ................................................................................ 2

*Matte v. Zapata Offshore Co.,*
  784 F.2d 628 (5th Cir. 1986) .................................................................... 62

*McNutt v. General Motors Acceptance Corp. of Ind.,*
  298 U.S. 178 (1936).................................................................................. 37

*Michael v. United States,*
  No. 2015-5055, 2016 WL 1019118 (Fed. Cir. Mar. 15, 2016)............ 40, 46, 47

*Moyer v. United States,*
  190 F.3d 1314 (Fed. Cir. 1999)................................................................ 37

*Nat'l Marketing Consultants, Inc. v. Blue Cross and Blue Shield Assoc.,*
No. 87 C 7161, 1987 WL 20138 (N.D. Ill. Nov. 29, 2001)............................49

*Neitzke v. Williams,*
490 U.S. 319 (1989)..........................................................................................38

*Nippon Steel Corp. v. United States,*
219 F.3d 1348 (Fed. Cir. 2000)..................................................................49, 54

*Offshore Logistics, Inc. v. Tallentire,*
477 U.S. 207 (1986)............................................................................60, 62, 63

*Reiter v. Cooper,*
507 U.S. 258 (1993)......................................................................................49, 53

*Reynolds v. Army & Air Force Exchange Serv.,*
846 F.2d 746 (Fed. Cir. 1988)........................................................................38

*Ricci v. Chicago Mercantile Exchange,*
409 U.S. 289 (1973)..........................................................................................49

*Rocovich v. United States,*
933 F.2d 991 (Fed. Cir. 1991)..........................................................................1

*Rodrigue v. Aetna Cas. & Surety Co.,*
395 U.S. 352 (1969)................................................................................. passim

*Sabine Towing & Transp. Co. v. United States,*
229 Ct. Cl. 265, 666 F. 2d 561 (1981)............................................................13

*San Carlos Apache Tribe v. United States,*
639 F.3d 1346 (Fed. Cir. 2011)..................................................................40, 47

*Schaghticoke Tribal Nation v. Kent School Corp. Inc.,*
595 Fed. Appx. 32 (2d Cir. 2014)....................................................................49

*Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States,*
672 F.3d 1021 (Fed. Cir. 2012)........................................................................38

*Stuler v. United States*
No. 07-642, 2008 WL 957009) (W.D. Pa. Apr. 8, 2008) ................................2

*Suburban Mortgage Assoc., Inc. v. HUD,*
480 F.3d 1116 (Fed. Cir. 2007)........................................................................54

*Texaco Exploration & Production, Inc. v. AmClyde Engineered Products,*
   448 F.3d 760 (5th Cir. 2006) ...........................................................................62

*Toon v. United States,*
   96 Fed. Cl. 288..................................................................................................2

*Total Petroleum, Inc. v. United States,*
   12 Cl. Ct. 178 (1987) .......................................................................................12

*Ultra-Precision Mfg., Ltd. v. Ford Motor Co.,*
   338 F.3d 1353 (Fed. Cir. 2003).......................................................................37

*Union Tex. Petr. Corp. v. PLT Eng'g, Inc.,*
   865 F.2d 1043 (5th Cir. 1990) ....................................................................61, 63

*United States Navigation Co. v. Cunard S.S. Co.,*
   284 U.S. 474 (1932).........................................................................................49

*United States v. Interstate Commerce Commission,*
   337 U.S. 426 (1949)....................................................................................50, 53

*United States v. Kwai Fun Wong,*
   135 S. Ct. 1625 (2015).....................................................................................40

*United States v. W. Pac. R.R. Co.,*
   352 U.S. 59 (1956)................................................................................48, 49, 53

*Virgin Islands Water & Power Auth. v. United States,*
   30 Fed. Cl. 236 (1994) .....................................................................................48

*Virgin Islands Water & Power Auth. v. United States,*
   30 Fed. Cl. 239.........................................................................................50, 53

*Walter Oil & Gas Corp. v. NS Group, Inc.,*
   867 F. Supp. 549 (S.D. Tex. 1994) ..............................................................60, 62

*Wolfchild v. United States,*
   108 Fed. Cl. 578 (2013) ..............................................................................50, 53

## STATUTES

28 U.S.C. § 2501 (2000) .....................................................................................39, 41

33 U.S.C. § 1251-1376 (1982).................................................................................7

33 U.S.C. § 1321 (1982) .............................................................................12, 62, 65

33 U.S.C. § 1321(d) ...................................................................................13

33 U.S.C. § 1321(i) ..............................................................................13, 62, 65

33 U.S.C. § 2701(19) .................................................................................13

33 U.S.C. § 2701(31) ...........................................................................13, 62, 65

33 U.S.C. § 2701(32)(C) .......................................................................13, 62, 65

33 U.S.C. §§ 2701- 62 (2010) ..........................................................................7

33 U.S.C. § 2702(a) .............................................................................13, 62, 65

33 U.S.C. § 2702(b)(1) .........................................................................13, 62, 65

33 U.S.C. § 2704(a)(3) ...............................................................................13

43 U.S.C. § 1331 ....................................................................................7, 9

43  U.S.C. § 1331 - 1356a ......................................................................6, 8, 56

43 U.S.C. § 1332 .....................................................................................9, 62

43 U.S.C. § 1333(a)(1) ..............................................................................56, 58

43 U.S.C. § 1333(a)(2) ...............................................................................9, 62

43 U.S.C. § 1333(a)(2)(A) .......................................................................... passim

43  U.S.C. § 1334 ....................................................................................9, 62

43 U.S.C. § 1347(b) ..................................................................................9, 41

43 U.S.C. § 1348(a) .................................................................................10, 62

43 U.S.C. § 1348(b)(2) ..............................................................................10, 62

43 U.S.C. § 1349(b)(1) .............................................................................. 58, 59

## REGULATIONS

30 C.F.R. § 250 ...................................................................................... passim

30 C.F.R. §§ 250.105 .................................................................................41

30 C.F.R. § 250.107 ................................................................................................41

30 C.F.R. § 250.141 ................................................................................................10

30 C.F.R. § 250.142 .............................................................................................11, 51

30 C.F.R. § 250.300(a)(1) ....................................................................................10, 18

30 C.F.R. § 250.300(a)(2) ........................................................................................18

30 C.F.R. § 250.1700 .................................................................................................2

30 C.F.R. § 250.1700 - 1703 ............................................................................10, 63, 65

30 C.F.R. § 250.1701(a) .......................................................................................10, 18

30 C.F.R. § 250.1702 ...............................................................................................14

30 C.F.R. § 250.1703 ...........................................................................................10, 12

30 C.F.R. § 250.1703(b) ...........................................................................................18

30 C.F.R. § 250.1710 .......................................................................................10, 63, 65

30 C.F.R. § 250.1714 - 1716 ......................................................................................18

30 C.F.R. § 250.1725 ...........................................................................................19, 65

30 C.F.R. §§ 556.52 .........................................................................................10, 17, 65

30 C.F.R. § 556.53(b) .........................................................................................11, 65

30 C.F.R. § 556.53(d) ...............................................................................................11

30 C.F.R. § 556.53(e) ..........................................................................................11, 66

30 C.F.R. § 556.56 ............................................................................................. passim

30 C.F.R. §  556.56(a) ..............................................................................................21

30 C.F.R. § 256.56(a)(1) ...........................................................................................11

30 C.F.R. § 556(a)(2) ................................................................................................12

30 C.F.R. §§ 556.56(a)(3) ..........................................................................................12

30 C.F.R. § 556.58(d)(2)(i) ...................................................................11, 66

30 C.F.R. § 556.58(d)(2)(ii) .......................................................................11

40 C.F.R. § 300.120(a) ..............................................................................14

40 C.F.R. § Part 300 et. seq. ....................................................................9, 13

40 C.F.R. § Part 300.5 ...........................................................................14, 22

40 C.F.R. §§ 300.120(a) .............................................................................14

40 C.F.R. §§ 322 .......................................................................................14

## **RULES**

RCFC 12(b)(1) ........................................................................................1, 39

RCFC 12(b)(6) .................................................................................. passim

RCFC 12(d) ................................................................................................1

## **OTHER AUTHORITIES**

5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 .................2

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| TAYLOR ENERGY COMPANY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 16-12C |
| | ) | Judge Nancy B. Firestone |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of

Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court

dismiss the complaint filed by Taylor Energy Company LLC (Taylor) for lack of subject

matter jurisdiction and for failure to state a claim upon which relief may be granted. In

support of this motion, we rely upon the amended complaint, documents attached to or

cited by the amended complaint, filings in Taylor's related proceeding before the Interior

Board of Land Appeals (IBLA) of the United States Department of the Interior (DOI),

matters of public record, and certain Government records.[1]

---

[1] Although we rely upon a number of documents not attached to Taylor's complaint, our
motion remains a motion to dismiss. "The requirement for conversion of a motion to
dismiss to a motion for summary judgment contained in RCFC 12(d) does not apply to
motions to dismiss for lack of jurisdiction brought under RCFC 12(b)(1). Indeed, on an
RCFC 12(b)(1) motion, the court is permitted to 'inquire into jurisdictional facts that are
disputed.'" *Legal Aid Soc. Of New York v. United States*, 92 Fed. Cl. 285, 287 n.1 (2010)
(citing *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)). Moreover, a
motion to dismiss is not converted into a motion for summary judgment when the motion
attaches exhibits that concern "matters incorporated by reference or integral to the
claim," or "'undisputed documents relied upon by the plaintiff, other items appearing in

# INTRODUCTION

This case arises from the destruction of an oil production platform in the Gulf of Mexico that was built in an undersea canyon upon sediment that was known to be unstable, and which collapsed and was partially buried by a massive underwater mudslide triggered by Hurricane Ivan in 2004. Although 12 of the 28 wells attached to the platform have been decommissioned by Taylor, 16 of the wells, which are buried under 100 feet of sediment and mud, have not been decommissioned.[2] Today, twelve years after the platform's collapse, oil continues to leak from the site of Taylor's operations. Taylor brings its complaint arguing that it is impractical or "impossible" to "decommission" the wells to prevent further leaks and remove the oil-contaminated soil around the collapsed wells, and therefore, it should no longer be obligated to hold its funds in a Trust, which was established through a Trust Agreement with regulators to ensure that Taylor has sufficient funds to pay the costs of decommissioning the facilities and addressing the contaminated soil.

Taylor presents four arguments in support of its overarching goal – of having the Trust nullified so that the funds in the Trust can be returned to Taylor. Taylor's

---

the record of the case, and matters of public record." *American Contractors Indem. Co. v. United States*, 81 Fed. Cl. 682, 687-88 (2008) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 and *Stuler v. United States*, No. 07-642, 2008 WL 957009) at *2 (W.D. Pa. Apr. 8, 2008)), *rev'd on other grounds*, 570 F.3d 1373 (Fed. Cir. 2009)). *See also Ingham Regional Med. Ctr. v. United States*, No. 13-821C, – Fed. Cl. – , 2016 WL 1104399 at *11 (March 22, 2016); *Love Terminal Partners v. United States*, 97 Fed. Cl. 355, 385-86 (2011); *Toon v. United States*, 96 Fed. Cl. 288. 299 (2010).

[2] "Decommissioning" means "ending oil, gas, or Sulphur operations; and . . . [r]eturning the lease or pipeline right-of-way to a condition that meets the requirements of regulations of MMS and other agencies that have jurisdiction over decommissioning activities." 30 C.F.R. § 250.1700.

arguments all hold in common (1) *an assumption* that, as a factual, scientific and technical matter, it is more environmentally risky to attempt to decommission the remaining 16 wells and remove the contaminated soil than it is to merely leave the wells and soil "as is"; and (2) *a recognition* that the governing law requires Taylor to provide financial assurance – represented by the Trust – that it can fund decommissioning efforts *until they are complete*, unless (as Taylor has requested from DOI) Taylor has been granted a specific exemption or "departure" from regulations requiring offshore lessees to decommission their facilities.

Specifically, Taylor argues that the Trust: (1) imposes an improper indefinite time for performance because there is no pronounced deadline for completing the decommissioning activity (Counts I, IV); (2) assumes the completion of tasks – plugging and abandoning the wells – that are impossible (Count II); and (3) was entered into under a mutual mistake because both parties assumed that the wells could be decommissioned safely using the then-existent "best available technologies" (Count III). Common to all of these arguments is Taylor's assertion that Louisiana contract law applies to the interpretation of the Trust Agreement.

First, as a threshold matter, this Court should dismiss this action for lack of jurisdiction pursuant to the statute of limitations, the doctrine of primary jurisdiction, or the failure to set forth claims over which this Court has jurisdiction.

The Court should dismiss Taylor's complaint for lack of jurisdiction in the first instance because Taylor's claims are barred by the statute of limitations. Taylor alleges that its decommissioning obligations only require it to use the "best available technology" that exists at any given time and not a later invented or future technology. *See* Compl.

¶¶ 14, 73, 76, 106. But not long after executing the Trust Agreement (if not before), Taylor determined that the then-existing "best available technology" was inadequate to either safely decommission the oil wells or remove the contaminated soil. Indeed, in the first half of 2008 Taylor received reports from its own experts and the Minerals Management Service (MMS) (predecessor to Bureau of Safety and Environmental Enforcement (BSEE)), both of which suggested that removing the contaminated soil was a massive project that, under existing conditions and technologies, would threaten more environmental impact than leaving it in place. Moreover, Taylor undoubtedly recognized by 2009 that the existing technology was not adequate to decommission the wells because by that point Taylor had "invented new patented technologies," and was employing this new technology in its decommissioning activity.

But Taylor's understanding that the best available technology was not adequate to remove the contaminated soil or decommission the wells in 2008 and 2009 triggered its awareness of the alleged legal and factual underpinnings of its theories in this case – *i.e.*, the allegedly improper nature of the Trust as demanding an impossible performance by Taylor in requiring that Taylor decommission the wells using best available technology before the Trust's funds could be released to Taylor. At that point, this Court's six-year statute of limitations began running for all of Taylor's claims because the claims all rely upon the predicate that the decommissioning is not possible using the best available technology – a theory the underpinnings for which were fully formed for Taylor no later than 2009. But Taylor did not file suit until January 4, 2016, more than six years after the alleged facts and circumstances that form the foundation for its theories were known and available. Accordingly, Taylor's claims are barred by the statute of limitations.

4

The Court should also dismiss Taylor's complaint for lack of jurisdiction pursuant to the doctrine of "primary jurisdiction." The doctrine of "primary jurisdiction" provides that, where a plaintiff brings claims that rely upon issues best determined by an agency, the court should defer to the agency's determination of those issues, especially where, as here, they are of a technical or scientific nature that fall within the expertise and discretion of the agency. Here, the key issues concern whether Taylor should be excused from its obligation to decommission the remaining 16 wells and remove the oil-contaminated soil due to the challenges presented. These issues form the predicate to Taylor's arguments that decommissioning of the Taylor facilities is impossible, and that the Trust Agreement embodies this impossibility by requiring Taylor's continued financial guarantee through the retention of its funds in the Trust.

But these are precisely the issues that are currently pending before the IBLA. Specifically, Taylor is requesting that the IBLA reverse the decision by BSEE denying Taylor's request for a "departure" from requirements that Taylor fully decommission the 16 wells and remove or address the contaminated soil. Thus, Taylor's "departure" argument before the IBLA centers on the same questions that are central here: whether, due to the technical challenges presented, Taylor should be excused from its regulatory and contractual obligations to decommission the remaining wells and deal with the contaminated soil, or whether those obligations should persist in the face of those challenges, and in light of the ongoing oil leaks.

Answering these questions will likely involve IBLA's assessment of a host of questions lying within the delegated discretion and particular expertise of the Department. Accordingly, pursuant to the doctrine of primary jurisdiction, this Court

should not entertain Taylor's complaint and instead should either dismiss or stay its claims here to allow the IBLA to reach its conclusions concerning whether or not Taylor should be given a departure from normal decommissioning requirements.

Furthermore, the Court should dismiss all of Taylor's claims for lack of jurisdiction to the extent they seek equitable or declaratory relief pertaining to the return of its funds held in the Trust because this Court does not possess jurisdiction to entertain such claims. In Counts Two and Three, Taylor limits its request for relief to equitable and declaratory and relief (dissolution, reformation or rescission of the Trust) without any claim for monetary damages; thus these counts must be dismissed. Moreover, although Taylor asserts claims money damage claims in Counts One and Four, its primary claim in both of these counts is, again, of an equitable or declaratory nature. But this Court does not have jurisdiction to entertain such requests for equitable and declaratory relief.

Finally, even if the Court were to determine that it possesses jurisdiction to entertain Taylor's complaint, it should dismiss Taylor's claims for failure to state a claim upon which relief can be provided because the terms of the Trust Agreement are entirely consistent with the requirements of Federal law – which controls here.

Taylor's complaint is based upon an interpretation of the Trust Agreement using Louisiana law. But Louisiana law does not control here. The Trust Agreement, which concerns the funding and performance of Taylor's obligations to decommission Taylor's facilities on the Outer Continental Shelf (OCS), is subject to Federal law pursuant to the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331-56b. Although, secondarily, state law can be adopted as the Federal law, this is true only *if the application of state law is not inconsistent with the Federal law* as it applies to the OCS.

Here, however, Taylor's proffered application of Louisiana contractual law principles is inconsistent with Federal law. Indeed, pursuant to Taylor's reading of Louisiana law, the Trust Agreement – which exists to satisfy Taylor's obligations under Federal law to ensure the funding of its decommissioning efforts – would be rendered a nullity.

But OCSLA, its implementing regulations as issued by the MMS, and other Federal laws such as the Federal Water Pollution Control Act (Clean Water Act), 33 U.S.C. § 1251-1376 (1982), and the Oil Pollution Act of 1990 (OPA), 33 U.S.C. §§ 2701-62 (2010), require what the Trust Agreement embodies: that OCS lessees are responsible for the decommissioning of their OCS facilities and the resolution of pollution incidents resulting from their operations, and that there is no limit on the length of time that they remain liable for those obligations. And lessees remain obligated to ensure the funding of their decommissioning obligations until they are met – or until they obtain a decision from DOI allowing a "departure" from the regulatory regime governing the decommissioning of oil and gas facilities.

In short, because Taylor's invocation of Louisiana law as applied to the Trust Agreement is inconsistent with the Federal law that establishes the rationale and specific terms embodied in the Trust Agreement, Taylor's theories under Louisiana law cannot prevail. Instead, Federal law – specifically OCSLA and its implementing regulations – demonstrates the propriety of the Trust Agreement. And because the Trust Agreement terms of which Taylor complains are entirely consistent with – and in fact are required by – Federal law, there is no cognizable state-law-based cause of action founded on the notion that the Trust Agreement should be nullified, rescinded, or reformed, or damages paid because of its terms.

Accordingly, this Court should dismiss Taylor's complaint.

## QUESTIONS PRESENTED

1. Should this Court dismiss Taylor's claims because they are barred by the statute of limitations?

2. Should this Court dismiss Taylor's claims, or stay proceedings in this Court, pursuant to the doctrine of "primary jurisdiction" pending determinations by the IBLA concerning Taylor's appeal of the decision by BSEE to reject Taylor's request to be exempt from the regulations requiring Taylor to decommission the wells and remediate the contaminated soil?

3. Should the Court dismiss Taylor's claims for equitable or declaratory relief pertaining to the return of its funds held in Trust because this Court does not possess jurisdiction to entertain such claims?

4. Should this Court dismiss Taylor's claims because the contract terms Taylor complains about are in accord with Federal law which requires that Taylor remain liable for decommissioning the wells and remediating the contaminated soil?

## STATEMENT OF THE FACTS

### I. Oil Drilling And Production Operations On The Outer Continental Shelf Are Highly Regulated By The Federal Government

Oil and gas development and production operations on the outer continental shelf (OCS) are highly regulated by the Federal Government, with operators subject to the OCSLA, 43 U.S.C. §§ 1331-56b, and its implementing regulations issued by the DOI's Bureau of Ocean Energy Management (BOEM) and BSEE,[3] the Clean Water Act (CWA), and the OPA. And with the discharge of oil, the "Protection of Environment" regulations set forth in the National Oil and Hazardous Substances Pollution Contingency

---

[3]   BSEE and the BOEM were created out of the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE), which itself was created out of the MMS. MMS existed until 2010, when it was divided into two agencies, BOEMRE and the Office of Natural Resources Revenue (ONRR). Subsequently, in October 2011, BOEMRE was divided into BSEE and BOEM. Generally, today, BSEE oversees and regulates operations on the OCS and BOEM oversees and regulates leasing and financial assurance. MMS was the entity that executed the Trust Agreement on behalf of DOI. Compl. Ex. 1 at 19.

Plan (NCP) provide the organization and procedures for responding to oil pollution. *See* 40 C.F.R. Part 300 *et seq.* Although these statutes and regulations address a wide array of issues, certainly two central themes are that (1) lessees on the OCS who pollute are strictly liable for the pollution and (2) the responsibility for decommissioning OCS facilities remains with the lessee until the decommissioning is complete or the lessee has obtained a specific "departure" from regulators.

### A.     OCSLA

Several provisions of OCSLA are of relevance to Taylor's operational and decommissioning responsibilities given the ongoing oil leaks:

- 43 U.S.C. § 1332 (stating that the OCS is to be developed "subject to environmental safeguards");

- 43 U.S.C. § 1333(a)(2) (providing that Federal law pertains to the OCS, and that the adjacent State law shall be adopted as the Federal law, unless the State law is inconsistent with "other Federal laws and regulations of the Secretary [of DOI].");

- 43 U.S.C. § 1334 (authorizing DOI to promulgate regulations necessary to administer oil gas leases on the OCS and to issue rules and regulations to prevent waste and conserve the natural resources of the OCS);

- 43 U.S.C. § 1347(b) (authorizing DOI to require "wherever practicable, on existing operations," the use of best available and safest technologies (BAST) determined "to be economically feasible, wherever failure of equipment would have a significant effect on safety, health, or the environment, except where the Secretary determines that the incremental

benefits are clearly insufficient to justify the costs of utilizing such technologies");

- 43 U.S.C. § 1348(a) (authorizing DOI to enforce safety and environmental regulations promulgated under OCSLA); and

- 43 U.S.C. § 1348(b)(2) (stating that it is the duty of any lessee to "maintain all operations within such lease area or within the area covered by such permit in compliance with regulations intended to protect persons, property, and the environment on the outer Continental Shelf.").

**B.**     **Relevant BSEE Regulations**

BSEE's regulations addressing the prevention and control of pollution are found at 30 C.F.R. Part 250, Subpart C. For example, Section 250.300(a) requires a lessee to take measures to prevent pollutant discharges into offshore waters, and section 250.300(a)(1) requires a lessee to take immediate corrective action when pollution has occurred.

BSEE's regulations concerning lessees' and operators' decommissioning obligations are found at 30 C.F.R. Part 250, Subpart Q. Pursuant to Subpart Q, all lessees are obligated to decommission all wells and other facilities on their leases within one year after their lease terminates or is relinquished. *See* 30 C.F.R. §§ 250.1700-1703, 250.1710, 250.1725; Compl. ¶ 14. As a general rule, a lessee must undertake decommissioning actions until all required decommissioning is done. 30 C.F.R. § 250.1701(a). BSEE may, however, in its discretion authorize a lessee to use in the performance of its operations (including decommissioning) procedures other than those specified in its regulations, if the proposed alternate procedures or equipment are

10

shown to provide a level of safety and environmental protection that equals or surpasses the regulatory requirement. 30 C.F.R. § 250.141. BSEE may also authorize an exemption or "departure" from its regulations. 30 C.F.R. § 250.142.

## C.     <u>Relevant BOEM Regulations</u>

BOEM runs the Federal Government's OCS oil and gas leasing program, and it regulates lease acquisition, termination, cancellation, and relinquishment. BOEM also requires and regulates lessees' and operators' provision of financial assurance for, among other things, the decommissioning of their lease facilities.

Pursuant to 30 C.F.R. § 556.53(d) (2015), BOEM can require a lessee to provide security in addition to the "general bonds" that are required at various stages of a lessee's operations at a leased cite. *See* 30 C.F.R. §§ 556.52, 556.53(a), 556.53(b). BOEM is authorized to set the amount of such additional security in order to secure compliance with obligations under the lease and regulations. 30 C.F.R. § 556.53(e). Moreover, BOEM's bonding regulations provide that additional security may be retained by BOEM following decommissioning if BOEM determines potential liability remains, for which a general bond would be insufficient. 30 C.F.R. § 556.58(d)(2)(i). In such a case, BOEM must provide notice to the lessee that the additional security will be retained for seven years (or longer, if necessary, due to litigation). 30 C.F.R. § 556.58(d)(2)(ii).

As an alternative to using bonds to ensure compliance with obligations under the lease and regulations, BOEM can authorize lessees to use "lease-specific abandonment accounts" (such as the Trust at issue here) to meet additional security requirements. *See* 30 C.F.R. § 556.56. BOEM's regulations require that the funds deposited into a lease-specific abandonment account be pledged to meet the lessee's obligations under §

11

250.1703 (which sets forth the general requirements for decommissioning). *See* 30 C.F.R. § 556.56(a)(1). The regulations further require that the lease-specific abandonment accounts have funds to "cover all the costs of lease abandonment and site clearance as estimated by BOEM." 30 C.F.R. § 556(a)(2). In addition, the regulations require that any funds in a lease-specific abandonment account above the maximum amount of funds insurable by the Federal Deposit Insurance Corporation must be invested in Treasury securities, pledged to BOEM. Interest earnings from the funds may be paid to the operator who deposited the funds into the account. 30 C.F.R. §§ 556.56(a)(3), 556.56(b), 556.56(c).

### D.   <u>Other Applicable Federal Statutes</u>

Other Federal statutes impact the operations of oil and gas operators on the OCS, including the CWA and the OPA.

The CWA and its implementing regulations apply to oil exploration and development on the OCS. *In re Deepwater Horizon*, 745 F.3d 157, 166 (5th Cir. 2014). The CWA establishes that it "is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States." 33 U.S.C. § 1321 (1982). *See Total Petroleum, Inc. v. United States*, 12 Cl. Ct. 178, 180 (1987). Moreover, under the CWA, the cost of cleanup, should a discharge occur, lies with the owners of the facility discharging the oil. *See Cities Serv. Pipe Line Co. v. United States*, 4 Cl. Ct. 207, 209 (1983) *aff'd* 742 F.2d 626 (Fed. Cir. 1984). The CWA imposes strict liability upon the facility owner or operator unless one of only a few exceptions applies. 33 U.S.C. § 1321(i); *Sabine Towing & Transp. Co. v. United States*, 229 Ct. Cl. 265, 268, 666 F. 2d 561, 563 (1981).

Pursuant to the OPA, a lessee whose facilities emit pollution is considered a "responsible party." *See* 33 U.S.C. § 2701(32)(C) (defining a "responsible party" with respect to "offshore facilities" as "the lessee or permittee of the area in which the facility is located"). A responsible party is liable for all removal costs incurred by the United States, consistent with the National Contingency Plan,[4] with respect to a facility "from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters." 33 U.S.C. §§ 2702(a), 2702(b)(1). "Removal costs" are defined as "the costs of removal that are incurred after a discharge of oil has occurred or, in any case in which there is a substantial threat of a discharge of oil, the costs to prevent, minimize, or mitigate oil pollution from such an incident." 33 U.S.C. § 2701(31). A responsible party for an offshore facility is responsible for up to *"all removal costs* plus $75,000,000." 33 U.S.C. § 2704(a)(3) (emphasis added).

"Congress intended that the OPA would 'build [ ] upon section 311 of the Clean Water Act [§ 1321] to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution.'" *In re Deepwater Horizon*, 745 F.3d at 168. "The OPA prescribes a supplemental, comprehensive federal plan for handling oil spill responses, allocating responsibility among participants and prescribing reimbursement for cleanup costs and injuries to third parties." *Id.*

## E.    **Environmental Protection Regulations**

The "Protection of Environment" regulations set forth in the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) provide the Federal Government's organizational framework and operative requirements for responding to

---

[4]  The "National Contingency Plan" referenced here refers to the National Contingency Plan published under 33 U.S.C. § 1321(d). *See* 33 U.S.C. § 2701(19).

pollution incidents, both large and small. *See* 40 C.F.R. Part 300 *et seq.* The NCP

establishes a National Response System (NRS), which is a multi-tiered and coordinated

response strategy used to address oil spill incidents. Pursuant to the NCP, the Coast

Guard is the lead response agency for spills that occur in coastal waters and deep water

ports, and the Federal On-Scene Coordinator "directs response efforts and coordinates all

other efforts at the scene of a discharge or release." 40 C.F.R. §§ 300.120(a), 300.305,

300.322.

## II.    Taylor Assumed Oil And Gas Leases In The Mississippi Canyon

Taylor was the lessee and operator of three separate leases issued by the Federal

Government that Taylor obtained by assignment from third parties. Compl. ¶ 10.

Specifically, Taylor's leases were identified as lease numbers OCS-G 04935, OCS-G

15459, and OCS-G 15371 (collectively, the MC-20 leases, attached hereto as Exhibits A

through C respectively). *Id.* Twenty-eight wells were drilled on the MC-20 leases, ten of

which were drilled by Taylor after its acquisition of the leases.[5] Compl. ¶ 10. All 28

wells were connected to a single platform that stood on a portion of the seafloor called

the Mississippi Canyon (located approximately 19 miles offshore from the Mississippi

River Delta).[6] *See* Ex. E "Site-Specific Environmental Assessment of the Application

for Permit for the Decommissioning of Platform A and Lease Site Remediation at

---

[5]  It is undisputed that Taylor accrued decommissioning responsibility for all 28 wells.
30 C.F.R. § 250.1702.

[6]  The "Mississippi Canyon" name follows from the fact that there is a large subsurface
canyon created by the waters and sediment flowing from the Mississippi River Delta as it
enters into the Gulf of Mexico.

Mississippi Canyon Area, Block 20 for Taylor Energy Company" (Sept. 10, 1999) (2009 SSEA) at p.1.[7]

All three leases contained provisions that required Taylor to maintain its operations "in compliance with regulations intended to protect persons, property and the environment on the [OCS]." *See* Ex. A, B & C at § 12(b). The leases also required that Taylor remain obligated, even after it surrendered its leases, to leave the leased area "in a manner satisfactory to the [Regional] Director." *Id.* at § 21.

## III. The Collapse Of Taylor's Oil Drilling Platform And The Resulting Oil Leaks

On September 16, 2004, Hurricane Ivan passed through the Gulf of Mexico causing a violent shift in the sediments on the seafloor within the Mississippi Canyon where Taylor's platform stood. Compl. ¶ 11; *see also* Ex. F (Ecological Risk Assessment: Consensus Workshop; An Examination of the Potential Ecological Impacts of Response Alternatives Being Considered for Sheen Abatement for the Remnants of the Taylor Energy Company, LLC (2013)) (CERA Report) at 13-15.[8] The shifting sediments toppled Taylor's platform onto the ocean floor, about 440 feet below the ocean's surface and about 550 feet down slope of its original location. The platform's 28 wellbores (one for each well connected to the platform) lay in a tangled web buried by an average of 100 feet of sediment and mud. Compl. ¶ 11; Ex. F at 14. With the collapse of Taylor's platform, oil began to leak from the area of the submerged equipment. Compl. ¶ 11. Oil is still leaking from the site now almost twelve years later. *See, e.g.,* Ex. K, Compilation of oil discharge amounts for Taylor Energy between 2013 and May 2016 as published by

---

[7] Taylor's Complaint cites and discusses the 2009 SSEA. *See* Compl. at ¶ 46.

[8] Taylor discusses the CERA Report at paragraphs 48-53, 60, and 87 of its Complaint.

the United States Coast Guard's National Response Center (NRC) Homepage at http://nrc.uscg.mil/.[9]

After the platform's 2004 collapse, Taylor surveyed the area around its toppled platform, but took no actions to stop the oil leaks for three years. *See* Ex. F. at 16.

Taylor's MC-20 leases terminated on June 28, 2007. Compl. § 16. Pursuant to its regulatory authority, MMS ordered Taylor to permanently plug and abandon all of the wells at the collapsed platform site within one year, *i.e.*, by June 28, 2008. *Id.* At that point, of Taylor's 28 wells at the MC-20 site, 25 needed to be decommissioned (three of the wells had been temporarily abandoned by Taylor before Hurricane Ivan, and the Government deemed them permanently plugged and abandoned). Compl. ¶ 12.

## IV. Taylor Enters Into The Trust Agreement To Ensure That Funds Are Available To Decommission Its Facilities And To Remediate The Contaminated Soil

In 2008, Taylor, which held numerous Federal OCS leases other than the three leases at MC-20, completed the sale and assignment of all of its other leases. Compl. ¶ 19. MMS, which had approval authority over the assignments, required that Taylor use some of the funds generated from the sale of its other leases to fund decommissioning activities at the MC-20 site. *Id.*

Under its regulatory authority, MMS was authorized to require Taylor to provide a secure financial assurance that Taylor would have the funds to perform the decommissioning work at the MC-20 site. *See* 30 C.F.R. § 556.52, et seq., Subpart I "Bonding" (establishing bond requirements for the lessee of an OCS oil and gas lease).

---

[9] The oil leak amounts reported at the NRC website are based upon observations of the size and thickness of the oil sheen on the ocean's surface as seen from overflights of the MC-20 area.

As noted above, one option available to Taylor, with the approval of the Regional Director, was a lease-specific abandonment account in lieu of a bond. *See* 30 C.F.R. § 556.56(a). Thus, pursuant to its regulatory authority, MMS required that Taylor contribute funds to a Trust, as a lease-specific abandonment account, in an amount equal to the initial estimate of the costs to decommission Taylor's facilities at MC-20. *Id.*

On March 19, 2008, Taylor entered into the Trust Agreement as the settlor, with the United States, through DOI, as beneficiary, and JPMorgan Chase Bank, N.A. (JPMorgan) as the Trustee. Compl. ¶ 20 and Ex. 1 at p.1. The Trust Agreement specifies that the parties entered into it "to fulfill certain obligations to plug and abandon the wells, remove a portion of the platform and facilities, clear the seafloor of obstructions and take corrective action associated with the wells and facilities" at MC-20. Compl. ¶ 20 and Ex. 1 at pp. 1, 3 at § 1.2(d); *see also* Compl. at ¶¶ 22-24 and Ex. 1 at Schedule A; Compl. ¶ 70. Taylor was required to complete these decommissioning obligations by the earlier of the date mandated by Federal laws and regulations, the leases, or a "Work Plan" that Taylor was obligated to create in order to detail its plan for decommissioning the collapsed platform and wells. Compl. Ex. 1 at § 5.3.

Pursuant to the Trust Agreement, Taylor deposited $666,280,000 into a Trust Account. Compl. ¶ 21. The amount of the deposit was based upon a schedule attached to the Trust Agreement, which set forth an initial estimate of the costs of: (1) plugging and abandoning the 25 wells; (2) removing the platform deck; (3) clearing the seafloor of obstructions; (4) removing pipelines; and (5) removing contaminated soil. Compl. ¶ 25 and Ex. 1 at Schedule A ("Work Cost Estimates"). The schedule detailing the remediation costs states that Taylor's "work plan and obligations under this Trust

agreement will conform to MMS regulations contained in 30 C.F.R. 250 Subpart Q –
Decommissioning Activities and Subpart C – Pollution Prevention and Control for the
decommissioning of [the MC-20 leases]." Compl. Ex. 1 at Schedule A.

MMS's regulations at 30 C.F.R. Part 250, Subpart Q, "Decommissioning
Activities," hold a lessee such as Taylor "responsible for meeting decommissioning
obligations for facilities on leases . . . *until each obligation is met*." *See* 30 C.F.R. §
250.1701(a) (emphasis added). The decommissioning requirements include an obligation
that the lessee "[p]ermanently plug all wells" to certain specified standards. 30 C.F.R.
§§ 250.1703(b), 250.1714-1716. And at 30 C.F.R. Part 250, Subpart C, "Pollution
Prevention and Control," MMS's regulations state that, when pollution occurs as a result
of a lessee's operations, the "control and removal of the pollution to the satisfaction of
the District Manager shall be at the expense of the lessee," who is required to take
"[i]mmediate corrective action." 30 C.F.R. § 250.300(a)(1).[10]

Although the United States is the beneficiary of the Trust Agreement, it is not the
direct recipient of *any* of the Trust funds – unless Taylor defaults upon its remedial
obligations, and even in that case the United States would only direct the Trustee to
disburse funds to pay for a third party to satisfy Taylor's defaulted obligations. *See*
Compl. Ex. 1 at 2.5(b) ("The Beneficiary shall not withdraw or transfer from the Trust
Account any of the Trust Funds other than as provided for herein."); *id.* at § 4.8
(providing for the transfer of the Trust Funds to the United States if Taylor declares
bankruptcy, fails to complete the remediation work, or fails to comply with material

---

[10]   Moreover, if the lessee fails to control and remove the pollution, the Regional Director
"shall have the right to control and remove the pollution at the lessee's expense" and that
action "shall not relieve the lessee of any responsibility provided for by law." 30 C.F.R.
§ 250.300(a)(2).

provisions of the Trust Agreement). Instead, disbursements from the Trust are intended to go to *Taylor to cover its* remediation expenses. *See id.* at §§ 4.1, 4.2.

The Trust Agreement further provides that any interest earned by the funds in the Trust is the sole property of Taylor and is to be distributed to Taylor on a quarterly basis. *Id.* at § 4.4. Moreover, Taylor, as Settlor, is entitled to direct the Trustee "regarding the allocation of all Trust Funds in interest-bearing Cash Equivalents." *Id.* at § 2.6.

Fees connected with the Trustee's administration are paid by Taylor (using non-Trust funds) to JPMorgan at a rate of 10 basis points per year based upon the value of the Trust's holdings. Compl. Ex. 1 at § 2.9 and at Schedule C.

Finally, the Trust Agreement provides that, *after Taylor has completed the remedial work* in its requisite Work Plan, the Trustee will "hold back" $50 million for three-and-a-half years, reducing that figure to $25 million for an additional three-and-a-half years. These "hold back" funds are to serve "as a cash reserve guarantee to fund any operations required due to a failure of completed Work." Compl. Ex. 1 at § 4.7. Thus, the parties understood that there remained a risk that the decommissioning measures, even if initially successful, could later fail. And to be clear: the Trust Agreement required that the decommissioning efforts using the Trust funds are to continue *until the oil leaks have stopped* – and only then will the hold back funds be released to Taylor:

> The Beneficiary's written concurrence [to release the hold-back funds] will be promptly given if the Settlor provides written documentation that monitoring of all Work completed to date ***shows no detectable leakage.***"

Compl. Ex. 1 at § 4.7 (emphasis added).

This "hold back" provision is consistent with the Trust Agreement's Termination clause, through which the parties agreed that the Trust Agreement will terminate upon

Taylor's compliance with all of its remedial "Obligations" pertaining to the remaining wells as set forth in Schedule A of the Trust Agreement. And the parties recognized that the obligations in Schedule A arose "pursuant to the terms of the Leases and applicable federal regulations related to such Leases." Compl. Ex. 1 at § 1.2(d). Specifically, the Termination clause stated:

> **Termination.** This Trust Agreement shall terminate upon the occurrence of either of the following conditions:
>
> (a)    Mutual written agreement of the Settlor and Beneficiary; or
>
> (b)    Settlor's compliance with all Obligations as evidenced by written concurrence of the Beneficiary. If this Trust Agreement terminates upon the occurrence of this condition, the Trustee shall transfer all Trust Funds as directed by the Settlor.

Compl. Ex. 1 at § 6.8.

The Trust Agreement further provides that Taylor "will promptly certify to [the United States] in writing when all Obligations have been properly completed . . . in material compliance with all applicable federal laws and regulations . . . [and with] the terms and conditions of the Lease(s)" (except to the extent that the Plan expressly contemplates an approved variance from the laws, regulations, or terms of the Leases). Compl. Ex. 1 at § 4.5; Compl. ¶ 29.

With the completion of its remediation obligations, Taylor would receive all remaining Trust funds (except the hold back funds as described in section 4.7). Compl. Ex. 1 at § 4.6; Compl. ¶ 29.

In connection with the Trust Agreement, Taylor, DOI, and JPMorgan entered into a contract setting forth the procedures to carry out the disbursement provisions of the

Trust Agreement. Compl. ¶ 27 and Ex. 2 (Agreement Between Taylor Energy Company LLC and the Minerals Management Service to Implement Article IV – Disbursements of the March 19, 2008 Trust Agreement) (Disbursement Agreement). Apart from further recognizing that the Trust funds were to be disbursed directly to Taylor in connection with its remedial expenses, the Disbursement Agreement set forth various scenarios describing how the distribution of Trust funds would work. In one of the scenarios, the Disbursement Agreement forecasts how Trust payments would work in a situation where Taylor begins to decommission a well; the work is stopped after Taylor encounters a problem that the parties agree "permanently prevents any further operations on that well;" but, later, circumstances change and Taylor resumes operations on the well. *See* Compl. Ex. 2 at 3, at Example 1. Thus, the parties expressly recognized that the agreement covered a situation where Taylor stops remediation work because of a problem that "*permanently*" prevents further work on a well, and yet, later, circumstances change so that remediation work can resume.

## V. The Oil Leaks Are Continuing

By assessing the size and density of the oil sheen on the ocean's surface through aerial overflights of the sheen area issuing from the MC-20 site, Taylor has for the last several years reported the estimated size of its oil leak, on a near-daily basis, with this information provided to the Coast Guard. The Coast Guard then publishes the reported discharge amounts (along with nationwide pollution discharges) at the Coast Guard's National Response Center (NRC) Homepage. *See* http://nrc.uscg.mil/. We have compiled a composite exhibit setting forth the NRC reports for Taylor from 2013 to the

present. *See* Ex. K. The average daily oil leak occurrence reported, in 6 month intervals is as follows:

3.6 gallons between January and June 2013;

4.8 gallons between July and December 2013;

2.4 gallons between January and June 2014;

74 gallons between July and December 2014;

94 gallons between January and June 2015;

123 gallons between July and December 2015;

112 gallons between January and April 2016.

*See* Ex. K (at averages on June 30 and December 31 of each year).

Certainly, within each year there is wide variety in the daily leak amounts. For example, in 2015 the highest reported oil leak was 2,329 gallons; in 2016, the highest oil leak to date has been 702 gallons. Ex. K (at April 1, 2015, and January 29, 2016).[11]

## VI.   Taylor Discovers The Difficulty Of Pursuing Conventional Plugging And Abandonment Techniques Due To The Burial Of The Wellbores

Pursuant to regulations for the "Protection of Environment," in the fall of 2007, the Coast Guard established a "Unified Command" composed of Taylor, DOI and the Coast Guard. Compl. ¶ 18; *see also* 40 C.F.R. Part 300.5. The Unified Command is led by a Federal on-scene-coordinator (FOSC), who is a member of the Coast Guard. 40 C.F.R. 300.120. In its role as the FOSC, the Coast Guard directs all response efforts to

---

[11]   In September 2014, following a workshop ordered by the Unified Command to provide Taylor's pilots with a standard operating procedure to more accurately assess the amount of oil as reflected in the size and density of the oil sheen, the reported amount of oil in the sheen increased dramatically relative to earlier reported amounts. This fact suggests that the earlier, smaller leak amounts were reported in error.

contain and cleanup a spill, which includes overseeing the responsible party's cleanup efforts. *Id.*

As noted above, in the fall of 2007, MMS ordered Taylor to permanently plug and abandon all of the wells at the collapsed platform site within one year. Compl. ¶ 12; *see* above at 16. Accordingly, Taylor undertook various survey activities to assess the conditions on the seafloor surrounding the fallen platform and to determine the location of the oil leaks. Ex. F at 16-17. In December 2007, Taylor initiated a study that consisted of evaluating, in the MC-20 area, oil in the water column and in the sediment generally and at "hot" or polluted areas. *Id.* This study indicated that oil leakage was greatest near the platform's original wellheads; that oil and natural gas were actively venting from discrete locations in the seabed; and that the sediment was contaminated with oil, with greatest concentrations within the original wellhead area. *Id.* at 17.

At that point, Taylor concluded that it was "impossible" to pursue "conventional plugging and abandonment activities due to the sheer volume and consistency of the overlying mud and sediment, the tangled web of wellbores and the environmental risks associated with accessing the wells under these circumstances." Compl. ¶ 35. Conventional plugging and abandonment typically involves re-entering a target well internally from the surface, maintaining well control and inserting cement plugs. Compl. ¶ 37.

In March 2008, Taylor received a report it commissioned from Dr. Harry Roberts and Dr. Robert Bea, which reviewed the proposed excavation of the contaminated soils for the purpose of pursuing conventional plugging and abandonment work. *See* Ex. G Taylor Energy Company MC20 Final Risk Assessment and Cost Estimate Report (2014)

23

(Taylor's FRACE Report) at 22 (Introduction). [12] Their report concluded that removing

the soils was not possible and thus that conventional plugging and abandonment

procedures, assuming reasonable safety parameters, were not technically feasible. *See*

Ex. F at 48; Ex. I, Dr. Harry Roberts & Dr. Robert Bea, *Stability Analyses of Excavation*

*of Submarine Apron of Mississippi River Delta Block 20, Mississippi Canyon Area Gulf*

*of Mexico* (March 1, 2008) at 4 (concluding that "[t]he excavation area and volume

modeled with a reasonable [Factor of Safety of 1.5] is not technically feasible"); *see also*

Compl. ¶ 45 (Taylor's experts concluded "that removal of the contaminated soil was not

technically feasible . . . and would pose greater environmental risk than benefit.").

In April 2008, at Taylor's request, the Government approved a departure from

standard decommissioning procedure, which allowed Taylor to plug and abandon wells

by drilling intervention wells rather than by conventional plug and abandonment

methods. Compl. ¶ 36. Taylor proceeded to drill intervention wells on nine of the 25

wells that it was required to decommission, with the last of the intervention wells

completed in March 2011. *Id.* at ¶ 39.

According to the allegations of the Complaint, in order to complete these

intervention wells, Taylor, together with an engineering firm it retained, "invented new

patented technologies." *See* Compl. ¶ 38 and at 16 n.6. Although Taylor drilled its first

two intervention wells using existing technology, by the time it began drilling its third

intervention well, A-16, in November 2009, Taylor was using its newly-invented

technology. *See* Ex. G at 42-43. [13]

_____

[12] Taylor's FRACE Report is discussed at paragraphs 55-58, and 60 of its Complaint.
   [13] Although these facts are not necessary for our motion given Taylor's
acknowledgement that it has invented new technology, upon information and belief, the

Taylor has not undertaken any intervention activity on the remaining *sixteen* wells (*e.g.*, by drilling an intervention well, or by conventional plugging techniques). Compl. ¶ 41. According to Taylor, the decision whether to drill intervention wells with respect to the remaining 16 wells involves complex assessments of technical issues connected with intervention well activity in the context of the potential for increased oil leaks if the intervention were to fail:

> [W]ith the drilling of each additional intervention well at MC20, the risk of adverse environmental consequences increases due to factors such as the close proximity of the target wells, the potential for well collisions, the potential for inadequately plugged perforations to be in communication with higher pressured reservoirs, resulting cross-flow potential, breaches of near-surface seals and other threats to well integrity, all of which could result in an induced flow event from a currently static wellbore for which a technical solution would likely not exist to terminate the flow.

Compl. ¶ 44.

## VII. The 2009 SSEA Report Indicates That Removal Of The Contaminated Soil Would Pose Greater Environmental Risk Than Benefit

In September 2009, Taylor received an assessment from MMS that concluded that natural sedimentation capping of the contaminated soil over a period of time (*i.e.*, undertaking no remediation) would pose less environmental impact than attempting to dredge and remove the contaminated soil. Compl. ¶ 46 (citing the 2009 SSEA); *see* Ex. E at 10 (at "Soil Remediation" and "Conclusion"). According to Taylor, in the 2009 SSEA, MMS concurred with the independent experts retained by Taylor that removal of

---

newly-invented technologies involve, among other things, the invention of new perforating charges (as a means for an intervention well situated next to a target well to penetrate that target well from outside the well tubing) and active magnetic ranging (as a way to more accurately locate a subsurface well).

the contaminated soil would pose greater environmental risk than benefit and that the more environmentally beneficial choice was to leave the soil in place to allow for natural attenuation. Compl. ¶ 46.

## VIII. The Unified Command Convenes Various Groups To Study The MC-20 Problems

The Unified Command, led by the Coast Guard, convened several groups of Government and Taylor-retained personnel to study an array of issues connected with the oil leaks at MC-20.

### A. The Technical Committee

In early 2012, the Unified Command established a technical committee, composed of experts from BSEE, the Coast Guard and Taylor, to analyze the technical risks of drilling further intervention wells for the remaining sixteen wells. Compl. ¶ 43. The technical committee assessed each well, including an assessment of:

> (1) reservoir parameters and a determination of the well's ability to flow to predict potential future flow from the wellbore and/or remaining open reservoirs; (2) historical production history; (3) the integrity of existing wellbore components and subsurface safety devices to determine their potential to fail; and (4) a detailed review of all drilling-related risks involved with well intervention on each specific well.

*Id.*

### B. The Sheen Source Workgroup

In 2012, the Unified Command established a second technical committee, the Sheen Source Workgroup, which is comprised of experts from BSEE, BOEM, Coast Guard, National Oceanic and Atmospheric Administration (NOAA), and Taylor. Compl. ¶ 47. The Sheen Source Workgroup's task was to identify the source of the oil pollution

at the MC-20 site. *Id.* The Sheen Source Workgroup is currently involved in ongoing efforts to identify the precise place or places where the oil pollution is being issued at the MC-20 site.

### C.   The CERA Workshop And Report

In May and June 2013, the Unified Command convened a group of "policy officials and experts from BSEE, BOEM, DOI, the Coast Guard, Taylor, NOAA, the Environmental Protection Agency (EPA), the United States Geological Survey, the United States Fish and Wildlife Service, Louisiana State University, Louisiana Department of Environmental Quality, Louisiana's Oil Spill Coordinator's Office," (Compl. ¶ 49) and outside experts retained by Taylor. The Unified Command convened the group to conduct a Consensus Ecological Risk Assessment (CERA), which resulted in the production of the CERA Report (*id.*), which was drafted by employees of Ecosystem Management and Associates, Inc., a firm retained by Taylor. *See* Ex. F at ii. The Federal agencies involved in the CERA workshop have "expertise and jurisdiction over prevention of pollution from OCS wells." Compl. at ¶ 53. The analysis undertaken by the CERA workshop centered on an evaluation of the ecological consequences of soil removal and on the environmental risks of drilling additional intervention wells. Compl. ¶ 48; Ex. F at 2. The analysis assumed an average oil leak of *only three gallons per day* (based on the sheen reports). Ex. F at 1.

The CERA Report set forth the results of various environmental investigations that had used a range of techniques (*e.g.*, acoustic survey, soil sampling and chemical forensic analysis). *Id.* at 20. And it described various Ecological Risk Ranking Matrices. *See id.* at 26, 30-33.

The CERA Report concluded that "the current situation presented relatively low levels of ecological risks," (Ex. F at 2) and that "[w]ell intervention was not recommended because drilling intervention wells was not expected to provide sufficient ecological benefit to offset the risks and impacts associated with drilling and plugging operations, even though multiple well conduits may remain open for potential flow." *Id.* at 3; *see* Compl. at ¶ 51. Thus, according to Taylor, the CERA Report recommended that Taylor "not pursue additional well intervention" and "not pursue dredge/dispose or dredge/cap options [of the contaminated soil]" because, in both cases, "the ecological risks outweigh the possible benefits." *Id.* at 3; Compl. at ¶¶ 50, 51, 52.

### D. The Establishment Of Working Groups To Conduct Further Analyses Concerning Oil Discharge Scenarios And A Cost Estimate For Incident Response Activities

After the CERA Report was issued, BSEE established a working group to (1) develop worst case discharge scenarios for all of the wells at the MC-20 site; (2) project potential discharge flow rates for the wells at MC-20; and (3) develop a risk analysis summary. Compl. at ¶ 54. In addition, the Coast Guard established a working group to develop a cost estimate for incident response activities necessary to address any residual risk posed by oil discharges at MC-20. *Id.*

### E. The FRACE Workshop And Report

In March 2014, another workshop, the Final Risk Assessment and Cost Estimate (FRACE) workshop, was convened to address certain scientific and factual issues regarding the MC-20 oil leaks. Compl. ¶ 55. In connection with the workshop, Taylor commissioned a report (Taylor's FRACE Report) that addressed certain studies and analyses performed with respect to the MC-20 site, with hyperlinks to a compilation of

"all prior studies and analyses that had been conducted with respect to the MC20 site."
*Id.* at ¶ 56; *see* Ex. G at 108-112 (listing 93 engineering and risk reports, studies and documents relied upon by the author of Taylor's FRACE Report).

Taylor's FRACE Report provided a summary of the response to the ongoing oil releases, asserting that the "complex nature of this response effort has been unprecedented." Importantly, the Report stated that Taylor's response "actions included developing new technologies and drilling intervention wells to plug nine of the wells." Ex. G at 8 ("Executive Summary"). Indeed, Taylor's FRACE Report asserted that Taylor and its team "devised a novel strategy . . . and created new patented technologies to accomplish successful interventions." *Id.* at 10 ("Decommissioning Actions and Well Interventions"); *see also id.* at 27 (noting that, in late 2007, Taylor concluded that "the only remaining option to access any specific buried MC20 wellbore" would be to use "a unique approach, unprecedented in complexity and scope, involving the drilling of 'expendable intervention wells' to locate and plug the target wells"); *id.* at 42-43 (describing the new technology Taylor developed to deal with the decommissioning of its wells). *See also* Compl. ¶ 38 and at 16 n.6.

Taylor's FRACE Report stated that "there continues to be a low volume hydrocarbon release at the site, resulting in a sheen expression on the surface, averaging *less than 4 gallons* per observation. The rate of release equates to approximately one drop of oil being released each minute from a two square foot area on the mud line." Ex. G at 9 "Current Site Status" (emphasis added). The Report further stated that there are "occasional larger surface expressions of hydrocarbons. . . . (still reflecting gallons, not barrels)." *Id.*

Taylor's FRACE Report asserted that "[t]he risks of intervening in the remaining 16 wells include inherently risky well interventions potentially resulting in well collisions, inadequately plugged perforations that are in communication with higher pressured reservoirs, cross-flow potential, breaches of near-surface seals, and other threats to well integrity." *Id.* at 12.

Taylor's FRACE Report concluded that, of the 16 wells that had not been remediated, only two had the ability for oil flow, and only at a rate of slightly more than half-a-barrel of oil per day. *See id.* at 53 ("Well Risk Workgroup Conclusions.")

One of the reports attached to Taylor's FRACE Report was prepared on Taylor's behalf and set forth an assessment of potential costs and impacts associated with hypothetical future releases from the MC-20 Wells. Compl. at ¶ 57. Specifically, as reported in the FRACE Report, one of the persons retained by Taylor, Dr. Dagmar Schmidt Etkin of Environmental Research Consulting, concluded that a worst case scenario for MC-20 would be a discharge of 3.8 barrels a day for 30 days, or a total over 30 days of 114 barrels. Ex. G at B ("Coast Guard's Response Cost Estimate Workgroup") at 15-16; Compl. at ¶ 57. And "[o]ne of Dr. Etkin's key conclusions with respect to her assessment of discharge scenario probabilities was that the overall annual probability of a spillage or leak event from one or more of the MC20 wells is very low; an incident would be expected once in 1,742 years." Compl. at ¶ 57; *see* Ex. G at 64. Dr. Etkin concluded that, if there was a spillage event, the oil volume would likely be

very small with a median predicted volume of 7.3 barrels (or approximately 307 gallons). *See* Ex. G at 64.[14]

Taylor's FRACE Report covered a wide array of highly technical issues including, for example, the possibility of well pipe corrosion (Ex. G at 59-61); sand strength analysis at the MC-20 site (*id.* at 65-67); the possibility of sediment plugging the wells (*id.* at 67 -68); the effect of the bent well pipes in restricting potential oil release rates (*id.* at 69); the possibility for constructing a containment system (*id.* at 71-75); a review of the activities by the Sheen Source workgroup to locate the precise location of the oil leaks (*id.* at 76-82); and the modeling of costs associated with future oil leaks (*id.* at 87-89).

The two-day FRACE workshop concluded with a request from the Government for additional time for consideration and evaluation of the risk assessment and cost estimate analyses and conclusions. Compl. ¶ 58.

## IX. BSEE, BOEM, Coast Guard, And The Department Of Justice Issue Their Views On The Status Of Taylor's Ongoing Oil Spill

On May 14, 2015, BSEE, BOEM, Coast Guard, and the Department of Justice jointly issued a two-page document entitled "The United States' Views on the Status of Taylor Energy Company's Obligations at Well Site MC-20 and Taylor Energy's Ongoing Oil Spill" (the US Views document) (attached hereto as Ex. N). *See* Compl. ¶ 59. In the U.S. Views document, the Government lists twenty points reflecting the United States' view of the circumstances of Taylor's remaining obligations and the ongoing oil leak at MC-20. The U.S. Views Document noted that "[t]he work that Taylor Energy committed

---

[14] There are 42 gallons in a barrel of oil. *See* http://www.bsee.gov/Inspection-and-Enforcement/Accidents-and-Incidents/Spills/.

to do in the 2008 Trust Agreement has not been completed." Ex. M at 1 ¶ 7; Compl. ¶

59. And the U.S. Views Document notes that:

> The reports and analysis presented by Taylor Energy's consultants to the Interagency Work Groups do not represent the views of the United States. Significant uncertainty exists related to the opinions about future events, including worst case discharges, sources, cross-flows, pressure recharge in the oil reservoirs, evolving technology, and suitable remedial measures.

Ex. M at 2 ¶ 14. For example, "the United States does not agree that 3.8 barrels per day

for 30 days is the 'worst case discharge' possible from the MC-20 site. The potential

worst case discharge could be considerably greater than this, both as to volume and

duration." *Id.* at 1 ¶ 4.[15]

> Furthermore, the U.S. Views Document stated that:

> Any assertions regarding the availability or unavailability of "existing" technology to completely stop and contain the ongoing discharge do not resolve the issue as to whether this discharge can be stopped or contained in the near or more distant future based on improved technology.

> If proper well plugging and abandonment is not currently technologically feasible, there is still more that can be done to control and contain the oil that is discharging from the well site.

Ex. M at 2 ¶¶ 15-16; *see* Compl. at ¶ 59.

And the U.S. Views Document stated that "DOI's estimate of the costs necessary

for completing the remaining obligations under the 2008 Trust Agreement exceeds the

amount of funds currently in the Trust." Ex. M at 2 ¶ 8. The document then stated that

---

[15] The oil discharge data reported to the NRC shows that the "worst case scenario" projected by one of Taylor's experts, Dr. Etkin, of 3.8 barrels per day for 30 days, for a total of 114 barrels *has already been exceeded. See, e.g.,* Ex. K at the 30 day period between June 1, 2015 and June 30, 2015: 5,477 gallons, or 130 barrels of oil observed on the ocean's surface.

there should be "[n]o reversion or partial reversion of Trust funds . . . until the oil spill is permanently stopped and decommissioning work and related oil containment/removal work is completed." *Id.* at 2 ¶ 10; Compl. ¶ 59.

At approximately the same time that the U.S. Views document was issued, BOEM and BSEE published a fact sheet, "Taylor Energy Oil Discharge at MC-20 Site and Ongoing Response Efforts" (May 2015) (attached hereto as Ex. N),[16] and the Coast Guard published a fact sheet "Taylor Energy Oil Discharge at MC-20A Well Site and Ongoing Response Efforts" (May 13, 2015) (attached hereto as Ex. O).[17] Many of the statements in the U.S. Views Document were also set forth in these two documents.

## X. Taylor Has Attempted To Avoid Further Intervention Obligations To Stop The Oil Leaks By Requesting A Departure From The Decommissioning And Pollution Prevention Regulations And By Filing Claims In DOI's IBLA

On March 24, 2010, Taylor filed an initial departure request with MMS requesting that MMS "require no further plugging and abandonment operations for the 16 designated wells at MC 20." Taylor withdrew that request two years later.

On March 21, 2014, two months after the FRACE workshop, Taylor again requested a departure from further well decommissioning efforts for each of the 16 remaining wells at MC-20. Compl. ¶ 60. Specifically, Taylor requested that BSEE grant departures and require no further decommissioning operations for the 16 remaining wells at MC20 because, according to Taylor, the risks associated with intervention and the

---

[16]  BOEM's and BSEE's fact sheet can be found at: http://www.bsee.gov/Inspection-and-Enforcement/Accidents-and-Incidents/Taylor-Energy-Oil-Discharge-at-MC-20-Site-and-Ongoing-Response-Efforts/.

[17]  The Coast Guard's fact sheet can be found at: http://www.bsee.gov/Inspection-and-Enforcement/Accidents-and-Incidents/Taylor-Energy-U-S--Coast-Guard-Fact-Sheet/.

extraordinary operational costs outweigh any potential benefits. *Id.* In addition, Taylor requested that BSEE grant a departure or alternate procedure authorizing the use of subsea containment systems as a means to capture any unanticipated discharges. *Id.* Finally, Taylor requested that BSEE grant a departure or alternate procedure authorizing any contaminated sediments to be left in place so that natural sedimentation could form a cap over the contaminated sediments. *Id.* Taylor asserted that the departure request was "in conformity with the primary 'consensus' conclusions reached in the CERA Report, as further supported by additional studies and analyses in the FRACE Report, that concluded that the drilling of any additional intervention wells or attempts to remove the contaminated soil would pose greater ecological risk than benefit." *Id.*

On May 11, 2015, the Government denied Taylor's departure requests. Compl. ¶ 61; Letter from Lars Herbst (BSEE) to William W. Pecue, III (Taylor) dated May 11, 2015 (attached as Ex. P). In its letter denying Taylor's departure requests, BSEE noted that "there continues to be an oil sheen on the sea surface." Ex. P at 2. Indeed, BSEE noted that "the average reported daily oil volume on the sea surface over the past seven months has been over two barrels [or 84 gallons]. . . . [with] 4 days [in which the volume was] greater than 35 barrels [or 1,470 gallons]." *Id.*

> As is evident from the continuing pollution and surface oil sheen in the area of the wells in question, hydrocarbons are still escaping the seafloor and entering the environment. Taylor has asserted that these hydrocarbons are escaping from contaminated sediment that will eventually be covered with more sediment, ending the hydrocarbon escape. Taylor, however, has provided no clear evidence to support its assertion that hydrocarbons are coming from contaminated sediment and not from leaking or unplugged wells. Nor is there any way to predict whether, in the future, sufficient mud/sediment will ever be deposited to seal ongoing or future flow, leaks, or seepage. Further,

there is the possibility that, in this unstable region, mud
could be removed from the area, rather than deposited,
leaving less mud and sediment cover over any
open/leaking/flowing unplugged wells. . . . Taylor's
Departure Request of March 24, 2010, candidly admits,
throughout its length, that there are many unknowns
concerning these unplugged wells and their fitness after the
destruction wrought by Hurricane Ivan. Essentially, the
integrity of each part of each of the 16 wells is unknown,
and weaknesses or failures of any of these parts could
cause, and may now be causing, leaks, seeps, or flows of
hydrocarbons.

Ex. P at 3.

Continuing, BSEE stated that it "agrees that there may be risks associated with

further intervention, and that the costs are high, but there is no way to know whether, in

the future, hydrocarbons in significant quantities could flow from the 16 unplugged wells,

or even from the 9 wells for which intervention wells were drilled." Compl. ¶ 61; Ex. P

at 3-4.

With respect to Taylor's request to allow a containment system to substitute for

the regulatory plugging and abandonment requirements, BSEE declined Taylor's request,

noting that Taylor had previously installed containment domes to collect leaking oil but

that "there were operational issues, including sinking into the seafloor, which rendered

them less than optimally-functional." Ex. P at 4. BSEE further noted that none of the

containment domes were presently operational and that Taylor had yet to deploy a new

subsea containment system, despite having been ordered to do so in 2012 by the Coast

Guard. *Id.*

Finally, BSEE denied Taylor's request to leave the contaminated soil in place. *Id.*

at 5. BSEE then stated that there may be "the possible need to remove the contaminated

soil in order to reach the still-vertical portions of the wellbores to perform more

conventional decommissioning." Compl. ¶ 61; Ex. P at 5.  And BSEE declined Taylor's

request "that would allow the contaminated sediment to remain permanently in place

without the option to require Taylor to remove it at some point in the future should such

removal become necessary." Ex. P at 5; Compl. at ¶ 61.

In concluding, BSEE stated that:

> [G]iven the continuing discharge of oil from the MC-20
> site, Taylor's inability to contain the discharge, and the
> possibility that future plugging and abandonment work
> and/or the removal of contaminated sediments may be
> required, BSEE denies Taylor's Request.

Ex. P at 5; Compl. at ¶ 61.

On July 9, 2015, Taylor filed a notice of appeal with the IBLA seeking review of

BSEE's rejection of Taylor's departure requests.  *See* Ex. H, Letter from Eric Andreas

(DOI Office of Solicitor) to IBLA (dated July 10, 2015) enclosing Taylor's Notice of

Appeal.  In its Notice of Appeal, Taylor argued that BSEE's denial of Taylor's departure

requests was "arbitrary, capricious, and an abuse of discretion, not in accordance with

law, and unsupported by evidence in the record." *Id.* at 2.  Further, Taylor argued that,

over the past decade, it had "conducted all requested expert analyses; convened broad

stakeholder workshops; and worked diligently to implement all requested existing

technology and to develop, design, and implement new technology when existing

remediation methods were unworkable." *Id.*

Finally, in support of its argument before the IBLA that a departure from

decommissioning obligations should be granted, Taylor stated "Taylor funds remain in

trust with the United States government for use in the unlikely event of a future

discharge." *Id.* at 3.  Thus, Taylor has argued on one hand that it should be allowed to

cease further efforts to decommission the wells and remediate the soil based in part on the ongoing security provided by the Trust funds (before the IBLA), and on the other hand that it should no longer be obligated to provide Trust funds to secure its obligations to decommission the wells or address the contaminated soil (in this lawsuit). The IBLA has not issued its decision with respect to Taylor's appeal.

## ARGUMENT

### I.    Standards Of Review

Jurisdiction is a threshold issue, and a court must satisfy itself that it has jurisdiction to hear and decide a case before proceeding to the merits. *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 338 F.3d 1353, 1356 (Fed. Cir. 2003). In examining jurisdictional facts, a court may consider all relevant evidence, including material outside the pleadings. *See Land v. Dollar*, 330 U.S. 731, 735 & n.4 (1947); *KVOS, Inc. v. Associated Press*, 299 U.S. 269, 278 (1936); *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999); *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985); *Chisolm v. United States*, 82 Fed. Cl. 185, 192 (2008).

When jurisdictional facts are challenged, the plaintiff must prove any disputed jurisdictional fact by a preponderance of the evidence. *McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014); *Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012); *Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993); *Reynolds v. Army & Air Force Exchange Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). "If a Rule 12(b)(1) motion challenges a complaint's allegations of jurisdiction, the factual allegations in the complaint are not controlling and

only uncontroverted factual allegations are accepted as true." *Shoshone*, 672 F.3d at

1030 (citing *Cedars–Sinai,* 11 F.3d at 1583).

A complaint should be dismissed for failure to state a claim upon which relief can

be granted "when the facts asserted by the claimant do not entitle him to a legal remedy."

*Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). Labels, conclusions, and

conclusory allegations are not entitled to the assumption of truth. *See Ashcroft v. Iqbal*,

129 S. Ct. 1937, 1951 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Allegations "that are 'merely consistent with' a defendant's liability" and "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements"

do not suffice. *Id.* (citation omitted).

The purpose of RCFC 12(b)(6) "is to allow the court to eliminate actions that are

fatally flawed in their legal premises and destined to fail, and thus to spare litigants the

burdens of unnecessary pretrial and trial activity." *Advanced Cardiovascular Sys., Inc. v.

SciMed Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993) (citation omitted). Indeed, a

dismissal for failure to state a claim "streamlines litigation by dispensing with needless

discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

## II. This Court Should Not Exercise Jurisdiction Over Taylor's Action Because Taylor's Claims Are Barred By The Statute Of Limitations

This Court should dismiss Taylor's claims because they are barred by the six-year

statute of limitations for actions brought against the United States in this Court. *See* 28

U.S.C. § 2501 (2000). Taylor asserts that its decommissioning and remediation

obligations only extend to operations that can be accomplished using "best available"

technology, and that, as soon as the required undertaking exceeds the capabilities of

existing technology, performance has become impossible and should be excused. Compl.

¶¶ 7, 63, 76, 106. Assuming the truth of Taylor's allegations, by 2008, Taylor possessed all of the facts and information necessary to support is current claims that it is not safely practicable to remove the 100-foot layer of soil sitting on top of the wellbores as a general matter or as a means to be able to access the wells to employ the existing conventional plugging techniques to satisfy its decommissioning obligations. And Taylor had concluded by 2008 that the "best available technology" did not provide a technically feasible method for safe well interventions in the unique circumstances encountered at MC-20. Indeed, Taylor alleges that, by 2009, it had been necessary to invent new technology, which Taylor alleges it invented and patented, in order to begin decommissioning work on one of the wells, identified as the A-16 well. *See* Compl. ¶ 36; Ex. G at 42-43. Taylor began drilling the intervention well for the A-16 well in November 2009, thus actually employing its new technology at that time. *See, e.g.*, Ex. L (MMS Well Activity Report for Well IW016, describing the beginning of drilling on November 13, 2009).

Thus, all of the alleged facts upon which Taylor bases its contract-related claims were known by Taylor (or certainly should have been known) more than six years before the date Taylor filed its complaint, barring Taylor's claims in this Court.

### A. Every Claim Brought In This Court Is Subject To A Six-Year Statute Of Limitations

"Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. The Supreme Court has repeatedly held that the particular six-year statute of limitations of § 2501 is "jurisdictional and thus not subject to equitable tolling." *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1634 (2015); *see also John*

*R. Sand & Gravel Co. v. United States,* 552 U.S. 130, 134, 135 (2008). "A cause of action against the government has first accrued when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *San Carlos Apache Tribe v. United States,* 639 F.3d 1346, 1350 (Fed. Cir. 2011) (citation and internal quotation marks omitted). "The question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue." *Fallini v. United States,* 56 F.3d 1378, 1380 (Fed. Cir. 1995); *see also Michael v. United States*, No. 2015-5055, 2016 WL 1019118, at *1 (Fed. Cir. Mar. 15, 2016); *San Carlos,* 639 F.3d at 1350.

### B. Taylor Alleges That Its Decommissioning Obligations Only Extend To Operations That Can Be Accomplished Using The "Best Available Technology"

As part of Taylor's claims that it faces an improper indeterminable period of performance in its obligations to decommission the wells and address the contaminated soil, Taylor alleges that, under Federal regulations, it is only required to pursue decommissioning actions under then-existing "best available technology."

> The nature of the Trust Agreement, the circumstances surrounding it and pertinent usage and custom establish that its term for Taylor's performance of the Obligations cannot be dependent on . . . speculative development of technology that does not currently exist. Instead, the Government's regulations specify that decommissioning obligations must be performed within one year of lease termination . . . and that an operator must use best "available" technology in the performance of its lease operations, not potential new technology that hypothetically may be invented at some indefinite point in the future.

Compl. ¶ 76. *See also* Compl. ¶ 7 (regulations only require "best available and safest technology whenever practical on all exploration, development, and production operations").

In alleging that Taylor is only obligated to use "best available" technology in its decommissioning efforts, Taylor cites to OCSLA and its implementing regulations. *See* Compl. at ¶ 73 (citing 43 U.S.C. § 1347(b); 30 C.F.R. §§ 250.105, 250.107). Invoking the "best available technology" standard, Taylor alleges that the "Government breached its obligations of good faith and fair dealing by requiring Taylor to perform decommissioning operations by use of speculative new technology that does not currently exist." Compl. ¶ 106.

### C. Taylor's Allegations State That It Knew By 2008 That Existing Technology Would Not Provide A Means To Properly Plug And Abandon The Majority Of Its Wells, Which Is Why It Invented New Technology To Partially Pursue Its Decommissioning Obligations

Taylor certainly recognized not long after the collapse of its oil platform that its wellbores were "buried by an average of 100 feet of mud and sediment." Compl. ¶ 11; *see also* Ex. F at 16 Fig. 3.4 (showing a 2006 profile view of the fallen platform and well bay with the well bores lying below the mudline and the platform partially submerged below the mudline). "[C]onventional plugging and abandonment typically proceeds by re-entering the target well internally from the surface, maintaining well control and inserting cement plugs." Compl. ¶ 37. And with conventional plugging, using "[v]ertical access is the only means that would allow Taylor to plug and abandon the wells strictly in accordance with the design specifications of the MMS regulations." Ex. J, MMS Environmental Assessment for Approval of Alternate Procedures or Departures from

MMS Regulatory Requirements, Platform A and Associated Wells, Mississippi Canyon Block 20, Taylor Energy L.L.C. (April 2008) at 4;[18] *see* Compl. at ¶ 4.

Taylor recognized that, in order to pursue conventional plugging and abandonment efforts, it would need to remove the soil above the wells so that direct vertical access to the wells could be obtained. Accordingly, Taylor retained experts to analyze whether removing the sediment above the collapsed wellheads was possible. *See* Compl. ¶ 45; Ex. I at 2 (noting Taylor's retention of experts to assess "the feasibility of a large sediment excavation project in [MC-20] . . . [where] the purpose of the potential excavation is to expose well site conductors so that MMS requirements to 'plug' abandoned wells can be met."). Taylor's experts concluded, however, that, "[u]sing a reasonable (minimal) FOS [factor of safety] . . . the results indicate that the excavation is not feasible." Ex. I at 3.

Thus, given that the wells lay buried by 100 feet of unstable mud and sediment, and excavation was not safely feasible, "Taylor . . . recognized the impossibility of pursuing decommissioning of the wells at MC20 through conventional plugging and abandonment techniques." Compl. ¶ 17; *see also id.* at ¶ 35 ("Taylor recognized the impossibility of pursuing conventional plugging and abandonment activities due to the sheer volume and consistency of the overlying mud and sediment, the tangled web of wellbores and the environmental risks associated with accessing the wells under these circumstances"); *id.* at ¶ 98 (alleging mutual error "as to Taylor's technical ability to perform its remaining Obligations.").

---

[18] MMS's April 2008 Environmental Assessment is discussed at paragraph 36 of the Complaint.

Having determined that conventional plugging required to meet MMS decommissioning requirements was not feasible, Taylor asked MMS for, and in April 2008, received, a departure from MMS's normal decommissioning requirements. Compl. ¶ 36. MMS allowed Taylor to drill intervention wells as an alternative means to decommission the wells. *See id.*; Ex. J at 6. [19] "Pursuant to this highly complex procedure, a separate, new well, called an intervention well, is drilled alongside each target well, which is the existing well that is being plugged." Compl. ¶ 36.

Even so, however, according to Taylor's allegations, Taylor recognized that there was not sufficient existing technology available for Taylor to pursue its plan of drilling an intervention well for each of the remaining wells at MC-20. Accordingly, "[t]o devise and drill the intervention wells, Taylor assembled a team of world-renowned experts and *invented new patented technologies*." Compl. ¶ 38 (emphasis added); *see also id.* at 16 n.6 ("Taylor's comprehensive response efforts have included *the development of new technologies* associated with drilling the intervention wells.") (emphasis added); *see also* Ex. G at 10 ("[Taylor] and its team of world-renowned experts devised a novel strategy utilizing well intervention and created new patented technologies to accomplish successful interventions"); Ex. H at 2 (Taylor had proceeded to "develop, design, and implement new technology when existing remediation methods were unworkable.").

Thus, according to its own allegations, Taylor was aware when it assembled a team and pursued the invention of new technologies in order to decommission the MC-20 wells, that the "best available" technology was not adequate to perform its decommissioning obligations and that it had to invent new technology to complete the

---

[19] Taylor had "first discussed the use of intervention at the Unified Command meeting on December 14, 2007." Ex. G at 27.

well interventions. At that point, more than six years before it filed suit on January 4, 2016, Taylor knew or should have known the factual underpinnings for its theories based on the position that the wells could not be decommissioned using the "best available" technologies *even assuming* that, as Taylor asserts, that is the relevant standard. Accordingly, Taylor knew or should have known everything it needed to pursue its current claims: that the decommissioning of the wells at MC-20 *using best available technology* could not be completed in a reasonable time or set forth an indefinite period for performance (Counts I, IV); or was an "impossibility" that reflected a "mutual mistake" by the parties (Counts II, III).

Taylor's FRACE Report provides further detail on how and when Taylor employed new technology in the well interventions it completed before stopping its efforts. *See* Ex. G at 42. Taylor drilled intervention wells on 9 wells. *Id.* It used "existing technology" for the first two wells, which were completed in March and October 2009. *Id.* But Taylor had "identified both process and technological opportunities" that could lower its intervention costs. *Id.* "These changes were first applied on the third intervention well, IW-16 [targeting well A-16]." *Id.* at 43.[20] Taylor commenced drilling on that third well in November 2009. *See* Ex. L (Form MMS-133, Electronic Version, Well Activity Report (Nov. 14, 2009) (showing that drilling started for Well IW016 [A-16] on November 13, 2009).

Thus, Taylor's recognition of the need for, and development and utilization of, the "patented new technology" undoubtedly happened long before January 2010, and thus,

---

[20] Taylor's FRACE Report further recognizes that Taylor had "developed, paid for and proven" new technology at MC-20, which Taylor subsequently provided to other companies. *Id.* at 43.

Taylor's awareness that the best existing technology was allegedly not sufficient similarly occurred long before that point. Taylor, however, did not file suit until January 4, 2016. As a result, more than six years passed between the date on which Taylor knew or should have known the basis for its current theories that the "best available technology" did not offer a pathway to decommissioning the MC-20 wells and the date that Taylor filed suit. Accordingly, Taylor's claims are barred by the statute of limitations. *See San Carlos*, 639 F.3d at 1350 (a cause of action accrues when plaintiff knew or should have known that a cause of action was available against the Government); *see also Michael*, 2016 WL 1019118 at * 1; *Fallini*, 56 F.3d at 1380.

### D.  According To The Complaint, Taylor Also Knew In 2008 That Removing The Contaminated Soil Was Not Reasonably Feasible

Following Hurricane Ivan's toppling of Taylor's platform at MC-20, Taylor commissioned expert geotechnical studies to determine the feasibility of excavation of the contaminated soil at MC-20. Compl. ¶ 45; Ex. G at 25. As Taylor alleges in its complaint:

> [S]tarting as early as 2004, Taylor also commissioned various geotechnical studies by leading experts. After initial dredging of a small test area proved futile, Taylor commissioned additional expert geotechnical studies to determine the feasibility of excavation of the contaminated soil at MC20. These studies ultimately resulted in the conclusion by the experts retained by Taylor that removal of the contaminated soil was not technically feasible – estimates of the volume of cubic yards of sediment that would need to be removed ranged in the millions or even billions – and would pose greater environmental risk than benefit.

Compl. ¶ 45. *See, e.g.*, Ex. I (March 2008 Excavation Report of Drs. Roberts and Bea); Ex. G at 25-26 (recognizing that the expert reports of Fugro GeoServices, Inc.

(summarizing 2005-2007 seafloor stability data), and Drs. Roberts and Bea (2008) concluded that excavation of the sediment was not technically feasible); Ex. E at 9-10 (discussing, in September 2009, Taylor's proposal to leave the contaminated sediments in place to avoid the effects from excavation and transport of the sediments).

Taylor further alleges that MMS knew, in connection with MMS's April 2008 Environmental Assessment, that conventional plugging and abandonment procedures could not be followed. Compl. ¶ 36. But this was due, primarily, to the fact that, as the April 2008 Environmental Assessment stated, "to gain access to the wellheads and casing, the operator would have to excavate a large void space to approximately 175 feet [below mud line] in unstable seafloor sediments. This type of operation in a confirmed mudslide area in these circumstances appears to be technically infeasible and quite dangerous to divers." Ex. J at 5 (TAY0000013558).

Furthermore, Taylor alleges that MMS knew, pursuant to the 2009 SSEA, "that removal of the contaminated soil would pose greater environmental risk than benefit and that the more environmentally beneficial choice was to leave the soil in place to allow for natural attenuation." Compl. at ¶ 46.

Thus, according to Taylor's own allegations, there can be no doubt that long before January 4, 2010, Taylor knew (or should have known) of the bases for its claim that removing the contaminated soil was not reasonably feasible. Accordingly, its claims in this Court based upon the impossibility or impracticality of removing the contaminated soil are barred by the statute of limitations. *See San Carlos*, 639 F.3d at 1350; *Michael*, 2016 WL 1019118 at * 1; *Fallini*, 56 F.3d at 1380.

## III. This Court Should Not Exercise Jurisdiction Over Taylor's Action Because The Primary Jurisdiction Concerning The Disposition Of The Trust's Funds For Decommissioning And Remediation Efforts Belongs With The IBLA

Pursuant to the doctrine of primary jurisdiction, this Court should dismiss this case for lack of jurisdiction or, alternatively, stay this case pending the resolution of Taylor's appeal before the IBLA. Taylor's appeal before the IBLA addresses whether Taylor should be given a "departure" from its obligations to properly decommission its wells and remediate the contaminated soil given the facts concerning the ongoing oil leaks and the difficulty of decommissioning the tangled and buried oil wells. If Taylor is excused from these decommissioning obligations, it will have a very significant impact on its obligations with respect to funding the Trust, which is meant to ensure that sufficient funds are secured to pay for Taylor's decommissioning activities. Whether Taylor should be given a "departure" from its decommissioning obligations, however, involves complex assessments within the special competence and discretion of DOI that this Court should leave to the IBLA. And these assessments will likely pertain directly to some of the key issues here; for example, whether Taylor should remain responsible for further decommissioning efforts taking place over a several-year period, whether decommissioning the wells is, as a scientific and technical matter, an impracticality looking forward, and whether the current technical challenges of fully decommissioning the MC-20 site should permanently excuse Taylor from its obligations.

### A. The Doctrine Of Primary Jurisdiction

The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. . . . 'Primary jurisdiction,' . . . applies where a claim is originally cognizable in the courts, and comes into

> play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956) (citing *Gen. Am. Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433 (1940)); *accord Virgin Islands Water & Power Auth. v. United States*, 30 Fed. Cl. 236, 239 (1994); *Ainsley v. United States*, 8 Cl. Ct. 394, 403 (1985). The primary jurisdiction doctrine "is applicable where 'a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body.'" *Schaghticoke Tribal Nation v. Kent School Corp. Inc.*, 595 Fed. Appx. 32, 34 (2d Cir. 2014) (quoting *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58-59 (2d Cir. 1994)).

Although "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," the Court has noted that it is particularly fitting for cases "requiring the exercise of administrative discretion." *W. Pac. R.R.*, 352 U.S. at 64. "It is sufficient that an administrative agency's decision will ultimately be a material aid in resolving the pending litigation to invoke the doctrine of primary jurisdiction." *Nat'l Marketing Consultants, Inc. v. Blue Cross and Blue Shield Assoc.*, No. 87 C 7161, 1987 WL 20138 at \*2 (N.D. Ill. Nov. 29, 2001) (citing *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 305 (1973)).

Thus, where the expert and specialized knowledge of the agencies involved has been particularly stressed in a case, or the questions presented turn on matters implicating the exercise of an agency's delegated discretion, the Court has dismissed cases pending

an administrative proceeding before an agency's board. *See W. Pac. R.R.*, 352 U.S. at 64; *see also Far East Conference v. United States*, 342 U.S. 570, 574-77 (1952); *United States Navigation Co. v. Cunard S.S. Co.*, 284 U.S. 474 (1932); *Nippon Steel Corp. v. United States*, 219 F.3d 1348, 1353 (Fed. Cir. 2000) (noting that the doctrine of primary jurisdiction should not be ignored by the court "'in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion,'" so that the issue could be heard by "'agencies created by Congress for regulating the subject matter.'") (quoting *Far East Conference*, 342 U.S. at 574); *Ainsley*, 8 Cl. Ct. at 403 (invoking the doctrine of primary jurisdiction and dismissing plaintiff's complaint without prejudice).

Alternatively, the Supreme Court has upheld a stay of cases pending the outcome of an agency's administrative review. *See Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993) (noting that, in a referral to the administrative agency under the doctrine of primary jurisdiction, a court "has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice") (citing *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 222-23 (1966)). *Accord Wolfchild v. United States*, 108 Fed. Cl. 578, 587 (2013). For example, in *United States v. Interstate Commerce Commission*, 337 U.S. 426 (1949), the Court discussed two related cases which involved "an ordinary action on a contract." *Id.* at 465 n.12. "Entangled however in the proper construction of that contract was the ascertainment of a transportation fact, which . . . made prior determination by the Interstate Commerce Commission appropriate." *Id.* And in those cases, the Court found it appropriate to suspend the exercise of jurisdiction until the agency reached the relevant determination. *Id.*; *see also*

*Virgin Islands Water*, 30 Fed. Cl. 239 (staying proceedings pending determination by agency with respect to the amount of potential liability).

**B.**     **Taylor's Complaint Should Be Dismissed Or Its Action Stayed Pursuant To The Doctrine Of Primary Jurisdiction**

Taylor bases its complaint on the notion that, as a scientific and technical matter, drilling any additional intervention wells or removing the contaminated soil at MC-20 would pose greater ecological risk than benefit, and it should therefore be released from the obligations that the Trust funds are in place to guarantee. *See, e.g.*, Compl. ¶ 86-87 (Taylor alleges that it is unable to perform Trust Agreement Obligations because "world renowned scientific experts . . . have concluded through extensive study, evaluation and analysis that Taylor's performance of the plugging and abandonment of the remaining sixteen wells and its removal of the contaminated soil at the site would risk causing undue or serious harm to the human, marine and/or coastal environment"); *id.* at ¶¶ 91-99 (Government and Taylor mutually erred when they agreed it was technically possible and more environmentally beneficial than risky for Taylor to decommission the remaining sixteen wells and remove the contaminated soil from MC-20).

Whether Taylor should be given a departure from the requirements to fully decommission all the wells at MC-20 and to remove the contaminated soil because doing so would pose greater ecological risk than benefit is likewise the central question at issue in its appeal before the IBLA. For example, Taylor describes its initial request to DOI for a departure from its decommissioning obligations as a request, "in conformity with the primary 'consensus' conclusions reached in the CERA Report, as further supported by additional studies and analysis in the FRACE Report, that . . . the drilling of any additional wells or attempts to remove the contaminated soil would pose greater

ecological risk than benefit." Compl. ¶ 60. And this argument was repeated in Taylor's current appeal before the IBLA, as Taylor argues that BSEE's rejection of its departure request was arbitrary and capricious. *See* Ex. H at 2 ("the environmental and safety risks of further decommissioning efforts outweighs any potential environmental benefit . . . [and] the [MMS] . . . determined that removing the contaminated sediment at MC20 presents a risk of increased environmental harm.").

The determination regarding whether a lessee or operator should receive a departure from its regulatory obligations is a matter firmly within the discretion of the agency. *See* 30 C.F.R. § 250.142 ("We *may* approve departures to the operating requirements.") (emphasis added). This determination implicates a host of issues that lie within the special competence of the agency, under the review of the IBLA.

For example, with respect to the risks and feasibility of various intervention techniques, an assessment has to be made of the full array of potential decommissioning options (and not merely those proposed by Taylor), and whether current challenges – twelve years into an evolving and iterative process – justify permanently absolving Taylor of the regulatory obligations secured by the Trust. The subjects explored by the various workshops convened by the Unified Command, the CERA Report and Taylor's FRACE Report demonstrate the complexity of the analysis. And the issues that need to be addressed fall within the delegated discretion and special competence of DOI and the IBLA. For example, with respect to the soil contamination issue, the matters that are likely to be considered include an accurate assessment of the level of contamination in the soil, the possibility of further oil releases from the contaminated soil, and the potential methods of addressing the soil contamination (*e.g.,* removal of the soil, various means to

treat the soil, and capping options). And, with respect to decommissioning the 16

remaining wells, Taylor's FRACE report alone invokes a number of factual, scientific,

and technical issues that may be considered that could affect a decision concerning

whether Taylor should be excused from its remaining obligations, including:

- the risks in intervening given the potential for "well collisions, inadequately plugged perforations that are in communication with higher pressured reservoirs, cross-flow potential, breaches of near-surface seals, and other threats to well integrity," (Ex. G at 12);

- whether there is more than one source for the oil leak and the explanation for "releases [that] occur on both an episodic and relatively continuous basis" (*id.* at 13);

- an assessment of the future worst-case oil discharge amount and the costs of responding to that contingency (*id.* at 15-19, 87-89);

- an analysis of the oil reservoirs' pressure under abandonment conditions; whether the pressure would be sufficient to cause oil flows; and the effect of seawater influx into the wells (*id.* at 30-31, 34-37);

- the risks of drilling intervention wells (*id.* at 40-42, 50-54);

- the possibility of well pipe corrosion (*id.* at 59-61);

- sand strength analysis at the MC-20 site (*id.* at 65-67);

- the possibility of sediment plugging the wells; (*id.* at 67 -68);

- the effect of the bent well pipes in restricting potential oil release rates (*id.* at 69);

- the possibility for constructing a containment system (*id.* at 71-75); and

- a review of the activities by the Sheen Source workgroup to locate the precise location of the oil leaks (*id.* at 76-82);

In short, although Taylor brings its action in this Court as a contract case, it is a

case that necessarily revolves around determinations concerning important issues

regarding Taylor's ongoing regulatory obligations at the MC-20 site. Resolving these

important issues is firmly within the delegated discretion and special competence of DOI and the IBLA, and they are in fact, at Taylor's urging, currently pending before that body. Accordingly, pursuant to the doctrine of primary jurisdiction, this Court should dismiss Taylor's complaint. *See W. Pac. R.R.*, 352 U.S. at 63-64; *Far East*, 342 U.S. at 574-77; *Gen Am. Tank Car*, 308 U.S. at 433; *Nippon Steel*, 219 F.3d at 1353; *Ainsley*, 8 Cl. Ct. at 403. In the alternative, this Court should stay this case pending the IBLA's determinations. *See Reiter*, 507 U.S. at 268-69; *Carnation*, 383 U.S. at 222-23; *Interstate Commerce Commission*, 377 U.S. at 465 n.12; *Wolfchild*, 108 Fed. Cl. at 587; *Virgin Islands Water*, 30 Fed. Cl. at 239.

## IV. This Court Should Dismiss All Of Taylor's Claims To The Extent They Seek Equitable Relief

This Court should dismiss all of Taylor's claims to the extent they seek equitable relief concerning the status of the Trust, because this Court does not possess jurisdiction to grant such relief.[21] Taylor seeks this declaratory or equitable relief explicitly in Counts Two and Three, less explicitly in Counts One and Four.

### A. Counts Two and Three

In Count Two, Taylor presents a "Request for Dissolution Based on Impossibility of Performance," concluding "the Trust Agreement 'is dissolved' . . . *thereby entitling* Taylor to the release of its funds held in the Trust Account." Compl. ¶ 89 (emphasis added). In Count Three, "Taylor seeks reformation or partial rescission of the Trust

---

[21] Moreover, even if Taylor could establish that it has a true claim for money damages, Taylor first must demonstrate that the Trust Agreement "could fairly be interpreted as contemplating monetary damages in the event of breach." *Higbie v. United States*, 778 F.3d 990, 994 (Fed. Cir. 2015) (citing *Holmes v. United States*, 657 F.3d 1303, 1315 (Fed. Cir. 2011)).

Agreement *as to those Obligations* and a release of its funds held in the Trust Account designated for *their* performance." Compl. ¶ 99 (emphasis added).

As the Federal Circuit has explained, a court "must look beyond the form of the pleadings to the substance of the claim." *Suburban Mortgage Assoc., Inc. v. HUD*, 480 F.3d 1116, 1125 (Fed. Cir. 2007). Taylor's complaint seeking the dissolution, rescission or reformation of the Trust Agreement is actually a challenge to the validity of DOI's technical decision not to excuse Taylor from its decommissioning obligations in light of ongoing oil leaks. In essence, what Taylor seeks is a declaration or order concerning Taylor's prospective responsibilities. But the Court of Federal Claims does not possess jurisdiction to grant such relief. *See, e.g., Jesko v. United States*, 3 Cl. Ct. 730, 732 (1983). To be sure, release of money from the Trust would be a consequence of a declaration or order of the sort Taylor seeks, but only an incidental one. And, as this Court's predecessor has noted, the release of funds "incidental and subordinate to a declaration of plaintiffs' rights" is beyond this Court's jurisdiction. *Doko Farms v. United States*, 13 Cl. Ct. 48, 60 (1987).[22]

**B.    Counts One and Four**

In Counts One and Four, though referring to its sought-after remedy as "damages," Taylor's true target again is the Trust funds. *See* Compl. ¶ 80 (seeking

---

[22] "Plaintiffs, in substance, seek judicial intervention in securing the removal of their names from the Claims Control Record. If such action is undertaken, the release of the funds currently withheld would occur automatically. In this instance, the release of funds would be incidental and subordinate to a declaration of plaintiffs' rights. This Court only has jurisdiction over the reverse situation. Plaintiffs' action is not primarily one for 'money judgment,' and as a result, it is not cognizable in the Claims Court. In substance and in form, the plaintiffs seek mandamus or declaratory relief which this Court is not empowered to grant." *Id.*

"monetary damages, including the release of its funds held in the Trust Account for the performance of the remaining Obligations"); *id.* at ¶ 109 (seeking damages for the "denial of the return of the funds held in the Trust Account"). To the extent these counts ask the Court to review Interior's regulatory decision making under the guise of a damages claim, they fare no better than Counts 2 and 3.

Count One also includes a claim for unspecified "monetary damages Taylor has suffered as a consequence of the Government's breach." Compl. ¶ 80. But Taylor does not identify these "consequential damages" or when they might have been incurred. Such conclusory allegations, without more, are not sufficient to plead a right to damages. *See Caldwell v. United States*, No. 16-357C, 2016 WL 1178717 at *3 (March 25, 2016, Fed. Cl.) ("'Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim'") (quoting *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998)); *see also Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'") (quoting *Twombly*, 550 U.S. at 557).

In Count Four, Taylor argues it has incurred "damages" due to the "loss of interest income on the funds held in the Trust Account and the incurrence of significant fees to maintain the funds in the Trust Account." Compl. ¶ 109. But Taylor's claim with respect to the loss of interest income is a conclusory assertion, untethered to any facts, that also fails the *Twombly/Iqbal* pleading standard. In fact, the Trust provides that interest on the funds be paid to Taylor and Taylor does not allege it has not been paid those funds *by the Trust* – nor would the United States be liable for any such failure *by the Trust*.

The Trust Agreement requires that all interest income from the Trust be paid to Taylor:

> **Interest Earned.** All interest accruing on the Trust Funds will be (i) the sole property of and (ii) distributed quarterly to the Settlor [Taylor].

Compl. Ex. 1 at § 4.3. Nowhere in its complaint does Taylor allege that its ownership of the interest earned by the Trust funds was abrogated by the United States or that Taylor did not receive the quarterly interest payments required by the Trust Agreement. Accordingly, this claim should be dismissed pursuant to RCFC 12(b)(6) for failing to state a claim upon which relief can be granted.

In Count Four, Taylor alleges it has incurred "damages" due to "the incurrence of significant fees to maintain the funds in the Trust Account." Compl. ¶ 109. Taylor appears to be alluding to the requirement in the Trust Agreement that Taylor pay JPMorgan 10 basis points (or a tenth of one percent) on an annual basis relative to the value of the assets held in the Trust Account. *See* Compl. Ex. 1 at § 2.9 and Schedule C (Schedule of Fiduciary Fees). While such damages are, in theory, awardable by this Court, for the reasons set forth in our other jurisdictional arguments (statute of limitations and primary jurisdiction) and in our 12(b)(6) argument (there was no breach of the Trust Agreement under Federal law), this Court should dismiss Taylor's claims with respect to these fiduciary fees.

**V.    This Court Should Dismiss Taylor's Complaint Because Federal Law, Not Louisiana Law, Controls The Disposition Of The Trust And Its Funds With Respect To The Decommissioning Costs, And The Trust Agreement Is In Accord With Federal Law**

This Court should dismiss Taylor's complaint for failing to state a claim upon which relief can be granted because the Trust Agreement is in complete accord with

Federal law, which, pursuant to OCSLA, applies to the Trust. Contrary to Taylor's allegations, Louisiana law as interpreted by Taylor cannot apply either directly or as surrogate Federal law because the results would be inconsistent with Federal law. Here, Federal law, as reflected in the Trust Agreement, is meant to ensure that Taylor remains responsible for decommissioning until it is complete and that sufficient funds from Taylor are secured to ensure Taylor's performance of its decommissioning obligations.

### A. Federal Law, Not Louisiana Law Controls The Disposition Of The Trust And Its Funds With Respect To Taylor's Decommissioning Obligations

A central premise underlying Taylor's complaint is that Louisiana law controls this Court's review of the Trust Agreement. This premise is incorrect. Louisiana law cannot control – even if it appears in a contractual "choice of law" clause – where it is inconsistent with applicable Federal law, specifically here, the OCSLA and its implementing regulations. The analysis here is a three step process.

*First*, the OCSLA provides that Federal law applies to matters concerning activities on the OCS:

> The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed . . . to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State[.]

43 U.S.C. §1333(a)(1). *See, e.g., Rodrigue v. Aetna Cas. & Surety Co.*, 395 U.S. 352, 356-57 (1969) (pursuant to OCSLA, federal law is to be applied to the OCS); *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 495 (5th Cir. 2002).

Furthermore, in stating that OCSLA provides that United States district courts have jurisdiction over OCSLA-related claims, Congress described the broad substantive reach of OCSLA in providing the applicable law:

> [T]he district courts of the United States shall have jurisdiction of cases and controversies *arising out of, or in connection with* (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this subchapter.

43 U.S.C. § 1349(b)(1) (emphasis added).

The courts have determined that OCSLA's Federal law regime applies broadly to contract claims focused upon activity to be performed, for the most part, at OCSLA situses. *See, e.g., Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 787 (5th Cir. 2009) ("a contractual indemnity claim (or any other contractual dispute) arises on an OCSLA situs if a majority of the performance called for under the contract is to be performed on stationary platforms or other OCSLA situses"); *Laredo Offshore Constructors v. Hunt Oil Co.*, 754 F.2d 1223, 1228-29 (5th Cir. 1985). That is, the Federal OCSLA regulatory regime is not limited to acts that literally occurred on the outer continental shelf, but also include cases and controversies "arising out of or in connection with" any "operation" conducted on the outer continental shelf. *See* 43 U.S.C. § 1349(b)(1).

Thus, the courts have concluded that OCSLA should be broadly construed so as to be "'extended to the entire range of legal disputes that [Congress] knew would arise relating to resource development on the Outer Continental Shelf.'" *EP Operating*

*Limited Partnership v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994) (quoting *Laredo*,

754 F.2d at 1228). And in *EP*, the Court of Appeals for the Fifth Circuit recognized that

OCSLA should apply to disputes concerning terminated drilling operations, specifically

invoking a district court case involving a dispute over a contract dealing with the raising

of a sunken platform (which was toppled by a hurricane). *EP*, 26 F.3d at 568 (citing

*Fluor Ocean Services Inc. v. Rucker Co.*, 341 F. Supp. 757, 758-60 (E.D. La. 1972)). In

*Fluor*, the district court stated that the OCSLA Federal law regime applies even with

respect to "controversies which may be only *indirectly* connected with operations on the

outer Continental Shelf conducted for the purpose of developing natural resources."

*Fluor*, 341 F. Supp. at 760 (emphasis in original). Thus, "the Fifth Circuit interprets the

reach of the OCSLA in an extremely broad manner" that reaches "acts or omissions [that]

occur on land." *BP Exploration & Prod., Inc. v. Callidus Tech's, L.L.C.*, No. Civ. A. 02-

2318, 2003 WL 193450 at *4 (E.D. La. Jan. 27, 2003).

Here, the Trust Agreement's purpose is to provide funds to "fulfill certain

obligations to plug and abandon wells, remove a portion of the platform and facilities,

clear the seafloor of obstructions, and take corrective action associated with wells and

facilities on [the Taylor leases]." Compl. Ex. 1 at 1; Compl. ¶ 20. Moreover, the Trust

Agreement was established in accord with DOI regulations that are meant to ensure that

(1) wells and facilities are properly decommissioned to stop and prevent oil leaks; and (2)

lessees can finance their regulatory plugging and abandonment obligations. *See, e.g.*, 30

C.F.R. Part 250, subpart Q (Decommissioning Activities); 30 C.F.R. Part 250, subpart C

(Pollution Prevention and Control); 30 C.F.R. § 556.56 (Lease-specific abandonment

accounts).

Accordingly, OCSLA applies to the Trust Agreement here.

**Second**, OCSLA provides that Federal law will adopt the civil laws of an adjacent State as the Federal law, but only if the State law is not inconsistent with Federal laws and regulations as set forth by DOI:

> To the extent that they are applicable *and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted*, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf[.]

43 U.S.C. § 1333(a)(2)(A) (emphasis added). *See, e.g., Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 217 (1986) ("Within the area covered by OCSLA, federal law controls but the law of the adjacent State is adopted as surrogate federal law to the extent that it is not inconsistent with applicable federal laws or regulations."); *Rodrigue*, 395 U.S. at 356 (OCSLA provides that the applicable law to be applied is the "federal law of the United States, applying state law only as federal law and then only when not inconsistent with applicable federal law.").

Here, Taylor's invocation of Louisiana contract law concerning the validity of the Trust Agreement results in a reading of the Trust Agreement that is inconsistent with the controlling Federal law and regulations. And it is inconsistent with the purpose and intent of the Trust Agreement, which was established pursuant to Federal regulatory law to ensure that sufficient funds remain available for decommissioning of the MC-20 site in accordance with Taylor's regulatory obligations. Indeed, Taylor's reading of Louisiana

law renders the Trust Agreement a nullity, requiring its dissolution. *See, e.g.,* Compl. at ¶ 5 ("Louisiana law therefore requires that the Trust Agreement be dissolved, entitling Taylor to the release of its funds from the Trust Account."). Such a result would be inconsistent with the requirements of OCSLA and its implementing regulations. OCSLA and DOI regulations implementing OCSLA extend to the entire range of legal issues relating to resource development on the OCS. They require decommissioning of the MC-20 site and the elimination of the oil discharge at the site. They likewise require Taylor to maintain adequate financial security to assure that these requirements are met. Thus, the Trust Agreement was established, pursuant to DOI regulation (30 C.F.R. § 556.56), to satisfy these requirements of Federal law.

Louisiana law, as described by Taylor, would render the Trust Agreement a nullity, eliminating the required security and preventing the use of the trust funds for decommissioning and the elimination of the oil discharge. Taylor's presentation of Louisiana law is therefore inconsistent with Federal law and cannot be used by this Court to interpret or administer the Trust Agreement in the manner that Taylor advocates. *See* 43 U.S.C. § 1333(a)(2)(A); *Offshore Logistics*, 477 U.S. at 217; *Rodrigue*, 395 U.S. at 356; *Union Tex. Petr. Corp. v. PLT Eng'g, Inc.*, 865 F.2d 1043, 1047 (5th Cir. 1990) ("But for adjacent state law to apply as surrogate federal law under OCSLA . . . . [t]he state law must not be inconsistent with Federal law."); *Laredo*, 754 F.2d at 1228. Instead, Federal law, specifically regulations issued by DOI, dictates the proper administration of the Trust Agreement.[23]

---

[23] The Federal law to be applied, when State law is inconsistent with OCSLA, is the "Constitution and laws of the United States, [and the] regulations of the Secretary of the Interior." *Rodrigue*, 395 U.S. at 357 (discussing S. Rep. No. 411 of the committee on

61

**Third**, the fact that the parties agreed to a "choice of law" clause selecting

Louisiana law as the law to be used in governing and construing the Trust Agreement in

no way alters this conclusion. *See* Compl. Ex. 1 at § 6.9.[24] Where, as here, a party

invokes a contractual choice of law provision to achieve a result that is inconsistent with

the OCSLA and DOI regulations, that choice of law provision is not given effect by the

courts. *See Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 485 (1981); *Texaco

Exploration & Production, Inc. v. AmClyde Engineered Products*, 448 F.3d 760, 772 (5th

Cir. 2006) (statutory choice of law rule in OCSLA is "not subject to exception by the

parties' agreement") *rehearing denied, amended on rehearing* 453 F.3d 652 (5th Cir.

2006); *Union Tex. Petr.*, 865 F.2d at 1050 (OCSLA is a congressionally mandated choice

of law provision which preempts any contrary choice of law provision found either in

state law or in the contract at issue). *See also Matte v. Zapata Offshore Co.*, 784 F.2d

628, 631 (5th Cir. 1986) (rejecting contract's choice of law clause where it violated

federal policy expressed in the OCSLA); *Alleman v. Omni Energy Services Corp.*, 434 F.

Supp.2d 405, 409 (E.D. La. 2006) ("parties cannot contract around OCSLA's statutory

choice of law provision."), *aff'd in part* 580 F.3d 280 (5th Cir. 2009); *Fuselier v. Sea

Boat Rentals, Inc.*, No. 06-4488, 2007 WL 2713278 at *3 (E.D. La. Sept. 14, 2007); *BP

Exploration & Production, Inc. v. Callidus Tech., LLC*, No. Civ. A. 02-2318, 2003 WL

---

Interior and Insular Affairs, 83d Cong., 1st Sess., 11 (1953)); *see also* 43 U.S.C. §
1333(a)(2)(A). That is, the law to be applied is not necessarily Federal common law in
the first instance, but Federal statutory and regulatory law, specifically, the regulations of
the DOI. *See, e.g., Walter Oil & Gas Corp. v. NS Group, Inc.*, 867 F. Supp. 549, 553
(S.D. Tex. 1994) (finding "that the phrase 'other Federal laws' in § 1333(a)(2)(A) refers
not to Federal common law, but rather to Federal statutory law").

[24] "Governing Law and Jurisdiction. This Trust Agreement shall be governed by and
construed in accordance with the laws of the State of Louisiana without giving effect to
that state's conflicts of laws rules, but the parties consent to the jurisdiction of the federal
courts to resolve any dispute arising under the Trust Agreement." Compl. Ex. 1 at § 6.9.

193450 at *2 (E.D. La. 2003); *AGIP Petroleum Co. v. Gulf Island Fabrication*, 920 F. Supp. 1330, 1342 (S.D. Tex. 1996) ("contractual choice-of-law provisions are ineffective" where OCSLA applies). *Cf. Offshore Logistics*, 477 U.S. at 227 (noting that federal maritime law displaces state common law remedies and that parties may not elect which law will govern); *accord Krossa v. All Alaskan Seafoods, Inc.*, 37 P.3d 411, 416 n.10 (Alaska 2001).

Accordingly, despite the Trust Agreement's choice-of-law clause, Louisiana law cannot be relied upon to overturn the outcome dictated by OCSLA and its implementing regulations. Instead, the terms of the Trust Agreement must be interpreted in accord with Federal law, including, specifically, DOI regulations requiring Taylor to fully decommission the MC-20 site and pursuant to which the Trust was established as a means to provide sufficient dedicated funds as security to cover those decommissioning costs. *See* 30 C.F.R. Part 250, subparts C and Q; 30 C.F.R. § 556.56.

## B. This Court Should Dismiss Taylor's Action Because The Trust Agreement Is In Complete Accord With Federal Law

This Court should dismiss Taylor's claims pursuant to Rule 12(b)(6) because the Trust Agreement is in complete accord with OCSLA, CWA, and OPA and with Federal regulations implementing those statutes. Pursuant to Federal law, Taylor remains liable for decommissioning its facilities until decommissioning is complete and the problem of the contaminated soil has been addressed – or until the DOI provides Taylor with a "departure" from these requirements. Furthermore, the Trust Agreement, as a lease-specific abandonment account, is a direct embodiment of Federal regulations requiring a lessee to provide security demonstrating its capacity to pay for decommissioning costs.

Certainly, there can be no doubt that OCSLA requires lessees to pursue their operations and to decommission their facilities in a manner that ensures the protection of the environment. See above at 9-10 (discussing 43 U.S.C. §§ 1332, 1332(a)(2), 1334, 1348(a), and 1348(b)(2)). Notably, OCSLA does not limit a lessee's liability for covering actual decommissioning costs, nor does it limit the length of time over which a lessee faces decommissioning obligations. In this regard, OCSLA is consistent with the CWA, which further mandates that (1) there be "*no discharges of oil or hazardous substances into or upon the navigable waters of the United States,*" (33 U.S.C. § 1321) (emphasis added); (2) the cost of cleanup be borne by the owners of the facilities discharging oil; and (3) facility owners face strict liability for the pollution save for only a handful of exceptions. See above at 13 (citing 33 U.S.C. § 1321(i)). And OCSLA is consistent with the OPA which provides that an offshore lease operator who pollutes is a "responsible party" and is liable for all removal costs. See above at 13 (citing 33 U.S.C. §§ 2701(31), 2701(32)(C), 2702(a), 2702(b)(1)).

Furthermore, under the authority given to it by OCSLA, BSEE's regulations require lessees to prevent oil discharges and to take immediate corrective action when pollution has occurred. See above at 10-11 (discussing 30 C.F.R. Part 250, subpart C). Although BSEE's regulations generally require a lessee to complete its decommissioning activities within one year of the termination of its lease, the regulations do not limit the duration of the decommissioning obligation if the lessee is unable to complete its decommissioning within a year of termination, and in fact expressly provide that lessees remain "liable for meeting decommissioning obligations . . . until each obligation is met." *See* 30 C.F.R. §§ 250.1700-1703, 250.1710, 250.1725; Compl. § 14.

And to ensure that funds are available to satisfy a lessee's decommissioning obligations, BOEM's regulations, also issued pursuant to OCSLA, require lessees to post a bond or provide other forms of financial assurance – such as a lease-specific abandonment account – to ensure that funds are available to cover the decommissioning costs. See above at 12-13 (discussing 30 C.F.R. §§ 556.52, 556.53(a), 556.53(b), 556.53(e), 556.56, 556.58(d)(2)(i)).

The Trust Agreement, which creates a lease-specific abandonment account under 30 C.F.R. § 556.56, embodies the requirements of OCSLA and BSEE and BOEM regulations, all with the objective that an OCS lessee decommission its facilities so that there are *no leaks* into the navigable waters of the United States, while requiring the lessee to provide financial assurance, through the completion of the decommissioning tasks, so the decommissioning costs are covered.

Thus, the termination clause of the Trust Agreement provides that the Trust will remain in effect until Taylor's "compliance with all Obligations," (unless there is otherwise a written agreement between Taylor and the United States). Compl. Ex. 1 at § 6.8. "Obligations" is a defined term under the Trust Agreement, and it means "the duties and costs of [Taylor] pertaining thereto to abandon wells, remove the platform and other facilities, clear the seafloor of obstructions, and take corrective action associated with wells as set forth in Schedule A attached hereto arising pursuant to the terms of the Leases and applicable federal regulations related to such Leases." Compl. Ex. 1 at § 1.2(d). The Trust Agreement is clear that the Obligations have to be completed "in material compliance with all applicable federal laws and regulations . . . [and with] the terms and conditions of the Lease(s)." Compl. Ex. 1 at § 4.5 Compl. ¶ 29. And to satisfy

the Obligations pursuant to the Trust Agreement, Taylor must demonstrate that its decommissioning "[w]ork completed to date *shows no detectable leakage*." Compl. Ex. 1 at § 4.7 (emphasis added).

Furthermore, Taylor's leases at MC-20 all required that Taylor "maintain all operations within the leased area in compliance with regulations intended to protect . . . the environment on the [OCS];" and they required that Taylor surrender its lease "in a manner satisfactory to [MMS]." *See* Ex. A, B, & C at §§12(b), 21.

Thus, the Trust Agreement, including its requirement that Taylor remain obligated to decommission the wells, whether undertaken now or in the future, and to maintain financial security in the meantime, is a valid embodiment of Federal laws and regulations – and Taylor's Federal leases. Accordingly, Taylor's attempt to employ Louisiana law to invalidate, dissolve, reform, or rescind the Trust Agreement – or to bring a claim for breach of the duty of good faith and fair dealing based upon a claim that the Trust has an indefinite term for performance – must be rejected by this Court. Instead, utilizing the Federal law which controls here and is consistent with – and indeed requires – the terms of the Trust Agreement, this Court should dismiss Taylor's claims.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court dismiss this action.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

/s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director


/s/ John H. Roberson
JOHN H. ROBERSON
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 353-7972
Fax: (202) 514-8640
Email:  John.Roberson@usdoj.gov

Dated May 24, 2016