# Exhibit List

Exhibit A: Oil and Gas Lease of Submerged Lands between the United States and Sohio Petroleum Co. (Dec. 1, 1981), for All of Block 20, Mississippi Canyon.

Exhibit B: Oil and Gas Lease of Submerged Lands between the United States and Union Oil Company of California (July 1, 1995), for All of Block 21, Mississippi Canyon.

Exhibit C: Lease Forms Transmitted for Execution (May 10, 1995), including Oil and Gas Lease of Submerged Lands between the United States and Pogo Producing Co., Global Natural Resources Corp. of Nevada, and Nippon Oil Exploration U.S.A. Limited, July 1, 1995, for All of Block 73, South Pass Area, South and East addition with assignment to Taylor Energy Co. (Oct. 23, 2001) and Assignment of Operating Rights (May 9, 2001).

Exhibit D: Intentionally left blank

Exhibit E: Site Specific Environmental Assessment of the Application for Permit for the Decommissioning of Platform A and Lease Site Remediation at Mississippi Canyon Area, Block 20 with Attachments A-C (Sept. 10, 2009)

Exhibit F: Ecological Risk Assessment Consensus Workshop, An Examination of the Potential Ecological Impacts of Response Alternatives Being Considered for Sheen Abatement for the Remnants of the Taylor Energy Company, MC-20A Platform (CERA Report) (2013).

Exhibit G: Taylor Energy Company MC20 Final Risk Assessment and Cost Estimate (FRACE Report) (2014).

Exhibit H: Taylor Energy Company Notice of Appeal (July 8, 2015) regarding BSEE's denial of Taylor's request for departures and alternate procedures in the decommissioning efforts concerning Mississippi Canyon Block 20

Exhibit I: Stability Analyses of Excavation of Submarine Apron of Mississippi River Delta Block 20, Mississippi Canyon Area Gulf of Mexico to Taylor Energy Company, New Orleans, Louisiana by Dr. Harry H. Roberts, Roberts GeoServices, Baton Rouge, Louisiana & Dr. Robert Bea, Risk Assessment & Management Services, Moraga, California (March 1, 2008).

Exhibit J: MMS Environmental Assessment for Approval of Alternate Procedures or Departures from MMS Regulatory Requirements, Platform A and Associated Wells, Mississippi Canyon Block 20, Taylor Energy L.L.C. (April 2008).

Exhibit K: Compilation of oil discharge amounts for Taylor Energy between 2013 and May 2016 as published by the United States Coast Guard's National Response Center Homepage at http://nrc.uscg.mil/.

Exhibit L: Form MMS-133, Electronic Version, Well Activity Report (Nov. 14, 2009).

Exhibit M: U.S. Views on the Status of Taylor Energy Company's Obligations at Well Site MC-20 and Taylor Energy's Ongoing Oil Spill (May 14, 2015)

Exhibit N: BOEM Fact Sheet, Taylor Energy Oil Discharge at MC-20 Site and Ongoing Response Efforts (May 2015).

Exhibit O: U.S. Coast Guard Fact Sheet, Taylor Energy Oil Discharge at MC-20A Well Site and Ongoing Response Efforts.

Exhibit P: BSEE Letter to William W. Pecue, III, denying Taylor Energy Company's March 21, 2014, request for departure or approval of alternative procedures (May 11, 2015).

# EXHIBIT A

| Form 3300-1 | | Office | Serial number |
| --- | --- | --- | --- |
| (September 1978) | | New Orleans, LA | OCS-G 4935 |
| UNITED STATES | | Cash bonus | Rental rate |
| DEPARTMENT OF THE INTERIOR | | $133,755,000.00 | $3.00 per acre |
| BUREAU OF LAND MANAGEMENT | | Minimum royalty rate | Royalty rate |
| | | $3.00 per acre | 16 2/3 percent |
| OIL AND GAS LEASE OF SUBMERGED LANDS UNDER THE OUTER CONTINENTAL SHELF LANDS ACT | | Work commitment | Profit share rate |

This lease is effective as of DEC 1 1981 (hereinafter called the "Effective Date") by and between the United States of America (hereinafter called the "Lessor"), by the Manager, New Orleans OCS Office, Bureau of Land Management, its authorized officer, and

Sohio Petroleum Company                                                         100%

RECEIVED Nov 12 11:58 AM '81 BUR OF LAND MGMT OUTER CONTINENTAL SHELF OFFICE NEW ORLEANS, LA.

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered         1 and 4         attached hereto, the Lessee and Lessor agree as follows:

Sec. 1. Statutes and Regulations. This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462 as amended; 43 U S.C. 1331 et. seq. (hereinafter called the "Act"). The lease is issued subject to the Act; Sections 302 and 303 of the Department of Energy Organization Act, 91 Stat. 578, 42 U.S.C. 7152 and 7153; all regulations issued pursuant to such statutes and in existence upon the effective date of this lease; all regulations issued pursuant to such statutes in the future which provide for the prevention of waste and the conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein; and all other applicable statutes and regulations.

Sec. 2. Rights of Lessee. The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf described as follows:

All of Block 20, Mississippi Canyon, as shown on OCS Official Protraction Diagram, NH 16-10

(Continued on reverse)

containing approximately 2508.86 acres or hectares (hereinafter referred to as the "leased area").
These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the United States Geological Survey or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

Sec. 3. Term. This lease shall continue for an initial period of **five** years from the Effective Date of the lease and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon.

Sec. 4. Rentals. The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental of $3.00 per acre ( per hectare) or fraction thereof.

Sec. 5. Minimum Royalty. The Lessee shall pay the Lessor at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty of $3.00 per acre ( per hectare) or fraction thereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

Sec. 6. Royalty on Production. (a) The Lessee shall pay a fixed royalty of 16 2/3 percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium) is subject to royalty. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated, will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (1) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty paid in amount in excess of tankage required when royalty is paid in value. When royalties are paid in amount, the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

Sec. 7. Payments. The Lessee shall make all payments to the Lessor by check, bank draft, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the United States Geological Survey and tendered to the Director, except that filing charges, bonuses, first year's rental, and other payments due upon lease issuance, shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

Sec. 8. Bonds. The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

Sec. 9. Plans. The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans, and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

Sec. 10. Performance. The Lessee shall comply with all regulations and orders relating to exploration, development, and production. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

Sec. 11. Directional Drilling. A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Sec. 12. Safety Requirements. The Lessee shall (a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the leased area;

(b) maintain all operations within the leased area in compliance with regulations intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

Sec. 13. Suspension and Cancellation. (a) The Lessor may suspend or cancel this lease during the initial lease term or thereafter pursuant to Section 5 of the Act and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in Section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

Sec. 14. Indemnification. The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

Sec. 15. Disposition of Production. (a) As provided in Section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16-2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price, or if no regulated price applies, at the fair market value at the well head of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) As provided in Section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal agency pursuant to Section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price, or if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in Section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war, or when the President of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12 of the Act.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale No. 66
Outer Continental Shelf
Gulf of Mexico

STIPULATION NO. 1                                        OCS-G 4935

If the Deputy Conservation Manager (DCM), having reason to believe that a site, structure, or object of historical or archaeological significance (hereinafter referred to as "cultural resource") may exist in the lease area, gives the lessee written notice that the lessor is invoking the provisions of this stipulation, the lessee shall upon receipt of such notice comply with the following requirements:

Prior to any drilling activity or the construction or placement of any structure for exploration or development on the lease, including, but not limited to, well drilling and pipeline and platform placement, (hereinafter referred to as "operation"), the lessee shall conduct remote sensing surveys to determine the potential existence of any cultural resource that may be affected by such operations. All data produced by such remote sensing surveys, as well as other pertinent natural and cultural environmental data, shall be examined by a qualified marine survey archaeologist to determine if indicators are present suggesting the existence of a cultural resource that may be adversely affected by any lease operation. A report of this survey and assessment prepared by the marine survey archaeologist shall be submitted by the lessee to the DCM and to the Manager for review.

If such cultural resource indicators are present, the lessee shall: (1) locate the site of such operation so as not to adversely affect the identified location; or (2) establish, to the satisfaction of the DCM, on the basis of further archaeological investigation conducted by a qualified marine survey archaeologist or underwater archaeologist using such survey equipment and techniques as deemed necessary by the DCM, either that such operation will not adversely affect the location identified or that the potential cultural resource suggested by the occurrence of the indicators does not exist.

A report of this investigation prepared by the marine survey archaeologist or underwater archaeologist shall be submitted to the DCM and the Manager for review. Should the DCM determine that the existence of a cultural resource which may be adversely affected by such operation is sufficiently established to warrant protection, the lessee shall take no action that may result in an adverse effect on such cultural resource until the DCM has given directions as to its preservation.

The lessee agrees that if any site, structure, or object of historical or archaeological significance should be discovered during the conduct of any operations on the leased area, he shall report immediately such findings to the DCM and make every reasonable effort to preserve and protect the cultural resource from damage until the DCM has given directions as to its preservation.

STIPULATION NO. 4

Portions of this lease may be subject to mass movement of sediments. Exploratory drilling operations, emplacement of structures (platforms) or seafloor wellheads for production or storage of oil or gas, and the emplacement of pipelines will not be allowed within the potentially unstable portions of this lease block unless or until the lessee has demonstrated to the DCM's satisfaction that mass movement of sediments is unlikely or that exploratory drilling operations, structures (platforms), casing, wellheads, and pipelines can be safely designed to protect the environment in case such mass movement occurs at the proposed location. This may necessitate that all exploration for and development of oil or gas be performed from locations outside of the area of unstable sediments, either within or outside of this lease block.

If exploratory drilling operations are allowed, site-specific surveys shall be conducted to determine the potential for unstable bottom conditions. If emplacement of structures (platforms) or seafloor wellheads for production or storage of oil or gas is allowed, all such unstable areas must be mapped. The DCM may also require soil testing before exploration and production operations are allowed.

Sec. 16. Unitization, Pooling, and Drilling Agreements. Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

Sec. 17. Equal Opportunity Clause. During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations, which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

Sec. 18. Certification of Nonsegregated Facilities. By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

Sec. 19. Reservations to Lessor. All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights include:
 (a) the right to authorize geological and geophysical exploration in the leased area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;
 (b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;
 (c) the right, as provided in Section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being with an area needed for national defense, and so long as such designation remains in effect no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within, any designated area are suspended pursuant to this paragraph, any payments of rent and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 20. Transfer of Lease. The Lessee shall file for approval with the appropriate field office of the Bureau of Land Management any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

Sec. 21. Surrender of Lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Bureau of Land Management a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

Sec. 22. Removal of Property on Termination of Lease. Within a period of one year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

Sec. 23. Remedies in Case of Default. (a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of Section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of Section 24 of the Act. Furthermore, pursuant to Section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.
 (b) Nonenforcement by the Lessor of any remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease for the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

Sec. 24. Unlawful Interest. No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified, and during this continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 7, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431-433, relating to contracts made or entered into, or accepted by or on behalf of the United States, from a part of this lease insofar as they may be applicable.

---

SOHIO PETROLEUM COMPANY
N.O. Misc. File No. 993

BY: _____
(Signature of Authorized Officer)

W. E. BISCHOFF
(Name of Signatory)

AGENT AND ATTORNEY IN FACT
(Title)

NOVEMBER 3, 1981
(Date)

8303 Southwest Freeway, Suite 600
Houston, Texas 77074
(Address of Lessee)

(Continued on reverse)

THE UNITED STATES OF AMERICA, Lessor

_____
(Signature of Authorized Officer)

John L. Rankin
(Name of Signatory)

Manager
New Orleans Outer Continental Shelf Office
Bureau of Land Management
(Title)

NOV 1 3 1981
(Date)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*

GPO 845—187