# EXHIBIT M

| | | | |
|---|---|---|---|
| **Bureau of Safety And Environmental Enforcement** | * **Department of Justice** | * **Coast Guard** | * **Bureau of Ocean Energy Management** |

May 14, 2015

### The United States' Views on the Status of Taylor Energy Company's Obligations at Well Site MC-20 and Taylor Energy's Ongoing Oil Spill

1)      There is an ongoing oil discharge from Taylor Energy's MC-20 well site.  The specific sources of discharge at the well site are not fully known.  However, because the discharge volume is greater than can reasonably be accounted for by oil released from sediment only, oil most likely emanates from one or more of the 25 wells and from oil from the well site that is moving up out of the sediment.

2)      If left unchecked, the oil discharge from the well site could continue for 100 years or more.

3)      Since the discharge began in 2004, some of the oil that is discharging into the Gulf of Mexico from the well site is rising to the ocean surface and causing a visible oil sheen.  In 2008, the Coast Guard issued Taylor Energy an Administrative Order that required Taylor Energy to, among other things, conduct daily overflights of the MC-20 well site to visually monitor the oil discharges. Looking at the recent data collected over the past seven months (since September 2014) of nearly daily overflights, oil sheens have been observed and reported to be as large as 1.5 miles wide and 14 miles long, with an average of 1 mile wide and 5.5 miles long, covering an average area of 8 square miles. Over this period, the daily volume of oil discharging from the MC-20 well site has fluctuated between a low of less than one barrel (1 barrel = 42 gallons) to a high of 55 barrels of oil (2,329 gallons).  The average reported daily oil volume on the sea surface over the past seven months has been in the range of over 2 barrels (84 gallons); the volume on over 75 days was greater than 1 barrel, including 23 days of volume greater than 3.8 barrels (160 gallons) and 4 days greater than 35 barrels (1,470 gallons).

4)      The United States does not agree that 3.8 barrels per day for 30 days is the "worst case discharge" possible from the MC-20 well site.  The potential worst case discharge could be considerably greater than this, both as to volume and duration.

5)      It would be contrary to the public interest and inappropriate under applicable law to provide Taylor Energy a release of liability under the Clean Water Act, the Oil Pollution Act (OPA), the Resource Conservation and Recovery Act, or the Outer Continental Shelf Lands Act (OCSLA) for the wells and the ongoing oil discharge from the MC-20 well site.

6)      The 2008 Trust Agreement embodies Taylor Energy's commitment to fulfill obligations under OCSLA regarding the MC-20 well site.  By entering into the Agreement, Taylor Energy fulfilled its bonding obligations and resolved an enforcement citation with respect to those obligations, enabling it to receive MMS approval for the sale of offshore assets.

7)      The work that Taylor Energy committed to do in the 2008 Trust Agreement has not been completed.  As Taylor has stated, "Taylor's sole reason to exist is to address final resolution at MC20. An existing trust agreement with the federal regulators has already directed the reservation of funds for any remaining action that the federal regulators may direct Taylor to undertake.  Pecue Decl. ¶ 10." Taylor Sum. J. Brief at 12 (Feb. 23, 2015).  Taylor also recognizes that the funds subject to the Trust Agreement cannot be released until the Department of the Interior (DOI) decides that Taylor's OCSLA obligations have been fulfilled.  *Id.*

8) DOI's estimate of the costs necessary for completing the remaining obligations under the 2008 Trust Agreement exceeds the amount of funds currently in the Trust.

9) No reduction in funding of the 2008 Trust Agreement is warranted in the face of the ongoing oil discharge and the presence of unplugged and/or unsecured wells.

10) No reversion or partial reversion of Trust funds is warranted until the oil spill is permanently stopped and decommissioning work and related oil containment/removal work is completed.

11) In light of the long-term and ongoing nature of the oil spill, limiting future estimates to seven or eight years of continued discharge is not reasonable or appropriate for estimating future costs related to the MC-20 well site, including estimates of worst case scenarios.

12) Pursuant to OPA and the regulations of the Bureau of Ocean Energy Management, Taylor Energy is required to provide evidence of financial responsibility (e.g., bond, insurance) demonstrating that it can fulfill its obligations for oil spills from the well site.

13) The Coast Guard's cost estimate for responding to Taylor's proposed scenario for a one-time "worst case discharge" is approximately $12 million. As noted above, however, the United States does not agree with Taylor's proposed worst case discharge scenario. Therefore, the actual cost of responding to a worst case discharge at the MC-20 site could be much greater.

14) The reports and analysis presented by Taylor Energy's consultants to the Interagency Work Groups do not represent the views of the United States. Significant uncertainty exists related to the opinions about future events, including worst case discharges, sources, cross-flows, pressure recharge in the oil reservoirs, evolving technology, and suitable remedial measures.

15) Any assertions regarding the availability or unavailability of "existing" technology to completely stop and contain the ongoing discharge do not resolve the issue as to whether this discharge can be stopped or contained in the near or more distant future based on improved technology.

16) If proper well plugging and abandonment is not currently technologically feasible, there is still more that can be done to control and contain the oil that is discharging from the well site.

17) Taylor Energy is the Responsible Party required to pay for oil spill recovery and response costs under OPA. As the Responsible Party, Taylor Energy must continue to fulfill its obligations to respond to the ongoing oil spill and must comply with the Coast Guard's orders.

18) In 2012, the Coast Guard issued Taylor Energy an Administrative Order requiring the design, construction, and installation of a new pollution containment dome and submission of a written plan that shows a projected timeline for fabrication and installation. As of May 1, 2015, the final engineering design of the new dome has not been completed.

19) Taylor Energy must continue to work to permanently stop the ongoing oil spill.

20) This document of the United States' views has been shared with Taylor Energy.