No. 16-12C
(Judge Firestone)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TAYLOR ENERGY COMPANY LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT WITH RESPECT TO COUNT ONE

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

STEVEN J. GILLINGHAM
Assistant Director

JOHN H. ROBERSON
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 353-7972
Fax: (202) 514-8640

September 14, 2018            Email: John.Roberson@usdoj.gov

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ......................................................................... iv

SUMMARY .................................................................................................1

STATEMENT OF FACTS ...........................................................................4

    I.    Contrary To Taylor's Pronouncements, The Trust Is A Regulatory Document That Requires Taylor To Fulfill Federal Regulatory Obligations....4

    II.    The United States' Reiteration Of Taylor's Obligation To Ensure There Is No Oil Leaking From MC20 In May 2015 Did Not Constitute An Insertion Of A New Duration Term..................................................................5

    III.    Taylor's Claims That "No Evidence Exists Of A Present And Ongoing Leak From Any Of The Wells At The MC20 Site" Is Incorrect ......................6

    IV.    Taylor's Assertions Concerning The Consensus Findings Of The Sheen Source Location Work Group Concerning The Nature And Amount Of The Leaking Oil Are Incorrect.........................................................................12

    V.    Recent Activities Of The Unified Command And BSEE...............................13

ARGUMENT...............................................................................................14

    I.    Standard Of Review ......................................................................................17

    II.    Taylor's Motion For Summary Judgment Should Be Denied ........................17

        A.    Taylor's Action To Dissolve The Trust Based Upon An Alleged Indefinite Term Is Barred By The Statue Of Limitations...................17

        B.    The U.S. Views Document Describes Taylor's Decommissioning Obligations In A Manner That Is Entirely Consistent With The Trust And It Could Not Have Implemented A Change To The Trust's Duration Term As A Matter Of Law; Therefore The Factual And Legal Premises To Count One Fail ................................19

            1.    Factually, The United States Did Not Insert A New Duration Term Into The Trust...............................................................19

2. There Is No Legal Mechanism Through Which The United States Could Have Unilaterally Inserted A New Trust Term ..21

C. If the United States Had Inserted An Invalid Term, Taylor Would Not Be Entitled To A Dissolution Of The Trust, But, At Most, The Severance Of The Invalid Term...........................................................21

1. Louisiana Law Has A Strong Interest In Interpreting Trusts In A Manner That Upholds The Validity Of The Trust...........22

2. If Louisiana Law Applies And If The Trust's Duration Term Is Uncertain, A Louisiana Court Will Uphold The Validity Of The Trust And Impose A 50-Year Duration Term......................................................................................25

D. Even If Louisiana Trust Law Is Ignored, Taylor's Motion Should Be Denied Because, As Viewed Under Louisiana Contract Law, The Duration Term Of The Trust Is Determinable..............................26

E. Taylor's Motion Should Be Denied Because, Even If Louisiana Trust Law Is Ignored And The Duration Of The Trust Is Considered Indeterminable, A Reasonable Period For Taylor To Complete Its Decommissioning Obligations Has Not Passed Given The Very Significant Amount Of Oil Leaking From MC-20 .............................28

CONCLUSION...............................................................................................................30

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*501 Rue Decatur, LLC v. VTM Properties, LLC,*
    141 So.3d 861 (La. App. 4th Cir. 5/21/14) ...........................................................29

*Albritton v. Albritton,*
    600 So.2d 1328 (La. 5/26/92) .......................................................................22, 23

*Anderson v. Liberty Lobby, Inc. v. United States,*
    477 U.S. 242 (1986) ...........................................................................................17

*Baker v. Baker,*
    No. 2012 CA 0911, 2013 WL 1791077 (La. App. 1st Cir. 4/26/13) ....................29

*Burge v. State,*
    54 So.3d 1110 (La. 2/11/11) ...............................................................................22

*Caddo Gas Gathering LLC v. Regency Interstate Gas LLC,*
    26 So.3d 233 (La. App. 2d Cir. 11/12/09) ..........................................................27

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ...........................................................................................17

*Ellamae Phillips Co. v. United States,*
    564 F.3d 1367 (Fed. Cir. 2009) ..........................................................................17

*Hart v. Mechanics & Traders Ins. Co of Hartford Conn.,*
    46 F.Supp. 166 (W.D. La., 1942) .......................................................................24

*Hudson v. City of Bossier City,*
    930 So.2d 881 (La. 4/17/06) ...............................................................................28

*In re Brennan's House of Printing, Inc.,*
    65 So.3d 165 (La. App. 5th Cir. 5/31/11) ...........................................................18

*In re Oil Spill by Oil Rig "Deepwater Horizon",*
    MDL No 2179, 2017 WL 5157533 (E.D. La., Nov. 7, 2017) .............................28

*J-W Operating Co. v. Olsen,*
    130 So.3d 1017 (La. App. 2d Cir. 1/15/14) ........................................................23

*Landry v. Blaise, Inc.,*
    829 So.2d 661 (La. App. 4th Cir. 10/23/02) .......................................................18

*Lelong v. Succession of Lelong,*
    164 So.2d 671 (La. Ct. App. 3d Cir. 6/17/64) .......................................................22

*Lemieux v. Am. Optical Corp,*
    712 Fed. Appx. 409 (5th Cir. 2018)........................................................................18

*McLendon v. First Nat'l Bank of Shreveport,*
    299 So.2d 407 (La. App. 2d Cir. 7/1/74) ..........................................................22, 23

*Opryland USA Inc. v. Great American Music Show, Inc.,*
    970 F.2d 847 (Fed. Cir. 1992)................................................................................17

*Phillips Co. v. United States,*
    564 F.3d 1367 (Fed. Cir. 2009)..............................................................................17

*Richards v. Richards,*
    408 So.2d 1209 (La. 1981 5/18/81) ..................................................................22, 23

*Rushing v. Succession of Graves,*
    No. 2008 CA 1997, 2009 WL 2855736 (La. App. 1st Cir. 3/27/09) ....................18

*Schultz v. Hill,*
    840 So.2d 641 (La. App. 1st Cir. 2/14/03)............................................................27

*Sepulvado v. Procell,*
    99 So.3d 1129 (La. App. 3rd Cir. 10/3/12)...........................................................18

*Smith v. State Dept. of Health and Hosp.,*
    895 So.2d 735 (La. Ct. App. 2d Cir. 3/2/05) ........................................................22

*Sod Farm, LLC v. Lakewood Development, LLC,*
    No. 2011-1203, 2012 WL 1070020 (La. App. 1st Cir. 3/28/12) ..........................28

*State v. Campbell,*
    877 So.2d 112 (La. 07/06/04) ................................................................................22

*Waterfowl Ltd. Liability Co. v. United States,*
    473 F.3d 135 (5th Cir. 2006) ...................................................................................2

## STATUTES

28 U.S.C. § 2501...........................................................................................................19

La. Civ. Code Ann. Art. 1778 (1984) ...........................................................................26

La. Civ. Code Ann. Art. 2034 (1985) ................................................................................28

La. Stat. Ann. § 9:1831(4) (1987).....................................................................................25

La. Stat. Ann. § 9:1832 (1964) .........................................................................................26

La. Stat. Ann. § 9:2251 (1964) .........................................................................................24

## FEDERAL REGULATIONS

30 C.F.R. § 250.1703 ..........................................................................................................6

30 C.F.R. § 556.902 ............................................................................................................6

30 C.F.R. § 556.904 ............................................................................................................6

30 C.F.R. § 556.906 ............................................................................................................6

## FEDERAL RULES

Rule 56 of the United States Court of Federal Claims..........................................................1

Rule 56(e) of the United States Court of Federal Claims ..................................................17

## MISCELLANEOUS AUTHORITIES

*Louisiana Trusts for the Louisiana Lawyer: Some Comments on the New Statute*,
1 La. L. Rev. 774, 778 (1938)...........................................................................................24

*Some Interesting Features of the Proposed Trust Code*, 24 La. L. Rev. 712 (1964) ........23

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

_____

|  |  |
|---|---|
| **TAYLOR ENERGY COMPANY LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE UNITED STATES,** | ) |
| | ) |
| **Defendant.** | ) |
_____)

No. 16-12C

Judge Nancy B. Firestone

### DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO COUNT ONE

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully responds to the motion of plaintiff, Taylor Energy Company LLC (Taylor), for summary judgment on Count One of its complaint.

### SUMMARY

Invoking Louisiana contract law, Taylor moves to dissolve the Trust established in 2008 to guarantee the payment of the costs of properly plugging and abandoning (decommissioning) Taylor's oil and gas wells. The Trust currently holds $423 million to cover these costs. Taylor alleges that, in May 2015, the United States breached the Trust through the improper insertion of an indefinite duration term, and that, under Louisiana contract law, indefinite duration terms are interpreted to limit a contract to a reasonable period of time under the circumstances. Taylor further alleges that "no evidence exists of a present and ongoing leak from any of the wells at the MC20 site;" that there is only a small amount (three to four gallons a day) of "remnant oil" being "sparged from the sediments;" and that the rewards of undertaking further decommissioning activities to stop this *de miminis* sparging of oil is not justified given the risks of decommissioning.

Given these presumptions, Taylor argues that it should not be required to undertake any further decommissioning and a reasonable time for the Trust's existence has passed. Thus, Taylor demands the dissolution of the Trust and the return of its $423 million.

Every aspect of Taylor's argument is incorrect.  Taylor is decidedly wrong on the facts; and it is flatly wrong on the law.[1]

The United States did not introduce a new indefinite term for performance in May 2015.  Indeed, Taylor cannot point to any draft insertion or revised version of the Trust because there was none.  Instead, when the United States published the U.S. Views document in May 2015, it merely reiterated the Trust's original terms; namely, that the Trust would remain in existence until Taylor completed its decommissioning obligations.

To be sure, the Trust's duration term is not indefinite; instead, it provides a defined, determinable end point (even if the actual date of this occurrence is presently uncertain), which will occur when Taylor completes its decommissioning obligations.

Moreover, there is not a mere three to four *gallons* of "remnant oil" being disbursed from MC20 as Taylor's experts' and supposed "consensus" reports state. Instead, as the United States' experts have determined, approximately 250 to 700 *barrels* of oil a day are leaking from MC20 (there are 42 gallons of oil in a barrel), and the oil's chemical characteristics are consistent with ongoing releases of oil from multiple wells.

---

[1] The Court's Order dated August 15, 2018, requires that we "addresss[] the relevant Louisiana law."  Although we respectfully disagree that Louisiana law and not Federal law applies in the first place (*see, e.g.,* Def. Mot. to Dismiss at 56-63; Def Reply at 37-40; *Cf. also Waterfowl Ltd. Liability Co. v. United States*, 473 F.3d 135, 143 (5th Cir. 2006)), for the purposes of this brief we assume, in accord with the Court's order, that Louisiana law applies to Taylor's summary judgment motion.

Taylor's legal errors begin with the statute of limitations, which bars its claim. Because the allegedly indefinite duration term has existed since the Trust's execution, Taylor's claim concerning the duration term accrued with its execution of the Trust in March 2008.  This Court's jurisdiction is limited to claims brought within six years of claim accrual, but Taylor waited to file its complaint until 2016.

Moreover, given that the issue here concerns a Trust, it is Louisiana *trust law* and not Louisiana *contract law* that provides the relevant law.  Under Louisiana trust law, Taylor's argument for dissolution fails because, even assuming (incorrectly) an inserted indefinite duration term, Taylor's remedy is not the dissolution of the Trust but rather a declaration from the Court that (1) severs the invalid duration term, (2) replaces it with a 50-year term, and (3) otherwise upholds the validity of the Trust.  Furthermore, even if this Court were to disregard Louisiana trust law and instead rely upon Louisiana contract law, the outcome would be the same – the Trust is not dissolvable.

First, the Trust's duration falls within the category of a contract whose term is uncertain but determinable, and thus, under Louisiana law, the Trust is valid.  Moreover, in the circumstances here, where there is a large and active oil release, and where Taylor's wells are located under hundreds of feet of water and up to a hundred feet of mud, the Trust's duration has not been unreasonable.  Indeed, given the significance of the ongoing oil release and the difficulties in decommissioning, it is entirely reasonable to anticipate that the Trust's existence will be necessary for a number of additional years.

Thus, *under these circumstances*, even if Louisiana *contract* law applied (and it does not), given the Trust's purpose  – which is to ensure that funds are available to pay

3

for the decommissioning of Taylor's wells, a reasonable period for the completion of

Taylor's decommissioning and funding obligations certainly has not passed.

Accordingly, this Court should deny Taylor's motion.

## STATEMENT OF FACTS

Taylor's motion for summary judgment is based upon several material factual

assertions with which the United States disagrees.  Among these are Taylor's assertions

(1) that the Trust is not a regulatory instrument; (2) that the United States literally

inserted new duration terms into the Trust in May 2015; and (3) that there have been

consensus conclusions that the risks of intervention outweigh any benefit of stopping the

oil release, with these conclusions based upon further alleged consensus findings that

there is a *de minimis* oil release from MC20.  Taylor's statement of facts is incorrect on

each point.

I.    **Contrary To Taylor's Pronouncements, The Trust Is A Regulatory
      Document That Requires Taylor To Fulfill Federal Regulatory Obligations**

Taylor begins its description of the facts by stating that the Trust Agreement was

"not required by any statute or agency regulation."  Pl. Mot. at 2.  Taylor is incorrect.

The Trust was established pursuant to regulations that require lessees of Federal offshore

minerals to provide security, either as a bond, or here, as a trust, to ensure that funds are

available to complete regulatory decommissioning obligations.  *See* Def. Mot. to Dismiss

at 16-21; Def. Reply at 18-25.  Certainly, it is not an accident that all of the obligations

defined in the Trust tie directly to regulatory obligations.  Nor can Taylor explain why it

put $666 million into the Trust in order to pay for well decommissioning costs other than

it was required to do so.  The truth of the matter is that the Trust embodies a whole set of

4

regulatory obligations and thus Taylor's claim that "this litigation does not affect

Taylor's regulatory responsibilities" (Pl. Mot at 3 n.3) is incorrect.

## II.     The United States' Reiteration Of Taylor's Obligation To Ensure There Is No Oil Leaking From MC20 In May 2015 Did Not Constitute An Insertion Of A New Duration Term

Taylor argues that the United States unilaterally inserted a new term – an

indefinite period for performance – into the Trust Agreement through the publication of

the U.S. Views document in May 2015.  Pl. Mot. at 5-6.  But Taylor does not point to any

new draft of, or any literal addendum to, the Trust Agreement – because it cannot.  There

was no insertion or imposition of any new term.

When the United States stated its views on the status of Taylor's obligations

relative to the Trust in May 2015, it did not change any Trust provision.  Instead, the

United States reiterated the obligations that were already set forth in the Trust, while

denying Taylor's *request for a release* from its funding and decommissioning obligations

under the Trust.  The Trust requires – and has always required – that Taylor complete all

of its decommissioning obligations before the Trust can terminate.  Compl. Ex. 1 at

§§ 4.5-4.7, 6.8.  The United States' denial of Taylor's request *for a release from its*

*existing obligations* does not constitute an imposition of a new obligation.

A review of the U.S. Views document underscores this dynamic.  After describing

the state of the oil discharge at the MC-20 site (Pl. Mot. Ex. 3 at ¶¶ 1-4), the U.S. Views

document states that it is "inappropriate under applicable law to provide Taylor Energy a

release of liability."  *Id.* at ¶ 5.  It then states that "[t]he 2008 Trust Agreement embodies

Taylor Energy's commitment to fulfill obligations under OCSLA regarding the MC-20

well site."  *Id.* at ¶ 6.  It notes that, "[t]he work that Taylor Energy committed to do in the

2008 Trust Agreement has not been completed," and that "Taylor also recognizes that the funds subject to the Trust Agreement cannot be released until the Department of the Interior (DOI) decides that Taylor's OCSLA obligations have been fulfilled." *Id.* at ¶ 7. And, consistent with the Trust, the U.S. Views document states that, "[n]o reduction in funding of the 2008 Trust Agreement is warranted in the face of the ongoing oil discharge and the presence of unplugged and/or unsecured wells." *Id.* at ¶ 9. It also states that, "No reversion or partial reversion of Trust funds is warranted until the oil spill is permanently stopped and decommissioning work and related oil containment/removal work is completed." *Id.* at ¶ 10. The Bureau of Safety and Environmental Enforcement's (BSEE's) two web postings, to which Taylor also sites, mirror the U.S. Views' statements. *See* Pl. Mot. Ex. 4 at 1.

All of these statements accurately reflect the terms of the Trust and the fact of the ongoing oil release from MC20 and none of them insert a new term.[2] In short, Taylor's assertion that the United States inserted new terms into the Trust is incorrect.

## III.   Taylor's Claims That "No Evidence Exists Of A Present And Ongoing Leak From Any Of The Wells At The MC20 Site" Is Incorrect

Taylor argues that, since undertaking the last of its attempts to decommission certain of its wells (which concluded in March 2011),[3] it has been involved with various

_____

[2] The Trust's duration term is consistent with OCSLA regulations, which are *incorporated into the Trust*. *See*, *e.g.*, 30 C.F.R. § 556.902 ("Any bond or other security that you, as lessee or operator, provide under this part must: . . . (2) Guarantee compliance with all of your obligations under the lease, regulations in this chapter, and regulations under 30 CFR chapters II and XII"); 30 C.F.R. §§ 556.904, 556.906; 30 C.F.R. § 250.1703; Def. Reply at § IV(b)(ii).

[3] Taylor repeatedly suggests that it has no more obligations to perform under the Trust Agreement. *See* Pecue Decl. at ¶ 13 ("Taylor completed the last of its 'Obligations'

6

scientific studies of the MC20 site and that "[a]s to the question of 'spills' and 'leakage,' all these scientific reports consistently conclude that no evidence exists of a present and ongoing leak from any of the wells at the MC20 site."  Pl. Mot. at 5.  In support of this statement, Taylor attaches the declarations of William Pecue II, Taylor's President, and Dr. Richard Camilli, an expert retained by Taylor.  *Id.*

Mr. Pecue states, at paragraph 14 of his declaration, that "there are no quantifiable adverse environmental impacts associated with MC20" and, in support of this statement, he invokes the CERA Report, which is annexed as Exhibit 2 to his declaration.  At paragraph 15, Mr. Pecue cites the FRACE report, which he states was commissioned to "finally resolve all remaining scientific and factual issues" regarding MC20, and to make recommendations regarding future actions.  Continuing, at paragraph 16, in a critical passage that underscores the disconnection of Taylor's arguments from the facts concerning the ongoing oil leaks at MC20, Mr. Pecue states that the CERA Report:

> [D]etermined that the best course of action at MC20 is to not take any affirmative action since (1) additional intervention wells should not be drilled because the ecological risks outweigh the possible benefits; [and] (2) soil remediation options should not be pursued because the ecological risks outweigh the possible benefits.

Pecue Decl. at ¶ 16.

But the risk/benefit analysis undertaken in connection with the CERA Report was based on fundamental flaws concerning the volume and nature of the oil leaking from the

_____

under the Contract on June 26, 2011."); Pl. Mot. at 12.  Taylor's Trust obligations are not complete and will not be complete until the currently large release of oil is stopped.  *See* Compl. Ex. 1 at 1 (Whereas clause), 3 (Obligations definition), 10 (Work Phase completion) and 11 (Certification of Completion of all Obligations), and Schedule A.

site, resulting in a fundamental error with respect to the "benefit" component of the

risk/benefit assessment of whether to undertake additional well interventions.

First, the CERA Report incorrectly concluded that only three gallons of oil "per

observation" were emanating from MC20.[4]  Second, the CERA report is based on an

acknowledged assumption – which is incorrect.  Specifically, in a remarkable assumption

that predicts its conclusion and precludes an assessment that there is an ongoing oil leak,

the CERA Report states that:

> The evaluations and assessments made during this workshop
> are ***based on the assumption that there is currently no***
> recharge or ***contribution from subsea reservoirs*** to the
> contaminated sediments ***and the source of surface***
> ***expression of oil is from contaminated sediments.***

Pecue Decl. Ex. 2 at 38 (emphasis added).  This assumption in the CERA Report

remained even though "the well review team concluded that multiple conduits may

remain open for potential flow."  *Id.* at 40 n.3.

Third, the CERA Report acknowledged that: "A fundamental concern is the

absence of a clear understanding of the mechanism driving the continuing releases that

are being attributed to the Dome C area."  *Id.* at 35.  Moreover, the Report admitted that

"Uncertainties that challenge our group include the knowledge of specific and discrete

locations, and source of ongoing oil discharge."  *Id.* at 39.

---

[4]   *See* Pecue Decl. at Ex. 2 at 1 ("daily observed sheen sizes have steadily diminished to
the current average observed sheen volume of about 3 gallons (gal.) per day"), 2 (the oil
sheen is "very limited."), 6 ("the release rate and the behavior of the spilled oil are
understood, based on the detailed studies of the spill site, and the historical release data
available from the USCG overflights"); 39 ("low historic discharge volumes.")

Despite these assumptions and caveats, the CERA Report concluded that further decommissioning of Taylor's wells, and removal of oil-contaminated soil, should not proceed because the risk of undertaking these activities was larger than the ecological benefit of stopping a leak that averaged only three gallons per sighting.  *Id.* at 41; *see also id.* at 3, 29, 36-37, 40, 41.

The FRACE Report echoes the conclusion of the CERA Report with respect to the amount of oil being released from MC20:

> At present, there continues to be a low volume hydrocarbon release at the site, resulting in a sheen expression on the surface, averaging less than 4 gallons per observation. ***The rate of release equates to approximately one drop of oil being released each minute*** from a two square foot area on the mud line.

*See* Ex. 1 FRACE Report (March 25-26, 2014) at 9 (emphasis added).

Continuing, the FRACE Report concludes that "[m]ultiple sonar surveys over the last few years have confirmed an absence of any plumes remaining in existence."  *Id.* Significantly, this "consensus finding" concerning the absence of plumes was later contradicted by the 2017 Sheen Source Location Work Group (SSLWG), which identified persistent plumes issuing from MC20.  *See* Ex. 2, Michel Decl. at Ex. A. However, expressly echoing the CERA Report, the FRACE Report states:  "For the remaining 16 wells, as confirmed during the CERA workshop discussed below, the environmental risks of intervention outweigh the risks of non-intervention."  Ex. 1 at 12; *see also id.* at 20, 98, 99, 100.

In addition to his reliance on the CERA and FRACE Reports, Mr. Pecue relies on the declaration of Taylor's expert, Dr. Camilli.  Dr. Camilli's declaration includes the

attachment of what he says are "the Final Reports" (totaling 660 pages) of the SSLWG. He also attaches a modeling analysis (the "Rum Punch" modeling) in which he and Dr. Christopher Reddy (another Taylor-retained expert) opine on whether there is "an actively leaking oil well" at MC20.  *See* Pl. Mot. at Ex. B with Exs. 1-2.  As quoted in Taylor's brief, the modeling analysis states that: "All evidence suggests that the sheen is being generated by remnant oil sparged from the sediments" and that their modeling does not support the scenario of "oil from a leaking well."  Pl. Mot. at 5; *see* Pl. Mot. at Ex. B. Decl. of Dr. Richard Camilli (Doc. 65-3) at Ex. 2 (Doc. 65-7).  Drs. Camilli and Reddy also pronounce the misdirection that "[t]here is no detectable contribution to the sea surface sheen from ***an*** actively leaking well" Camilli Decl. at Ex. 2 at 9 (emphasis added); *see also id.* (noting that their "analysis does not support the scenario . . . [of] oil from ***a*** leaking well").  They also conclude that "if a well is actively leaking and contributing to the sheen, its flow rate is . . . on average, less than 2.4 gallons/day."  *Id.*

The United States disagrees with the CERA Report's conclusion, echoed by Taylor, that the risks of intervention outweigh the benefit of stopping the existing oil being released from MC20 – precisely because that risk/benefit assertion is based upon erroneous assertions concerning the volume and characteristics of the oil being released from MC20.  As detailed in the annexed expert report of Dr. Oscar Pineda-Garcia, the oil being released from MC20 is not three or four gallons a day as described in the CERA and FRACE Reports, nor is it bound by the "theoretical" modeling of Drs. Camilli and Reddy of less than 2.4 gallons a day.  Instead, Dr. Garcia has determined that the average amount of oil leaking from MC20 ranges from between approximately ***250 to 700 barrels a day.***  *See* Ex. 3, Expert Report of Oscar Pineda-Garcia, Ph.D. (Sept. 14, 2018) at § 2.0

(F) and 3.9, 3.12.[5]  Dr. Garcia's volume calculations are based on a combination of

satellite imagery, oil thickness measurements obtained at MC20, and measurements of

the duration on the ocean's surface of the oil emanating from MC20. Certainly, neither

Taylor nor its experts could opine that such an amount of oil could be explained by the

uplifting of remnant oil from previously contaminated soil.  Instead, the volume of oil

being released from MC20 is entirely consistent with active – and very significant –

releases of oil from Taylor's wells.

       Furthermore, as explained in the annexed expert report of Dr. Scott Stout, the

conclusions of Drs. Camilli and Reddy as set forth in their "Rum Punch" modeling

analysis are predominantly incorrect.  *See* Ex. 4, Expert Report of Scott A. Stout, Ph.D.,

P.G. (September 11, 2018).  First, in contrast to their conclusions, Dr. Stout opines that

the weathered character of the oil exiting the seafloor at MC20 does not indicate that the

seepage is necessarily "old" remnant oil, nor does it preclude that fresher oil is actively

leaking from some depth below the seafloor.  *Id.* at 5-7.  Moreover, he concludes that the

sheens from MC20 all exhibit chemical heterogeneities which indicate that the oil is

derived from **multiple wells** and that this data does not rule out active leakage from

**multiple** wells.  *Id.* at 7-9.  Dr. Stout further opines that the "Rum Punch" thesis is based

on two flawed premises:  that there is ***only one*** actively leaking well at the Taylor site

and that, if multiple wells were actively leaking, their oils would blend thoroughly to

_____

[5]  This range is based upon the application of the lowest, industry-agreed standard for oil
thicknesses for various classifications of oil surface expressions, and the highest industry-
agreed standard for oil thicknesses.  *See id.* at §§ 3.5, 3.7.  That is, the oil industry
recognizes that various surface expressions have a range of thickness and Dr. Garcia's
analysis considers those ranges by presenting corresponding low and high estimates.

present a homogenized chemical signature before leaving the seafloor. *Id.* at 11-13.

Finally, Dr. Stout concludes that "contrary to the primary conclusion of Camilli and

Reddy (2018) . . . all evidence <u>does not</u> suggest that the sheens are 'being generated by

remnant oil sparged from the sediment." *Id.* Instead, Dr. Stout finds that the "evidence is

also consistent with the viable scenario that multiple wells are actively leaking." *Id.*

**IV.   Taylor's Assertions Concerning The Consensus Findings Of The
        Sheen Source Location Work Group Concerning The Nature And
        Amount Of The Leaking Oil Are Incorrect**

Through the declaration of Dr. Camilli and his attachment of Taylor's five expert

reports, Taylor misstates the scope of the SSLWG and its conclusions. *See* Pl. Mot. Ex.

B at Ex. 1. Dr. Camilli characterizes these documents as "the Final Reports" of the

SSLWG, implying these were consensus reports of the SSLWG. Pl. Mot. Ex. B at ¶ 4;

*see also* Pl. Mot. at 14 ("any suggestion that there is an ongoing leak from an MC20 well

is directly contrary to the recent Final Reports of the [SSLWG]"). Dr. Camilli misstates

the nature of his attachment; these "Final Reports" were not consensus reports.

As noted in the attached declaration of Dr. Jacqueline Michel, who served as a

representative of NOAA on the SSLWG and *who drafted the final SSLWG memorandum*,

the only *consensus* document issued by the SSLWG was a six-page memorandum dated

November 17, 2017. *See* Decl. of Dr. Jacqueline Michel (Sept. 6, 2018) at ¶¶ 3-4. That

singular consensus document is attached as Exhibit A to Dr. Michel's declaration. *See*

*also* Pl. Mot. Ex. B at Ex. 1 at pp. 11-16 (out of 664). The six-page consensus

memorandum sets forth the only consensus determinations taken from the SSLWG's

review of the five expert reports tendered by Taylor's experts. *Id.* at ¶ 5. Indeed,

contrary to Dr. Camilli's suggestion, Dr. Michel states that "[t]hese five reports in their

entirety were not considered to be part of the November 2017 SSLWG memorandum *and they were not listed as appendices to the memorandum*." *Id.* at ¶¶ 6-7 (emphasis added). Furthermore, Dr. Michel states that she noted her disagreements with the conclusions of Taylor's experts within certain of those documents. *Id.* at ¶¶ 8-9.  Among her objections are that "'All of the forensic analysis conducted does <u>not</u> preclude the presence of a leaking well at the site;'" that "'Many of the bulleted points are very subjective and not supported by the chemical results cited;'" and that "Recharge from one or more wells would not lead to a more homogenous contamination; it would still be a heterogeneous mixture.'" *Id.* at ¶¶ 9-10 (citing pages 163 and 165 of appendix to the expert report of Drs. Overton and Reddy); *see* Pl. Mot. Ex. B at Ex. 1 at pp. 416, 418 (out of 664).

## V.      Recent Activities Of The Unified Command And BSEE

From August 14th through August 16th, 2018, the Unified Command (UC), now led by just the Coast Guard and Taylor, met and created an Incident Action Plan (IAP). *See* Ex. 5, Decl. of Capt. Kristi Luttrell (Sept. 6, 2018) at ¶ 3.  The IAP has several objectives, including to "secure the source of the ongoing sheen – elimination of the sheen within 12 months." *Id.* at ¶ 4 and Ex. A at 4.  The IAP calls for Taylor to assess and plan for dredging the contaminated sediment at MC20. *Id.*  If undertaken, removing the contaminated soil would fulfill a requirement of the Trust.  *See* Compl. Ex. 1 at Schedule A at § 5.  During the recent UC meeting, the UC considered alternative options to secure the source of the ongoing sheen, including an option to intervene and plug the wells at MC20. Ex. 5 at ¶ 4 and Ex. B.  As stated by Captain Luttrell:  "If dredging and hauling away contaminated sediment is determined to not be a viable response strategy or

does not eliminate the sheen at the MC-20 site, the Unified Command will pursue alternative strategies until the objective of eliminating the sheen is achieved." *Id.* at ¶ 4.

BSEE and NOAA scientists were at the MC20 site the week of September 3, 2018 to study, among other things, the oil flow release rate using below sea surface instruments. *See* Ex. 6, Decl. of David Fish (Sept. 11, 2018) at ¶ 4. They also obtained samples of the released oil and gas for further chemical analyses. *Id.* at ¶ 5. A preliminary report interpreting the data from this study is expected in January 2019. *Id.* at ¶ 6.

## ARGUMENT

Taylor's motion for summary judgment should be denied because the duration term about which Taylor complains – specifically a requirement that the Trust remain in existence until Taylor completes all of its decommissioning obligations – existed on the day (March 19, 2008) that Taylor signed the Trust. Thus, Taylor knew or is deemed to have known of the duration term no later than its execution of the Trust Agreement. Given that the statute of limitations in this Court for contesting this duration term as a breach expired six years later, on March 19, 2014, and Taylor did not file its complaint until January 2016, Taylor's claim concerning the duration term is time-barred.

To be sure, Taylor argues that there was a unilateral insertion of a new duration term to the Trust in 2015, with the issuance of the U.S. Views document. But, as noted above, the U.S. Views document did not change the Trust's duration term; it merely reiterated that the original duration term continued to apply. Nor would there have been any mechanism for the United States to have unilaterally inserted a new term into the Trust. The Trust provided neither party with the capacity to amend the Trust. Thus,

Taylor's complaint describes an event, a "unilateral insertion of a term into the Trust," that did not occur as a matter of fact and that could not have occurred as a matter of law.

Even if, however, such an insertion took place (and it did not), the remedy would not be the dissolution of the Trust and a return of Taylor's funds. Instead, at most, given Louisiana's strong policy of upholding the indestructibility of trusts, a court (other than the Court of Federal Claims)[6] could issue a declaratory judgment to the effect that the attempted insertion was void and that the original duration term of the Trust should remain in place. As interpreted under Louisiana trust law, the Trust's original duration term would remain in place – requiring that the Trust continue until Taylor completes all of its decommissioning obligations, or, under the limits placed by Louisiana trust law, until the passage of 50 years, whichever occurs first.

Taylor's summary judgment motion and its duration arguments in Count One ignore the application of Louisiana trust law; instead, Taylor incorrectly invokes Louisiana contract law. But if this Court determines that the Trust should be interpreted under Louisiana law and not Federal law, it is Louisiana trust law that applies to the interpretation of the Trust.

Taylor compounds its error of applying Louisiana contract law by misstating the Trust's duration term. It is not an "indeterminable and uncertain" duration term as described under Louisiana law but, instead, a "determinable and uncertain" duration term. That is, although it will be determinable when Taylor completes its decommissioning

---

[6] This Court does not possess jurisdiction to issue declaratory judgments. *See* Def. Reply at 29-37.

obligations, it is uncertain as to the date that Taylor will complete those obligations. Under Louisiana law, it is entirely appropriate for a contract's duration term to be determinable and uncertain. Therefore, although Louisiana law calls for the Court to presume in the case of a contract with an indeterminable and uncertain term that the duration will be for a reasonable period under the circumstances, this presumption is not applicable to the Trust.

But even if the Court were to determine that Louisiana contract law and not trust law applies here and that the Trust's duration term is "indeterminable and uncertain" such that a reasonable period for performance should be assessed as the time for performance, under the circumstances here, where there is a very significant oil leak, a reasonable time for performance – i.e., for completing the decommissioning of those wells – certainly has not passed. Taylor argues, however, that it is a "consensus" finding that the risk benefit analysis (based on an assumption of a leak of three gallons a day of remnant oil) favors no further decommissioning activity. And given that no further decommissioning is warranted, a reasonable time for further decommissioning activity has passed.

As, however, we have shown above, a finding of a three gallon oil leak is not a "consensus" finding. Instead, as set forth in the expert report of Dr. Oscar Pineda-Garcia, the amount of oil leaking from MC-20 is in a range of between 250 to 700 barrels a day. Moreover, the chemical analyses of Dr. Scott Stout indicates that the chemical signatures of the oil being released are consistent with ongoing releases from multiple wells. Furthermore, BSEE and NOAA scientists are actively studying these issues at this time. Given the magnitude of the oil leaking from Taylor's wells, and the difficulty of decommissioning wells that are 400 feet underwater and buried under 60 – 100 feet of

mud, "a reasonable period" for Taylor to complete its decommissioning obligations and to guarantee the funding of its obligations under the Trust has certainly not passed.

Thus, under any reading of Louisiana law, this Court must deny Taylor's motion.

## I.      Standard Of Review

For a summary judgment motion to succeed, the movant must show "that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law.  RCFC 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc. v. United States,* 477 U.S. 242, 247 (1986); *Ellamae Phillips Co. v. United States,* 564 F.3d 1367, 1371 (Fed. Cir. 2009).  In order to defeat a motion for summary judgment, the nonmoving party must point to "'specific facts showing that there is a genuine issue for trial.'"  *Celotex,* 477 U.S. at 324, (quoting Fed.R.Civ.P. 56(e)).  "A genuine dispute is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the non-moving party."  *Opryland USA Inc. v. Great American Music Show, Inc.,* 970 F.2d 847, 850 (Fed.Cir.1992) (citing *Anderson,* 477 U.S. at 248).  To the extent that actual evidence is presented, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.

## II.      Taylor's Motion For Summary Judgment Should Be Denied

### A.      Taylor's Action To Dissolve The Trust Based Upon An Alleged Indefinite Term Is Barred By The Statute Of Limitations

In Count One of its complaint, based on its allegations of an indefinite duration term, Taylor seeks a court order dissolving the Trust and returning all of the Trust's funds to Taylor.  *See* Compl. at ¶¶ 4, 80; Pl. Sum. J. Mot. at 11.  The alleged defect of an

indefinite duration term, if any such defect actually existed (and it did not), would have

existed, however, with the inception of the Trust.  And this is exactly what Taylor argues:

> The Contract does not contain an express, fixed *or*
> *determinable time period* for Taylor to complete the
> performance of the Obligations.

Pl. Mot. at 11 (citing, generally the Trust) (emphasis added).

The Trust's duration term does not set forth a definite number of years, but is,

instead, defined relative to a determinable future event:  Taylor's completion of all of its

decommissioning obligations.  Compl. Ex. 1 at §§ 4.5-4.7, 6.8.  As discussed below, this

determinable yet uncertain duration term is a valid duration term under Louisiana law.

But if such a duration term is improper, as Taylor alleges, Taylor has known

about the Trust's duration term since at least the Trust's inception.  *See, e.g., Rushing v.*

*Succession of Graves*, No. 2008 CA 1997, 2009 WL 2855736 at *3 (La. App. 1st Cir.

3/27/09) ("constructive knowledge or notice, sufficient to commence the running of

prescription exists when the plaintiff should have known, by exercising reasonable

diligence, that he had a cause of action) (citing *Landry v. Blaise, Inc.,* 829 So.2d 661, 666

(La. App. 4th Cir. 10/23/02)).  Certainly, Louisiana courts recognize that claims can

accrue upon the signing of a contract.  *See, e.g., Lemieux v. Am. Optical Corp.,* 712 Fed.

Appx. 409, 414 (5th Cir. 2018) ("because the bases upon which Plaintiffs' nullity claim is

based were readily discoverable at the time Plaintiffs executed the Settlement Agreement,

the prescriptive period commenced on the date Plaintiffs entered into the agreement")

(citing *Sepulvado v. Procell*, 99 So.3d 1129, 1135 (La. App. 3rd Cir. 10/3/12)); *see also*

*In re Brennan's House of Printing, Inc.*, 65 So.3d 165, (La. App. 5th Cir. 5/31/11).

18

Accordingly, given that the Trust was created as of March 19, 2008, any breach action to annul the Trust based on Count One must have been brought within six years, or by March 19, 2014.[7]   Taylor filed suit in January 2016; thus its claim is time-barred.

**B.     The U.S. Views Document Describes Taylor's Decommissioning Obligations In A Manner That Is Entirely Consistent With The Trust And It Could Not Have Implemented A Change To The Trust's Duration Term As A Matter Of Law; Therefore The Factual And Legal Premises To Count One Fail**

In an apparent effort to sidestep the statute of limitations, Taylor argues that it only first learned through the May 2015 publication of the U.S. Views document and BSEE web page that the United States would require that Taylor's funds remain in the Trust until all its decommissioning obligations are met.  Pl. Mot. at 6.  Taylor alleges that this May 2015 publication breached the Trust by inserting a new duration term.

**1.     Factually, The United States Did Not Insert A New Duration Term Into The Trust**

Taylor's argument fails in the first instance because the U.S. Views document does not change the Trust.  It inserts no new duration term; and it merely reiterates the duration term existent in the Trust since its inception.  See above at 5-6.  Moreover, although Taylor argues that there was a literal, unilateral insertion of a new term into the Trust, this is factually incorrect.  The United States did not propound a draft of the Trust with a new duration term, and Taylor, of course, can proffer no such document.

---

[7]  Although Louisiana law provides a ten-year statute of limitations period for a breach of contract (*see* La. Civ. Code art. 3499), this Court's jurisdiction is limited to the review of breach of contract claims brought within six years of accrual.  28 U.S.C. § 2501.

Rather than setting forth new duration provisions, as Taylor argues, the U.S. Views document merely reiterated the conditions already set forth in the Trust that require Taylor to complete *all* the Trust's decommissioning obligations before the Trust is terminated.  Indeed, at § 4.5 ("Final Certification of Completion of all Obligations"), the Trust requires that Taylor provide the United States with a written certification when Taylor has "properly completed" "all Obligations" under the Trust, which are specifically defined to include "material compliance with all applicable federal laws and regulations" and "the terms and conditions of the Lease(s)," and the obligations set forth in "the Plan" (Compl. Ex. 1 at 4.5, 5.3).[8]  It is only after the submission of this written certification – and "[t]he Beneficiary's written concurrence" (assuming "that monitoring of all Work completed to date shows no detectable leakage"), that the seven-year hold back of trust fund provision comes into play, which constitutes a tail to the Trust as it winds down.  *Id.* at § 4.7.  Importantly, Taylor has not provided the United States with any such written certification; nor could it truthfully do so.  The Trust's duration term is determinable, even if it is currently uncertain when Taylor will complete its decommissioning obligations.

Accordingly, there is no basis for Taylor's claim of a unilateral insertion of new duration terms through the issuance of the U.S. Views document.

_____

[8]  Obligations are defined to "mean the duties *and costs* of the Settlor pertaining thereto to abandon wells, remove the platform and other facilities, clear the seafloor of obstructions, and take corrective action associated with wells as set forth in Schedule A attached hereto arising pursuant to the terms of the Leases and applicable federal regulation related to such Leases."  Compl. Ex. 1 at §1.2(d) (emphasis added).

**2.      There Is No Legal Mechanism Through Which The United States Could Have Unilaterally Inserted A New Trust Term**

Furthermore, Taylor's description of the breach fails because there is no legal mechanism by which the United States could have modified the terms of the Trust. Simply put, by merely posting the U.S. Views document and communicating the substance of this document to Taylor, the Government's action did not amount, literally or constructively, to an insertion of terms into the Trust.

First, the Trust does not permit either party unilaterally – or the parties collectively – to insert a new term, or modify any existing term of the Trust. The Trust only allows the parties, upon mutual agreement, to *terminate* the Trust. *See* Compl. Ex. 1 at § 6.8(a). Certainly, the U.S. Views document recognizes, as the Trust has always stated, and as the Federal statutory and regulatory law embedded in the Trust provide, that Taylor is obligated to abide by the Trust's funding requirements until the decommissioning of its wells is complete to BSEE's satisfaction.

Thus, the premise to Taylor's motion fails at the outset: Factually, with the publication of the U.S. Views document, there was no change in the duration term of the Trust, and as a matter of both the Trust and Louisiana law, there could not have been a change in the duration term through an alleged unilateral act by the United States.

**C.      If the United States Had Inserted An Invalid Term, Taylor Would Not Be Entitled To A Dissolution Of The Trust, But, At Most, The Severance Of The Invalid Term**

Taylor's arguments seeking the dissolution of the Trust ignore that the Trust, if it is subject to Louisiana law, is subject first to Louisiana *trust law* rather than generic

Louisiana *contract law*.[9]  While both Louisiana contract and trust law uphold the validity of severance clauses, such as is found in the Trust, under Louisiana trust law there is an especially strong predisposition for upholding, in the first instance, the validity of a trust.

### 1. Louisiana Law Has A Strong Interest In Interpreting Trusts In A Manner That Upholds The Validity Of The Trust\_\_\_\_\_

Louisiana law requires that any interpretation of a trust be undertaken with a strong pre-disposition for upholding the trust's validity.  "'Whenever possible, that construction of a trust instrument will be favored which upholds the validity of the trust and renders the instrument effective.'"  *Lelong v. Succession of Lelong*, 164 So.2d 671, 674 (La. Ct. App. 3d Cir. 6/17/64) (quoting 90 C.J.S. Trusts § 161d, p. 20); *accord Smith v. State Dept. of Health and Hosp.*, 895 So.2d 735, 742 n.4 (La. Ct. App. 2d Cir. 3/2/05).

This predisposition to upholding a trust follows because, as the Louisiana Supreme Court has stated, "[t]he concept of trust indestructibility is inherent in our Louisiana trust law."  *Richards v. Richards*, 408 So.2d 1209, 1210 (La. 5/18/81) (citing *McLendon v. First Nat'l Bank of Shreveport*, 299 So.2d 407 (La. App. 2d Cir. 7/1/74)); *accord Albritton v. Albritton*, 600 So.2d 1328, 1332 (La. 5/26/92).[10]

---

[9]  The general rule of statutory construction in Louisiana "is that a specific statute controls over a broader, more general statute."  *Burge v. State*, 54 So.3d 1110, 1113 (La. 2/11/11).  "This Court has held that 'It is a fundamental rule of statutory construction that when two statutes deal with the same subject matter, if there is a conflict, the statute specifically directed to the matter at issue must prevail as an exception to the statute more general in character.'"  *Id.* (*quoting State v. Campbell*, 877 So.2d 112, 118 (La. 07/6/04)).

[10] Furthermore, the predisposition to upholding a trust in Louisiana is recognized as an evidentiary matter; thus, in Louisiana, "'Parol or extrinsic evidence may be admitted to aid in construing a trust instrument only if the instrument is ambiguous or uncertain, and only to explain, and not to contradict, the instrument."  *Lelong*, 164 So. 2d at 674 (citing 90 C.J.S. Trusts § 165a. p. 34).

22

Rather than obtaining the dissolution of the Trust as Taylor demands here because of an alleged attempt by the United States to insert a new duration term (Compl. at ¶ 80), under Louisiana trust law the Court is not empowered to readily dissolve a trust, but rather it is tasked with upholding a trust.[11]  Thus, in the *Richards* case, where a party attempted to exceed the statutory term limit for a trust, the Louisiana Supreme Court noted that the lower court's proper tack was not to dissolve the trust, but rather to pronounce the Trust's duration as the maximum allowed under Louisiana Trust law:

> 'If the terms of the trust purport to require a period of duration as to any beneficiary longer than the maximum allowable period set forth in the preceding sentence, but the trust is otherwise valid under this Act, *the trust shall be enforced as to such beneficiary for the maximum allowable period* and shall then be terminated.'

*Richards*, 408 So.2d at 1213 (quoting Section 4 of La. Act 81 of 1938) (emphasis added). With respect to the subsequent version of Louisiana Trust Code, the *McLendon* court noted that:  "'This stringent provision against terminability is contrary to the laws of most other states, which permit the settlor and all the beneficiaries to terminate the trust.'" *McClendon*, 299 So.2d at 410 (quoting David W. Robertson, *Some Interesting Features of the Proposed Trust Code*, 24 La. L. Rev. 712 (1964)).

---

[11]     Indeed, even if the parties were to agree to a change in the Trust's terms, such an agreement would not be permissible under Louisiana law unless there is an express reservation of such right in the Trust.  *See* La. Stat. Ann. § 9:2028 (2015) ("The consent of all settlors, trustees, and beneficiaries shall not be effective to terminate the trust or any disposition in trust, unless the trust instrument provides otherwise."); *Albritton*, 600 So.2d at 1332; *Richards*, 408 So.2d at 1210; *McLendon*, 299 So.2d at 409-10).  The strict upholding of the terms of an original trust agreement, even in the face of an agreement by the settlor, trustee and beneficiary, to change a trust's terms, is a bedrock principle under Louisiana law.  *See J-W Operating Co. v. Olsen*, 130 So.3d 1017, 1021 (La. App. 2d Cir. 1/15/14) (citing *Albritton*, 600 So.2d at 1332).

23

Here, there is no reservation of rights in the Trust for the parties *to modify* the

terms of the Trust Agreement; there is merely the reservation that Taylor and the United

States may agree to *terminate* the Trust upon "[m]utual written agreement."  Compl. Ex.

1 at § 6.8(a).  Accordingly, this Court must uphold the Trust's duration term:  "'The Act

upholds the doctrine that a valid trust, once it is created, should run the precise course and

the full course which its settlor has charted in its terms.  Deviations can be ordered only

by the court and then only the better to carry out the purposes of the trust.'"  *McLendon*,

299 So.2d at 410 (quoting Frank R. Stubbs, *Louisiana Trusts for the Louisiana Lawyer:*

*Some Comments on the New Statute*, 1 La. L. Rev. 774, 778 (1938)).

Furthermore, because Louisiana trust law has a statutory severability provision,

even if this Court were to find that the Trust's duration term was invalid, the remedy

would not be to dissolve the trust as Taylor argues:

> If a provision in the trust instrument is invalid for any reason,
> the intended trust does not fail, unless the invalid provision
> cannot be separated from the other provisions without
> defeating the purpose of the trust.

La. Stat. Ann. § 9:2251 (1964); *see, e.g., Hart v. Mechanics & Traders Ins. Co of*

*Hartford Conn.*, 46 F.Supp. 166, 168 (W.D. La., 1942).  This severability provision of

Louisiana law is echoed in the Trust's "Invalidity" clause.  *See* Compl. Ex. 1 at § 6.6.

Accordingly, even if – counterfactually – the United States were to have

"unilaterally imposed new terms that do not in fact exist in the Trust" as Taylor argues

(*see* Pl. Surreply (Apr. 25, 2018) at 28), the remedy under Louisiana law would not be the

Trust's dissolution but a declaratory judgment severing these breaching terms from the

Trust, leaving the rest (*i.e.,* the original terms) of the Trust in place, whose duration, as explained below, would be 50 years.

> **2.      If Louisiana Law Applies And If The Trust's Duration Term Is Uncertain, A Louisiana Court Will Uphold The Validity Of The Trust And Impose A 50-Year Duration Term**

If, nonetheless, this Court were to accept Taylor's argument that the Trust did not have a defined termination date, the implication of this finding would be that under Louisiana trust law, a duration term of 50 years will be found for the Trust.  The analysis under Louisiana law is as follows.

First, Louisiana law recognizes different analyses for Trusts concerning beneficiaries who are natural persons versus Trusts whose beneficiaries are not natural persons.  Here, the beneficiary of the Trust is the United States, which is not a natural person (nor is the settlor, Taylor, or the Trustee, JPMorgan Chase).  Thus, in the first instance, Louisiana Trust law states that:

> If the trust instrument stipulates no term, the trust shall terminate: . . . (2) At the end of the term prescribed by R.S. 9:1831(3) or 9:1831(4), if the income beneficiaries do not include a natural person.

La. Stat. Ann. § 9:1833 (1964).

Thus, because neither the settlor nor the beneficiary here is a natural person (and thus La. Stat. Ann. § 9:1831(3) is inapplicable), under § 9:1831(4) the term of the Trust is deemed to be fifty years from the creation of the Trust:

> [A] trust shall terminate at: . . . . (4) The expiration of fifty years from the creation of the trust, if none of the settlors and none of the income beneficiaries is a natural person.

La. Stat. Ann. § 9:1831(4) (1987).

Thus, because the Trust was executed on March 19, 2008, under Louisiana trust law, assuming an indefinite duration term, the Trust will terminate on March 19, 2058. Even if the duration term of the Trust called for a duration that could exceed 50 years, the Trust would not be dissolved but would be limited to a term of 50 years:  "A trust instrument that stipulates a longer term than is permitted shall be enforced as though the maximum allowable term had been stipulated."  La. Stat. Ann. § 9:1832 (1964).

**D.**     **Even If Louisiana Trust Law Is Ignored, Taylor's Motion Should Be Denied Because, As Viewed Under Louisiana Contract Law, The Duration Term Of The Trust Is Determinable**

Taylor argues that the Trust has an "unreasonable indefinite, and perhaps perpetual" term.  Pl. Mot. at 1.  And Taylor argues that "where a contract does not contain 'an express fixed or determinable time period' for performance, the contract must be performed within a 'reasonable time.'"  *Id.* (citing La. Civ. Code Ann. art. 1778 (1984)).

But Taylor mischaracterizes the Trust's duration term relative to Article 1778. Article 1778 provides that:

> A term for the performance of an obligation is a period of time either certain or uncertain.  It is certain when it is fixed. It is uncertain when it is not fixed but is determinable either by the intent of the parties or by the occurrence of a future and certain event.   It is also uncertain when it is not determinable, in which case the obligation must be performed within a reasonable time.

La. Civ. Code Ann. art. 1778 (1984).

The comments to Article 1778 state both that "where no time is fixed, an obligation must be performed in a reasonable time," (*id.* at cmt. (a)), and that "a term may be fixed not only by a period of time allowed for the performance of an obligation but

also by an event which is certain." *Id.* at cmt. (b).  Taylor's errors are thus obvious.  The

court does not explore what a "reasonable period for performance" is, unless a contract is

*both* indeterminable and uncertain.  That is not the situation here.

Here, the Trust provides that it will terminate upon a determinable event, namely,

the completion of the decommissioning obligations set forth in Schedule A to the Trust.

*See* Compl. Ex. 1 at §§ 4.5 – 4.7, 6.8 and Schedule A.  Even though it is currently

uncertain when Taylor will complete these decommissioning obligations, the completion

of those obligations, when they occur, will, in fact, be determinable.  Thus, even if

viewed solely under Louisiana contract law, the Trust's terms on their face *are not*

uncertain and indeterminable, and thus a resort to what a reasonable time period is under

the circumstance is not an exercise that a Louisiana court would entertain here.  For

example, in a case where the parties' contract provided that plaintiff was entitled to the

transport of a specified quantity of gas through the defendant's pipelines as long as the

defendant owned the pipelines, the court upheld the duration term finding it to be

determinable and uncertain:

> While it is not certain when the pipeline will cease to be used
> or when gas will cease to flow from the areas serviced by the
> pipeline, these events will one day take place.  Though the
> term is uncertain, it is certainly determinable by reference to
> the happening of future events.

*Caddo Gas Gathering LLC v. Regency Interstate Gas LLC*, 26 So. 3d 233, 237 (La. App.

2d Cir. 11/12/09); s*ee also Schultz v. Hill*, 840 So.2d 641, 645 (La. App. 1st Cir. 2/14/03)

("Taking the comments and text of Article 1778 together, one concludes that an uncertain

term that is determinable by reference to the happening of a future event is valid and

enforceable, even though the date of the happening of that future event cannot be known until its occurrence.").

Taylor cites to no cases where a contract's duration term was unilaterally adjusted by one party to a contract, which is what it complains about here.  As noted above, if the United States had (counterfactually) somehow managed such a feat, Taylor's remedy would not be a declaration of the Trust's invalidity (and the return of all of funds in the Trust), but rather, the mere severance of this newly-inserted term.  *See* Compl. Ex. 1 at § 6.6.  And this would be true under Louisiana contract law as well as Louisiana trust law.  *See* La. Civ. Code Ann. Art. 2034 (1985); *Hudson v. City of Bossier City*, 930 So.2d 881 (La. 4/17/06); *In re Oil Spill by Oil Rig "Deepwater Horizon"*, MDL No 2179, 2017 WL 5157533 at *8 (E.D. La., Nov. 7, 2017).[12]

Thus, if this Court were to find that the allegedly newly-inserted duration term is invalid, the original duration terms of the Trust would apply, and, as noted above, any such claim is barred by this Court's statute of limitations.

**E.     Taylor's Motion Should Be Denied Because, Even If Louisiana Trust Law Is Ignored And The Duration Of The Trust Is Considered Indeterminable, A Reasonable Period For Taylor To Complete Its Decommissioning Obligations Has Not Passed Given The Very Significant Amount Of Oil Leaking From MC-20**

Finally, even if this Court were to find that it should assess whether a reasonable period for the performance of Taylor's Trust obligations has passed, given the

---

[12] Taylor's citation to *Sod Farm, LLC v. Lakewood Development, LLC*, No.  2011-1203, 2012 WL 1070020 (La. App. 1st Cir. 3/28/12) (Pl. Mot. at 8-9) is misplaced because in that case the presumed future facts had changed.  In Count One, Taylor's argument is not that future facts have changed, but rather that there has been a change to the Trust itself.

28

circumstances in this case, the Court should find that a reasonable period has not passed and that Taylor should remain obligated to complete its decommissioning obligations.

Taylor argues that, given "[t]he nature of the contract, the circumstances surrounding it and pertinent usage and custom . . . 'even in the complex world' of OCS decommissioning obligations, a period of ten years cannot meet the reasonableness standard," thus violating Louisiana contract law which requires performance of a contract within a reasonable time.  Pl. Mot. at 13-14 (citing Art. 1778).  *See, e.g., 501 Rue Decatur, LLC v. VTM Properties, LLC*, 141 So.3d 861, 868 n.18 (La. App. 4th Cir. 5/21/14) ("under Louisiana law, when a term is left blank, it is considered to indicate a 'reasonable period'"); *Baker v. Baker*, No. 2012 CA 0911, 2013 WL 1791077 at *6 (La. App. 1st Cir. 4/26/13) (performance term claimed to be open-ended "must instead be performed within a 'reasonable time.'").

In assessing the current circumstances, Taylor warns the Court to ignore "any suggestion that there is an ongoing leak from an MC20 well," because that would be directly contrary to the "Final Reports" of the SSLWG.  *Id.* at 14.  And, citing the "Rum Punch" modeling of its experts, Drs. Camilli and Reddy, Taylor further warns the Court that any suggestion of an ongoing leak would be "directly contrary to the scientific 'modeling analysis' performed to answer a question of the Government."  *Id.*  Taylor concludes its warning by arguing that, because evidence of an ongoing leak from MC20 would be contrary to the work of its scientists, the introduction of "immaterial and irrelevant facts" concerning any leakage from its wells would not be material, and, indeed, would not even be relevant to its claims in this Court.  *Id.*

The conclusions of Taylor's experts are not, however, uncontested facts. Indeed, as noted above, the analysis undertaken by Drs. Garcia and Stout constitute compelling evidence of an active oil leak averaging between 250 to 700 barrels a day. *See* Exs. 3 and 4. Moreover, we disagree with Taylor's suggestion that the five reports its experts authored in connection with the SSLWG are uncontested, consensus reports. As Dr. Michel has stated, those reports were not consensus reports and they were not part of the conclusions issued by the SSLWG. *See* Ex. 2 at ¶¶ 5 – 9.

The circumstances of the large and ongoing release of oil from MC20 matter to the analysis of what is a reasonable time for performance of Taylor's decommissioning obligations. And these circumstances matter in connection with any cost/benefit analysis of the risk of undertaking intervention or decommissioning actions.

Thus, even if this Court were to apply Louisiana contract law, and to assume that the Trust's duration term is both indeterminable and uncertain, thus requiring an assessment of what a reasonable duration for the Trust should be under the circumstances, here, this Court should deny Taylor's motion. Given the magnitude of the ongoing oil leak, and the Coast Guard and BSEE's current steps in understanding the nature of the leak and in directing Taylor to stop the current sheen, it cannot be the case that a reasonable time for Taylor to complete its decommissioning activities under the Trust has passed. Accordingly, this Court should deny Taylor's motion and uphold the Trust so that funds are available to pay for future decommissioning costs at MC20.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court deny Taylor's motion for summary judgment with respect to Count One.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

/s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director


/s/ John H. Roberson
JOHN H. ROBERSON
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 353-7972
Fax: (202) 514-8640
Dated September 14, 2018                Email:  John.Roberson@usdoj.gov

31