# IN THE UNITED STATES COURT OF FEDERAL CLAIMS


TAYLOR ENERGY COMPANY LLC,    *    **CASE NO. 16-12C**

          **Plaintiff,**    *

**VERSUS**    *    **JUDGE NANCY B. FIRESTONE**

    *

**THE UNITED STATES OF AMERICA,**

    *

          **Defendant.**

\*    \*    \*    \*    \*    \*    \*    \*


## <u>TAYLOR'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON COUNT ONE OF THE COMPLAINT</u>

CARL D. ROSENBLUM, T.A.
ALIDA C. HAINKEL
LAUREN C. MASTIO
Jones Walker LLP
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8000
Facsimile: (504) 589-8296
crosenblum@joneswalker.com

And

JOHN F. COONEY
PAUL A. DEBOLT
Venable LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
Telephone: (202) 344-4000

**Attorneys for Plaintiff,**
**Taylor Energy Company LLC**

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

LAW AND ARGUMENT...................................................................................................4

I.      Louisiana Contract Law, Rather than Louisiana Trust Law, Must Be Applied to the Contract, as It Fails to Meet the Requirements for a Valid Trust.....................4

II.     This Is a Breach of Contract Action Pursuant to Which Taylor Seeks Monetary Relief, and This Court Is Vested with Jurisdiction Pursuant to the Tucker Act. ...........................................................................................................7

III.    The Government Unlawfully Extended the Term of the Contract Indefinitely, and Perhaps in Perpetuity...............................................................................7

IV.    The Government's Strained Attempts to Distract this Court with a Factual Dispute Contrived Years After the Breach Related to the Extent of "Leakage" at the MC-20 Site Is Admittedly Irrelevant to Taylor's Motion. ...............................13

V.     Finally, Separate and Apart from the Fact that It Is Not Material to Taylor's Motion, the Information Put Before this Court is Largely Incomplete and/or Inaccurate. ..................................................................................................17

CONCLUSION ...............................................................................................................20

CERTIFICATE OF SERVICE .......................................................................................21

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Adarbe v. United States*,
    58 Fed. Cl. 707 (2003) (Firestone, J.) ...................................................................................16

*Annie Sloan Interiors, Ltd. v. Jolie Design & Decor, Inc.*,
    No. 17-11767, 2018 U.S. Dist. LEXIS 75740 (E.D. La. May 4, 2018)..................................12

*Caddo Gas Gathering LLC v. Regency Interstate Gas LLC*,
    26 So.3d 233 (La. App. 2d Cir. 11/12/09) ...........................................................................11

*LAD Servs. Of La., LLC v. Superior Derrick Servs., LLC*
    (La. App. 1 Cir. 11/17/14); 167 So. 3d 746 .........................................................................15

*Lemieux v. Am. Optical Corp.*,
    712 Fed. Appx. 409 (5th Cir. 2018).....................................................................................10

*Lynch v. United States*,
    292 U.S. 571 (1934)................................................................................................................2

*Mobil Oil Exploration & Producing Southeast, Inc.*,
    530 U.S. 604 (2000)................................................................................................................2

*Schultz v. Hill*,
    840 So.2d 641 (La. App. 1st Cir. 2/14/03)...........................................................................11

*Sod Farm, LLC v. Lakewood Development, LLC*,
    2011-1203 (La. App. 1 Cir. 3/28/12); 2012 WL 1070020, at *4...........................................13

*Trient Partners I Ltd. v. Blockbuster Entm't Inc.*,
    83 F.3d 704 (1996)...............................................................................................................12

*United States v. Park Place Associates, Ltd.*,
    563 F.3d 907 (9th Cir. 2009) .................................................................................................7

*Williams v. Classic Locksmith, LLC*,
    405 Fed. Appx. 884 (5th Cir. 2010)......................................................................................11

**Statutes**

La. Civ. Code art. 1778........................................................................................4, 10, 11, 13, 15

La. Civ. Code art. 1833.................................................................................................................4

La. Civ. Code art. 1836.................................................................................................................5

La. Civ. Code art. 1906 ............................................................................5

La. Civ. Code art. 1927 ............................................................................5

La. Civ. Code art. 1965 ............................................................................5

La. R.S. 9:1721 .......................................................................................5

La. R.S. 9:1752 .......................................................................................4

La. R.S. 9:1831(4) ...................................................................................6

La. R.S. 9:2043 .....................................................................................6, 7

La. R.S. 9:2201 .......................................................................................5

La. R.S. 9:2221 .......................................................................................5

Trust Code article 1961(B) .......................................................................6

**Other Authorities**

30 C.F.R. § 556.58 ..................................................................................6

RCFC 56 ...........................................................................................14, 15

**INTRODUCTION**

The Court should grant Taylor's Motion for Summary Judgment because no genuine dispute as to any material fact exists as to Taylor's Count One claim that the Government breached the Trust Agreement ("Contract") in May 2015 by its unilateral insertion of an indefinite and potentially perpetual term for Taylor's performance under the Contract. In particular, the Government does not challenge Taylor's showing, based on documents published by federal agencies,[1] that the Government "notified" Taylor that it was indefinitely suspending Taylor's performance of its remaining Obligations under the Contract unless and until some new, currently unknown, technology may be created to allow Taylor's performance in a safe manner where the environmental benefits would exceed the well-documented environmental risks.

The Government's underlying argument – that Taylor seeks to avoid its statutory and regulatory obligations to address the response at the MC-20 site by having the Court "dissolve" the Contract[2] – is groundless. In Taylor's Complaint and its subsequent pleadings, Taylor has explicitly and repeatedly disavowed any effort to have the Court modify its regulatory obligations. *See, e.g.*, Rec. Doc. 1 at ¶¶ 8, 65; Rec. Doc. 72 at pp. 21-23 of 45; *see also* Rec. Doc. 72, n. 8. Nevertheless, in an effort to escape this Court's review of whether its conduct constituted a breach of contract under ordinary principles of contract law, the Government continues its practice of recasting Taylor's claims by repeating its legally and factually unfounded assertion that Taylor, by this litigation, seeks to avoid its legal responsibilities. To the contrary, Taylor has not asked this

---

[1] *See* the 2015 US Views document and the 2015 web postings (Rec. Docs. 11-3 and 11-14).

[2] To be clear, Count One of Taylor's Complaint does not seek to "dissolve" the Contract. Rather, it is a straightforward breach of contract claim pursuant to which Taylor seeks "monetary damages, including the release of the funds held in the Trust Account, . . . and the monetary damages Taylor has suffered as a consequence of the Government's breach." Rec. Doc. 1 at ¶ 80.

Court to modify or relieve it from its statutory and regulatory obligations, as Taylor accepts those obligations, which it has been performing since 2004.[3]

While the Government voluntarily entered into the Contract with Taylor to secure funding with respect to the performance of certain specified and defined Obligations,[4] there are several alternative mechanisms – separate and apart from the Contract – through which the Government can require a former lessee like Taylor to guarantee the availability of funding necessary to fulfill its regulatory obligations. Those alternatives would remain available irrespective of the Court's decision regarding whether the Government, by its conduct, breached the Contract. Indeed, the Government admits to the availability of other alternatives for guaranteeing funding for performance of lease decommissioning by a lessee. *See* Rec. Doc. 81 at p. 10 of 37 ( "The Trust was established pursuant to regulations that requires lessees . . . to provide security, either as a bond, or here, by as a trust, to ensure that funds are available to complete regulatory decommissioning obligations."); Rec. Doc. 11 at p. 77 of 79 ("BOEM's regulations . . . require lessees to post a bond or provide other forms of financial assurance – such as a lease-specific abandonment account – to ensure that funds are available to cover decommissioning costs."); *see also id.* at pp. 19 and 23 of 79. Accordingly, the Government's argument, based on a mischaracterization of Taylor's Count One claim, fails as a matter of law.

---

[3] This further highlights the distinction between this litigation and the IBLA appeal of the departure denial because the Government cannot point to anything in the relief sought here that would require addressing the regulatory provisions at issue before the IBLA. If the Court holds in Taylor's favor, Taylor's regulatory obligations and rights would remain unchanged.

[4] The Contract embodies a subset of regulatory obligations, in addition to other specific contractual terms and obligations, that the parties agreed to perform. As set forth in Taylor's prior briefing, the law is clear that, when the Government enters into a contract with a private party, it must abide by the rules of contract law that apply in the private-party context. *Lynch v. United States,* 292 U.S. 571, 579 (1934) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private parties."); *see also Mobil Oil Exploration & Producing Southeast, Inc.*, 530 U.S. 604, 607-08 (2000).

More importantly, however, for purposes of this litigation, the Government still has issued no orders to Taylor to perform any of the remaining Obligations under the Contract. In fact, to the contrary, it expressly instructed Taylor that it should <u>not</u> perform those Obligations unless and until Taylor receives such an instruction from the Government at some uncertain future date, if ever.

In a transparent tactical litigation ploy, for the first time, less than two weeks before the hearing on Taylor's Motion, the Government put forth what it contends is the "science" to support the purported existence of a leaking well. Putting aside its fundamental scientific defects, like its lack of proper peer review and non-compliance with Interior's Scientific Integrity Standards, evidence of whether a well is leaking, as the Government has admitted, is irrelevant and "immaterial" to Taylor's Motion. Simply put, this so-called "evidence," which was contrived years <u>after</u> the alleged breach, does not create an issue of material fact sufficient to defeat Taylor's Motion. The issue before the Court, as the Court has specifically asked the Government to address, is the applicability of Louisiana law, and whether, under Louisiana law, the Government breached the Contract when it publicly announced and "notified" Taylor in 2015 that it would unilaterally impose an indefinite term for Taylor's performance under that agreement.

Indeed, Taylor's Motion for Summary Judgment, and the evidence in support of it, is very straightforward. Taylor and the Government voluntarily entered into the Contract on March 19, 2008. Rec. Doc. 1 at Ex. 1. In 2015, the Government notified Taylor that it was unilaterally imposing an indefinite term for Taylor's performance of the remaining Obligations under the Contract and publically announced its withholding of Taylor's funds in the Trust Account indefinitely, and perhaps in perpetuity.[5] Governing Louisiana law provides that, when, as here,

---

[5] *See* Rec. Doc. 11-13 and Rec. Doc. 11-14.

the term for performance of a contract is not fixed and is not determinable, the contract must be performed within a reasonable time. *See* La. Civ. Code art. 1778. An indefinite and potentially perpetual term on its face cannot – and here does not – meet the standard of reasonableness. Accordingly, summary judgment in Taylor's favor is fully warranted.

## LAW AND ARGUMENT

**I.** **Louisiana Contract Law, Rather than Louisiana Trust Law, Must Be Applied to the Contract, as It Fails to Meet the Requirements for a Valid Trust.**

As Taylor has maintained from the outset, the Trust Agreement is a contract between the parties, governed by Louisiana contract law. For purposes of opposing this Motion, however, the Government has reversed its position yet again on whether the Trust Agreement is a contract,[6] now contending that it is a "trust" and thus that Louisiana trust law, not Louisiana contract law, applies.[7] The Government's contention is unavailing because the Trust Agreement, despite its title, is not recognized as a trust under Louisiana law.[8] First, the Trust Agreement is not a trust under Louisiana law because it is not in proper form. *See* La. R.S. 9:1752. Specifically, La. R.S. 9:1752 provides that "[a]n inter vivos trust may be created <u>only</u> by authentic act[9] or by act under private

---

[6] *See, e.g.,* Rec. Doc. 74 at p. 14 of 26 (the Government asserting that "our position is that the Trust Agreement <u>is a contract</u> . . . ."). (emphasis added).

[7] As a review of the Government's briefing throughout the course of this matter demonstrates, the Government's position on the Trust Agreement's nature has ebbed and flowed to suit the needs of the Government's various arguments. Today, it is a trust. Yesterday, it was a contract. *See* Rec. Doc. 74 at p. 14 of 26. Before that, it was a lease specific abandonment account. Taylor has already extensively briefed for the Court the reasons that the agreement fails to satisfy the mandatory requirements for a lease specific abandonment account and points out here, additionally, that the regulations for a lease specific abandonment account require that the funds be paid "on demand" to BSEE, another requirement foreign to the Contract.

[8] The Government chose to completely ignore Taylor's comment to this effect contained in its prior briefing. *See* Rec. Doc. 72 at p. 16 of 45, n. 9.

[9] Under Louisiana Civil Code article 1833, "[a]n authentic act is a writing executed before a notary public or other officer authorized to perform that function, in the presence of two witnesses, and

signature[10] executed in the presence of two witnesses and duly acknowledged by the settlor or by the affidavit of one of the attesting witnesses." (emphasis added). Here, the Trust Agreement was not created by an authentic act, there were not <u>any</u> witnesses (much less two witnesses) to the execution of the Trust Agreement, nor was it duly acknowledged by the settlor or by the affidavit of an attesting witness. *See* Rec. Doc. 1 at pp. 63 and 64 of 77. Accordingly, the Contract does not constitute a valid trust under Louisiana law, and Louisiana law pertaining to trusts is not implicated.

Second, the Trust Agreement, while meeting all the Louisiana law requirements for a valid contract,[11] is not consistent with the substantive characteristics of a trust under Louisiana law. *See* La. R.S. 9:1721, *et seq.* Typically, under a Louisiana trust, the property held in trust is ultimately distributed to and belongs to the beneficiary; it is simply held in trust by the trustee. *See also* La. R.S. 9:2201 (providing that there is a breach of trust where there is a loss or depreciation of the value of the trust estate resulting from a breach of trust); La. R.S. 9:2221 (vesting the beneficiary with the cause of action to pursue the breach).

Rather, the purpose and structure of the Contract differ from a typical trust in significant ways. Under the Contract, Taylor deposited its own funds to be held in trust. In accordance with the Contract's provisions, Taylor was contractually bound to pay for the performance of the specific Obligations from its funds outside the trust, until Taylor's completion of a given

---

signed by each party who executed it, by each witness, and by each notary public before whom it was executed…."

[10] Under Louisiana Civil Code article 1836, an act under private signature duly acknowledged is the signature of a party "acknowledged by a party to that act by recognizing the signature as his own before a court, or before a notary public, or other officer authorized to perform that function, in the presence of two witnesses."

[11] *See* La. Civ. Code arts. 1906, 1927 and 1965.

Obligation, after which the Contract entitles Taylor to reimbursement from its funds held in trust commensurate with the cost estimates set forth in the Contract with respect to each Obligation. Rec. Doc. 1 at p. 52 of 77. Moreover, contrary to a typical Louisiana trust, the Contract specifies that the funds held in trust must ultimately be returned to the Settlor, Taylor. *See* Trust Agreement, Article 6.8 (providing that all remaining funds revert to the Settlor upon termination of the agreement). Likewise, pursuant to Article 4.4 of the Contract, interest on the trust assets belongs to the Settlor. Taylor's entitlement to the interest on its funds held in trust is, again, inconsistent with Louisiana trust law, as Trust Code article 1961(B) provides that any income not allotted to an income beneficiary shall be allocated to the principal. In the end, notwithstanding the Contract's "Trust Agreement" title, its content ultimately controls.[12] Upon examination, its content reflects all the necessary elements of a valid Louisiana contract, while diverging in a number of substantive respects from the requirements for a valid Louisiana trust. As such, La. R.S. 9:1831(4), which provides that fifty years is the maximum allowable term of a trust if there is no earlier termination date, simply does not apply.[13]

Finally, even if the Contract were a valid trust and Louisiana trust law were implicated, under La. R.S. 9:2043, contract law applies because the trust is an onerous disposition in trust.

---

[12] Here, the "Trust Agreement" is more akin to an escrow agreement in connection with specific obligations, *i.e.,* a conventional contract, not a trust.

[13] This is further supported by the nature of the Contract, the circumstances surrounding it and pertinent usage and custom. *See* Rec. Doc. 65 at pp. 15-17 of 20 (discussing a reasonable period for performance in light of the circumstances). Indeed, while 50 years may be reasonable in the context of a typical trust, it plainly exceeds the standard of reasonableness with respect to a contract for purposes of securing funds for the performance of lease decommissioning obligations. *See, e.g.,* the seven-year hold back period under Article 4.7 of the Trust Agreement, which aligns with the general regulatory requirement imposing a seven-year retention period before cancellation of a bond put in place to secure a lessee's compliance with its lease obligations. *See, e.g.,* 30 C.F.R. § 556.58.

Specifically, under La. R.S. 9:2043, "[a]n onerous disposition in trust may be rescinded for the causes and under the limitations specified in the general law of contracts." As a result, even if the Contract met the requirements for a valid trust, which it does not, general law of contracts would control.

## II. This Is a Breach of Contract Action Pursuant to Which Taylor Seeks Monetary Relief, and This Court Is Vested with Jurisdiction Pursuant to the Tucker Act.

Notwithstanding that Article 6.9 of the Contract provides that "the parties consent to the jurisdiction of the federal courts to resolve any dispute arising under the Trust Agreement," the consent to waive sovereign immunity must be statutory. It cannot be granted by a contractual provision. *See e.g., United States v. Park Place Associates, Ltd.*, 563 F.3d 907, 928-29 (9th Cir. 2009). Furthermore, Article 6.9 does not set forth any particular federal court that a party must seek relief in, nor the type of relief that a party is entitled to pursue. Here, the "dispute" is a breach of contract by the Government, and the Tucker Act confers exclusive jurisdiction on the United States Court of Federal Claims to adjudicate Taylor's claims.[14]

## III. The Government Unlawfully Extended the Term of the Contract Indefinitely, and Perhaps in Perpetuity.

The Government argues that, in May 2015, it did not physically introduce a new indefinite term for performance into the text of the Contract. Consequently, because the US Views document and the web postings did not textually change the language of any contractual provision, the

---

[14] In addition, this Court should consider the absurd implications if Article 6.9 were interpreted in such a way as to "mandate that the plaintiff first seek declaratory relief in a federal court with jurisdiction." Simply by way of example, if there were a requirement to pursue a declaratory claim in advance of a breach of contract claim, this could result in the barring of valid breach of contract claims by operation of the six-year statute of limitations. Given that a cause of action for breach of contract accrues from the time of the breach, construing Article 6.9 to require resort to declaratory relief in a different federal court before pursuit of a breach of contract claim in this Court could effectively deprive Taylor of its legal right under the Tucker Act to pursue any monetary relief for the Government's breach.

Government claims a "no harm, no foul" theory. Specifically, the Government asserts that the original agreement provided that it would terminate upon Taylor's completion of its specific contractual Obligations and that there is no harm because the "revised" agreement contains the same duration for Taylor's performance. This linguistic game, however, ignores the effect of the 2015 US Views document and the web postings, which, in practice, extended indefinitely, and perhaps in perpetuity, the duration for Taylor's completion of the remaining Obligations specified in the Contract. Simply put, the Government decided, in the US Views document and the web postings, to delay Taylor's ability to perform the remainder of its Obligations until some undefined future date, which may never arrive, pending the invention and availability of hypothetical new technology that speculatively may allow Taylor to perform the remaining Obligations in a safe manner in which the environmental benefits outweigh the risks.

In its filing, the Government asserts three arguments based on this defective theory. First, the Government argues that it did not physically insert a new duration term into a second version of the document. This argument is specious. The facts readily establish that four government agencies published a formal decision that stated and "notified" Taylor that its performance of the remaining Obligations under the Contract was suspended indefinitely. This unilateral decision was binding on Taylor, irrespective of whether the parties agreed to modify the contractual text. Indeed, it has been implemented by BSEE as binding since 2015. As the United States concedes, "[t]here is no legal mechanism through which [it] could have unilaterally inserted a trust term." Rec. Doc. 81 at p. 27 of 37.

Second, the Government argues a new statute of limitations theory not presented in its Motion to Dismiss: that, even if the Government inserted a term of indefinite duration, that term was the same as the duration term that was in the agreement as originally signed, and Taylor failed

to timely challenge the duration provision within six years of signing the agreement, resulting in the barring of Taylor's claim. This argument mischaracterizes the nature of Taylor's claim. Furthermore, it ignores the effect of the US Views document, which in reality imposed an indefinite period for Taylor's performance of the remaining Obligations that could extend in perpetuity, particularly given the Government's authority to delay indefinitely Taylor's ability to complete its performance. As demonstrated by the Government's failure to authorize any additional performance by Taylor to date, the Government's acts in 2015 imposed a new term in the Contract that suspended indefinitely, and perhaps in perpetuity, Taylor's performance. The Contract as originally signed in 2008 contained no such provision.

Consequently, in practical terms, this new contractual provision has already delayed, for nearly three and one-half years, and will continue to delay the date on which Taylor's remaining Obligations will be completed. Thus, it cannot be credibly disputed that the Government has extended the actual duration of the Contract. Yet, through its argument, the Government asks the Court to overlook the actual operation and practical effect of the provision created by the US Views document. The Government added and "notified" Taylor of this provision in May 2015, and Taylor promptly filed this lawsuit in January 2016. Taylor therefore timely filed its Complaint, and the Government's argument fails as a matter of law.

Additionally, as a matter of law, the statute of limitations did not accrue on the date of the execution of the Contract, as the Government misguidedly contends. As discussed above, the circumstances have changed since the parties entered into the Contract. Indeed, in the Government's own words, Taylor was "notified" of the Government's unilateral insertion of an indefinite term in 2015. If Taylor knew from the outset of signing the agreement, why would it have to be "notified" in 2015? Also, from a practical perspective, why would Taylor have entered

into the Contract in the first place if it thought that it may never be able to perform all its specified Obligations such that its money would be locked in trust without purpose?  Notably, the language of the Contract is to the contrary, specifying Taylor's right to "diligently pursue to completion" each of the Obligations,[15] which reflects the parties' contemplation that Taylor would continuously perform under the Contract while receiving reimbursements from its funds held in trust in due course.

The cases cited by the Government to support its contention that a breach of contract action accrues upon execution of the contract are inapposite.  In *Lemieux v. Am. Optical Corp.*, 712 Fed. Appx. 409 (5th Cir. 2018), the primary case upon which the Government relies, "[a]ll three bases on which Plaintiffs assert nullity relate to the circumstances surrounding Plaintiffs' execution of the Settlement Agreement," and "these bases were readily apparent or reasonably ascertainable at the time the agreement was signed or in the five years that followed."  In the case, the plaintiffs sought to reset the prescriptive clock to the product liability claimant's death but failed to assert how, if at all, his death changed plaintiffs' understanding of the Settlement Agreement or their ability to assert a nullity cause of action within the five-year prescriptive period.  The circumstances here are markedly different because the facts giving rise to Taylor's claim of breach did not arise at the time of the contract's execution and instead arose in 2015 when the Government notified Taylor that it would not authorize Taylor to continue to "diligently pursue to completion" the remaining Obligations under the Contract and that, to the contrary, Taylor would have to wait indefinitely, as perhaps forever, to complete its performance.

Finally, the Government argues that the duration of the Contract is determinable under Louisiana law.  Louisiana Civil Code article 1778 provides as follows:

---

[15] Trust Agreement at § 5.3.

A term for the performance of an obligation is a period of time either certain or uncertain. It is certain when it is fixed. It is uncertain when it is not fixed but is determinable either by the intent of the parties or by the occurrence of a future and certain event. It is also uncertain when it is not determinable, in which case the obligation must be performed within a reasonable time.

Contrary to the Government's argument, the term for Taylor's performance of the remaining Obligations is not determinable.[16]  A contract's term is determinable only by reference to the happening of "a future event," which the Government asserts exists here and will occur when Taylor completes its performance of the remaining Obligations under the Contract.  The future event, however, must be certain to occur, absent which, the term fails to meet the "determinability" standard.  For this reason the Government's citations to *Caddo Gas Gathering LLC v. Regency Interstate Gas LLC* and *Schultz v. Hill*, both of which involved certain future events (the ownership and use of a pipeline and the termination of applicable leases, respectively), are distinguishable and inapposite because Taylor's completion of its performance of the remaining Obligations is not, in fact, certain to occur.  Illustrating this point, in *Annie Sloan Interiors, Ltd. v. Jolie Design*

---

[16] As the Government concedes, *see* Rec. Doc. 81 at p. 21 of 37, the term is far from certain. Comment (b) to Louisiana Civil Code art. 1778 provides that, "[u]nder this Article, a term may be fixed not only by a period of time allowed for the performance of an obligation, but also by an event which is certain, such as a person's death."  Unlike death, which is certain to occur, here there is no certainty regarding when, if ever, the Government will authorize Taylor's performance of the remaining Obligations under the Contract.  The circumstances here also differ from those contemplated in Comment (d), which provides as follows: "[u]nder this Article, a time for performance is implied when, though not fixed, it is clearly indicated by the circumstances.  Thus, if a wedding dress is ordered and the obligor is advised of the date of the wedding, performance is due no later than that date even though the latter has not been fixed as the time for performance." Instead, the circumstances here are more akin to Comment (e) which provides: "[u]nder this Article, performance is due within a reasonable time when it is neither expected immediately by the obligee nor due at a certain time.  Thus, an obligation to deliver a crop which was promised while still growing is due a reasonable time after the crop has been harvested."  As recognized by the court in *Williams v. Classic Locksmith, LLC*, 405 Fed. Appx. 884, 885-886 (5th Cir. 2010) (applying Louisiana law), "[t]he examples the Louisiana Code gives of terms that were not fixed but determinable from future and certain events involved events that were specific identifiable moments in time that served as a single reference point. La. Civ. Code § 1778, cmts. b, d, e (date of a person's death, date of a wedding, harvest of a crop)."

*& Decor, Inc.*, No. 17-11767, 2018 U.S. Dist. LEXIS 75740, at *19-20 (E.D. La. May 4, 2018), the United States District Court for the Eastern District of Louisiana recently engaged in an analysis of Louisiana law regarding determinable terms, citing with approval and ultimately relying upon the Fifth Circuit's decision in *Trient Partners I Ltd. v. Blockbuster Entm't Inc.*, 83 F.3d 704 (1996).[17]  The *Annie Sloan Interiors, Ltd.* court explained:

> The License Agreement [in *Trient Partners I Ltd.*] allowed for termination upon "(1) defaults by either party that are not or cannot be cured within a specified number of days; (2) the death or incapacity of a natural person who is one of Trident's [*sic*] partners, if Blockbuster does not consent to the transfer of the deceased partner's interest; (3) the transfer or change of control of Trident's [*sic*] partnership without Blockbuster's prior approval; and (4) the insolvency of either party." *Id.* at 708. The court held that none of the aforementioned conditions were of "the kind of determinable events that transform a contract of indefinite duration into one of definite duration," and explained that it
>
>> Would not hold that a contract is definite in duration when it . . .is confined in time only by "termination provisions" which contain conditions that are likely never to transpire.  If we were thus to hold, Trident [*sic*] could very well be forced by Blockbuster to stay in the video rental and sales business, and operate Superstores, in perpetuity.  This is precisely the antithetical result that courts seek to avoid by holding indefinite duration to be terminable at will.
>
> *Id.* at 709 (citations omitted).

*Annie Sloan Interiors, Ltd.*, 2018 U.S. Dist. LEXIS 75740, at *19-20.

In making its argument that the term for performance is determinable, the Government asks this Court to completely ignore the practical effects of the Government's insertion of a new unilateral provision into the Contract, which gives BSEE full authority, in the exercise of its discretion, to control when the termination date will occur, if ever.  Indeed, when the parties entered into the Contract, the intention was that Taylor would sequentially and continually perform

---

[17] While Texas law applied in the *Trient Partners I, Ltd.* case, the *Annie Sloan Interiors, Ltd.* court found the case applicable.

its Obligations until complete. But, the circumstances changed in light of the consensus conclusions of the CERA Report that environmental risks outweighed the possible benefits of further performance of Taylor's Obligations. Thereafter, the Government unilaterally put Taylor's performance on an indefinite and perpetual hold. This was not what the parties originally contemplated, and, at that point, the term of the Contract was certainly not determinable because Taylor's completion of the remaining Obligations under the Contract may, in fact, never occur, making the term for performance indeterminable. *See Sod Farm, LLC v. Lakewood Development, LLC,* 2011-1203 (La. App. 1 Cir. 3/28/12); 2012 WL 1070020, at *4.[18]

Here, Taylor's term for performance of its Obligations is not determinable; therefore, Louisiana law dictates that it must be performed within a reasonable time. *See* La. Civ. Code art. 1778. As previously briefed by Taylor,[19] the circumstances here surpass all bounds of reasonableness. Still, as we sit here today, the same circumstances apply, and Taylor has not been authorized to perform any further Obligations. In fact, the last Obligation that the Government authorized Taylor to perform was completed in July 2011 – over seven years ago.

## IV.     The Government's Strained Attempts to Distract this Court with a Factual Dispute Contrived Years After the Breach Related to the Extent of "Leakage" at the MC-20 Site Is Admittedly Irrelevant to Taylor's Motion.

The Government's Opposition presents a factual disagreement with Taylor's position on the extent of the "leakage" of oil at the MC-20 site, based on facts collected over three years <u>after</u> the wrongful conduct, and that the Government now tries to read back into the factors to be

---

[18] The Government's attempt to distinguish this case fails because the circumstances have in fact changed, which in turn resulted in the Government's decision to impose unilaterally an indefinite and perhaps perpetual term.

[19] Taylor incorporates by reference its prior briefing on why a reasonable time for performance has already elapsed. *See* Rec. Doc. 65 at pp. 15 - 19 of 20.

considered in determining whether a breach occurred in 2015. The Government's after-the-fact introduction of these materials is not sufficient to defeat Taylor's Motion for a number of independent reasons.[20]

First, the Department of the Interior's Scientific Integrity Procedures Handbook expressly provides that it will not rely on science that does not comply with established scientific integrity standards. *See* Scientific Integrity Procedures Handbook, attached hereto as Exhibit "1" at pp. 5-6. Further, Taylor objects to the inclusion of such "evidence" on the basis that much of the information and the supporting expert reports are not proper summary judgment evidence sufficient to defeat Taylor's Motion. *See* RCFC 56(c)(2). Ultimately, from an evidentiary standpoint, the information furnished by the Government is insufficient.[21]

Rather, the recent creation of "evidence" is premeditated gamesmanship for the sole purpose of influencing this litigation. If the Government truly believed that 250 to 700 barrels of oil on average were leaking each day, it, without question, would be under an immediate duty to act. But the bottom line is that it has not done so, and Taylor's response obligations are no different today than they were in 2015. Indeed, despite the Government's recent introduction of alarming – yet unsupported – "facts," the Government has not told Taylor to do anything differently, and

---

[20] Interestingly, the Government expressly attacked Taylor's presentation of the science, *see* the Government's Cross-Motion to Strike Plaintiff's Expert Report (Rec. Doc. 68), but now it attempts to rely upon its own expert reports, expressly crafted in connection with this litigation, in a superficial effort to defeat Taylor's Motion.

[21] The "evidence" offered by the Government is also unsupported, and in fact contradicted, as addressed in Section V, *infra.* But, again, this should be of no moment with regard to Taylor's Motion. Undoubtedly, the Government will attempt to use the facts presented in its Opposition to support its other motions pending before this Court. Indeed, the Government's inclusion of this "evidence" reflects a back-door attempt to present additional evidence in connection with its Motion to Dismiss (among other various pending motions), given that the other motions have already been fully briefed.

the Government continues to adhere to the prevailing consensus conclusions of the CERA Report. *See* Rec. Doc. 11-6 at 54, § 6.3.7 ("Do not pursue additional well intervention because the ecological risks outweigh the possible benefits" and "Do not pursue dredge/dispose or dredge/cap options because the ecological risks outweigh the possible benefits"); *see also id.* at 53, §§ 6.3.1 and 6.3.2.

The breach of contract that is the subject of Count One occurred in 2015, when the Government, in its own words, announced that the pause that it initiated to engage in further studies was not just a temporary pause, but rather was indefinite, and perhaps in perpetuity. In its Opposition, the Government does not dispute the fact that it made such a determination or suspended Taylor's performance of the remaining Obligations indefinitely, nor does it claim that Taylor has been instructed to perform any specific Obligation. Thus, the only material facts for Rule 56 purposes remain undisputed – that the Government unilaterally inserted an indefinite, and perhaps perpetual, term in the Contract in 2015 in violation of Louisiana law.

The Government attempts to graft its current position, developed during the heat of litigation, onto the events of 2015 in an attempt to apply its *post hoc* views retroactively in order to justify its 2015 breach of contract. But the Government cannot now, years after its 2015 breach of contract, create "evidence" in an effort to defeat Taylor's breach of contract claim.[22] *See, e.g., LAD Servs. Of La., LLC v. Superior Derrick Servs., LLC* (La. App. 1 Cir. 11/17/14); 167 So. 3d 746, 761 (holding that "it is the conduct in failing to perform or in breaching the contract, that is relevant to whether a party was in bad faith, not the party's actions subsequent to the breach."). This recent activity does not create a material issue of fact within the meaning of RCFC 56 because

---

[22] Similarly, this *post hoc* recasting of the facts to justify the Government's 2015 decision should have no bearing on the legal determination of a "reasonable term" for Taylor's performance.

the Government nowhere claims (nor could it) that it relied on these recent reports to suspend the time for Taylor's performance indefinitely.

Third, as extensively briefed in Taylor's Motion to Strike (Rec. Doc. 62), the extent and source of an alleged "leak" is irrelevant and "immaterial."[23]   In fact, the Government itself expressly acknowledged that the extent and source of the release of oil is "immaterial."  *See* Rec. Doc. 68 at 7 ("The factual assertions to which Taylor objects are ultimately immaterial. . . . ." (emphasis added); *id.* at 11 (Taylor "challenges concepts that are immaterial to the key determinations this Court will have to resolve. . . .") (emphasis added).  Hence, based on the Government's own words, this Court should not consider any purported "facts" related to leaks or discharges.  Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Adarbe v. United States*, 58 Fed. Cl. 707, 714 (2003) (Firestone, J.) (quoting *Anderson*, 477 U.S. at 247-48, 106 S.Ct. at 2505).  "It is proper on a motion for summary judgment for this court to engage in interpretation of contracts and statutes," *Adarbe*, 58 Fed. Cl. at 714 (citations omitted), which is the only thing Taylor seeks in this Motion.  By virtue of this Motion, Taylor simply asks the Court to interpret the Contract by application of standard principles of contract law to resolve whether the Government committed a breach, in

---

[23] Taylor incorporates by reference the arguments set forth in its Motion to Strike (Rec. Doc. 62) and Reply to Defendants' Opposition to Taylor's Motion to Strike and Opposition to Defendants' Cross-Motion to Strike Plaintiff's Expert Report (Rec. Doc. 71), which are equally applicable here. Again, it is important to remember that the Trust Agreement relates only to select, defined "Obligations," and, because the "Obligations" under the Contract do not cover a sheening event, it is entirely irrelevant for purposes of this breach of contract action whether a "discharge" from the marine sediments on the ocean's floor is causing sheening on the ocean's surface at the MC20 site, or whether or to what extent it may be from some other source.

2015, when it unilaterally sought to insert an indefinite term for Taylor's performance.[24]  Here, no genuine dispute exists as to any material fact regarding this Count One claim, warranting summary judgment.

**V.     Finally, Separate and Apart from the Fact that It Is Not Material to Taylor's Motion, the Information Put Before this Court is Largely Incomplete and/or Inaccurate.**

While Taylor does not want to take the Government's "bait" by disputing the so-called "facts" presented in its Opposition, it would be remiss not to address several significant omissions and issues with respect to what has been offered to the Court.

The Expert Report of Oscar Pineda-Garcia (Rec. Doc. 81-3) (the "Garcia Report"), is fundamentally flawed because it relies on surface observations to conclude that an astronomical quantity of oil is being discharged daily.  As the Government's own policy establishes, it is not possible to determine an alleged quantity of discharge from the sediment based upon observations on the surface.  *See* Declaration of Wade Bryant (Rec. Doc. 72-8).  This is directly contrary to the Coast Guard's own manual and NOAA's directives.  *See id.*  Additionally, Garcia disagrees with the reports from the United States Coast Guard's National Response Center, *see* Rec. Doc. 81-3 at p. 5 of 91, ¶¶ I and J, contradicting the Government's own composite exhibit (Rec. Doc. 11-11) previously submitted to this Court.

Over time, the Coast Guard has modified its Order directing Taylor to conduct overflights to monitor the sheen and provide Coast Guard with reports on the overflight observations, first reducing the overflights to only one overflight per day, and thereafter further reducing the requirement to two overflights per week.  This reduction in overflights directly undercuts the

---

[24] Again, by this litigation, Taylor does not seek a ruling affecting its regulatory responsibilities under OCSLA or the federal regulations.  *See* Rec. Doc. 1 at ¶¶ 8 and 65.

Garcia Report's estimate. Also, just recently, in a decision memorandum dated September 13, 2018, the Government advised that it no longer wants quantity reported on the NRC reports. *See* Decision Memorandum, attached hereto as Exhibit "2." This further supports that the surface observations are not a sound way to quantify "daily" discharge, and the Government's recognition of same.

And, nowhere does the Government's expert, Scott Stout, definitively conclude that a well, much less multiple wells, is leaking. *See* Expert Report of Scott A. Stout (Rec. Doc. 81-4) ("Stout's Report"). Stout's Report sets forth only tentative statements, at best. *See, e.g.,* Rec. Doc. 81-4 at pp. 5 and 7 of 57 (stating that the presence of biodegraded oil exiting the seafloor and creating sheens "does not preclude the scenario where fresh(er) oil is actively leaking"), 9 of 57 (noting that leaking wells cannot be ruled out), and 11 and 12 of 57 (referencing only a "viable scenario that multiple wells are actively leaking"). Thus, Stout's Report offers only theories, which even Stout himself is unwilling to stand behind definitively.

Moreover, the Government's recent "evidence" that a well is leaking is contrary to the Final Reports of the SSLWG and the mixing model, both performed at the express directives of the Government. And, although the Government attempts to dissect the Final Reports of the SSLWG into two parts, labeling certain pages as an "appendix," all 664 pages are the "final" reports. *See* Declaration of Richard Camilli (Rec. Doc. 65-3) at ¶ 4, authenticating and identifying all 664 pages as the final reports of the SSLWG (Rec. Doc. 62-2). The statements contained in the recent Declaration of Jacqueline Michel (Rec. Doc. 81-2) (the "Michel Declaration") cannot be reconciled with her <u>own</u> contemporaneous statement establishing that each scientist in the group considered and addressed the comments received from the other scientists on their work (*i.e.*, the SSLWG members engaged in peer review). *See* Appendix 6, p. 162, ¶ 5 ("We addressed this point

and made the necessary changes."); *see also id.* at p. 165, ¶ 7 ("This section was removed from the Appendix"); *see also* email correspondence dated October 18, 2017, attached hereto as Exhibit "3" (confirming that "all members of the SSLWG have submitted their comments" and Dr. Cho of the Government stating "I agree with Dr. Camilli's conclusions on his report based on Taylor's data."). In fact, the precise sections cited by Dr. Michel in paragraphs 8 and 9 of her Declaration contain such notations, that she conveniently omits to reference. Further, the Michel Declaration is contradicted by the express terms of her own cover "memorandum" dated 17 November 2017, which identifies the five individual expert reports and states "[e]ach of the [5] authors responded to comments provided by the SSLWG members and revised their reports accordingly. Therefore, the SSLWG considers these reports as final and the 2017 studies as completed." *Id.* at 11 of 664. Accordingly, as Dr. Michel has admitted, all of the discussion by the Government on "comments" to the "initial draft report" were addressed and resolved prior to publishing the final reports approved by the SSLWG and submitted to the Unified Command.

Finally, the recent "activity" reported by the Government, and particularly that set forth in the Declaration of Captain Kristi M. Luttrell, USCG (Rec. Doc. 81-5), is selective and incomplete. *See* Declaration of William W. Pecue, II, attached hereto as Exhibit "4." Capt. Luttrell's Declaration was executed on September 6, 2018, and it attached an Incident Action Plan ("IAP") dated August 16, 2018 (the "August IAP").[25] However, since the August IAP, the parties reconvened and a new IAP was developed (the "September IAP"), reflecting a number of substantive changes. *See id.* at ¶¶ 8, 10. Despite the fact that the Government's Opposition was not filed until September 14, 2018, there is no specific discussion of these meetings or the

---

[25] Indeed, the IAP Cover Page attached to Capt. Luttrell's Declaration was a draft version unilaterally created by the Government that the Government later replaced with the correct cover sheet upon Taylor's objection. *See* Exhibit "4" at ¶ 7.

September IAP.  Notably, since the August IAP, Taylor engaged in due diligence and concluded that dredging/haul away of contaminated sediment is not technically feasible, and as a result, the objective of pursuing dredging was moved from the "operational" category to the "management" category. *Id.* at ¶¶ 9, 10. This underscores the Government's continued knowledge that, consistent with the CERA Report, dredging is not a possible option.

In short, the "facts" presented to this Court are both incomplete and inaccurate.  The recent activity is nothing more than superficial and immaterial gamesmanship for purposes of the instant litigation.  It is pure optics, so that the Government can come before the Court and claim that there is a great deal going on.  But, in reality, nothing has substantively changed.  The facts are the facts, and the fact is that the Government has not permitted Taylor to perform any Obligations under the Contract since 2011.  Moreover, Taylor's continuous efforts to cooperate in the performance of its response obligations with the Unified Command should have no effect, much less any negative effect, on Taylor's rights pursuant to the Contract and at law.  The Court simply needs to look to the Contract and interpret it as a matter of law. At the very least, to the extent the Court is inclined to deny Taylor's Motion on the basis that there are factual issues, Taylor should be given the opportunity to conduct discovery related to any facts that the Court determines remain in dispute.

## CONCLUSION

Under the uncontested material facts and applicable legal principles (*i.e.,* Louisiana law), Taylor's Motion for Summary Judgment on Count One must be granted.  The Government's 2015 unilateral insertion of an indefinite, and perhaps perpetual term, has prevented Taylor from taking actions required of it under the Contract within a reasonable period of time.  Taylor has no ability to control when or if its Obligations will ever be fulfilled.  For the reasons set forth in Taylor's original Motion and above, Taylor respectfully requests that this Court grant its Motion for Summary Judgment on Count One and award Taylor all damages deemed appropriate.

Respectfully submitted this 21st day of September, 2018.

                          *s/Carl D. Rosenblum*
                          CARL D. ROSENBLUM, T.A.
                          ALIDA C. HAINKEL
                          LAUREN C. MASTIO
                          Jones Walker LLP
                          201 St. Charles Avenue, 49th Floor
                          New Orleans, Louisiana 70170-5100
                          Telephone:  (504) 582-8000
                          Facsimile:  (504) 589-8296
                          crosenblum@joneswalker.com

                          And

                          JOHN F. COONEY
                          PAUL A. DEBOLT
                          Venable LLP
                          600 Massachusetts Avenue, NW
                          Washington, D.C. 20001

                          Telephone:  (202) 344-4000

                          **Attorneys for Plaintiff,**
                          **Taylor Energy Company LLC**

<u>**CERTIFICATE OF SERVICE**</u>

    **I HEREBY CERTIFY** that on this 21st day of September, 2018, a true and correct copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record participating in CM/ECF by operation of the court's electronic filing system.

                          */s/ Carl D. Rosenblum*