IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TAYLOR ENERGY COMPANY LLC,  *  CASE NO. 16-12C
          Plaintiff,  *
           *
VERSUS  *  JUDGE NANCY B. FIRESTONE
           *
           *
THE UNITED STATES OF AMERICA,  *
           *
          Defendant.  *
*   *   *   *   *   *   *   *

## JOINT MOTION TO LIFT STAY AND JOINT STATUS REPORT

Plaintiff, Taylor Energy Company LLC ("Taylor Energy"), and defendant, the United States, submit this Joint Motion to Lift Stay and Joint Status Report in accordance with the Court's Orders dated January 23, 2019 and November 26, 2018 (ECF Nos. 96 and 94).  Given the significant differences between the positions of Taylor Energy and the United States with respect to their responses to the Court's November 26, 2018 Order, each party submits their response separately below.

As a result of the restoration of funding to the Departments of Justice, Interior, and Homeland Security, Taylor Energy and the United States jointly move to have the stay of this case lifted.

## I.  THE RESPONSE OF TAYLOR ENERGY

### A.  Summary of Taylor Energy's Position

To assist the Court in fully appreciating the relevance of the events that have transpired since the September 27, 2018 hearing in this case, Taylor Energy reiterates the parties' agreement on the significant distinction between "containment," on the one hand, and "decommissioning," on the other, as well as the agencies' differing jurisdictional roles, with the

Coast Guard having authority over containment activities, while the United States Department of the Interior ("Interior") has authority over decommissioning activities.  *See* 9/27/18 Hearing Transcript at pp. 62-64, 187-190 (ECF No. 87).

Both Taylor Energy and Interior agree that this case is not moot.  *See infra* at IIC.  It presents live issues that are not rendered moot by the Coast Guard's October 23, 2018 Administrative Order Number 19-001.  Throughout this litigation, including notably at the September 27th hearing, the parties have emphasized the difference established by federal statutes between "decommissioning" activities for offshore oil and gas wells, which are subject to the exclusive jurisdiction of Interior, and "containment" activities, which are subject to the exclusive jurisdiction of the Coast Guard.  The issues before this Court do <u>not</u> involve any containment activities and therefore are not affected by the Coast Guard's Administrative Order. This case only concerns decommissioning activities, namely whether Interior violated the terms of the Trust Agreement in 2015 by directing Taylor Energy to suspend  performance of the remaining decommissioning "Obligations" under the Trust Agreement for an indefinite period of time while refusing to release the remaining funds Taylor Energy had deposited in the trust fund. Consequently, since both Taylor Energy and Interior agree that the Administrative Order is limited to "containment" activities (*see infra* at IIA), the Coast Guard's Administrative Order is not relevant to this matter.  For this reason and more, issues dealing with the Coast Guard's and the FOSC's authority and the rank speculation of what the FOSC for the Coast Guard has done and "may" in the future do, is completely irrelevant and beyond the Court's inquiry.  For the same reason, the Coast Guard's and the FOSC's actions based upon unverified, and fundamentally flawed theory is irrelevant to this case.  Again, this case is only about Interior's breach of the Trust Agreement - a contract to which the Coast Guard is <u>not</u> a party.

Further, as the Court is aware, on October 30, 2018, the Interior Board of Land Appeals ("IBLA") affirmed the May 11, 2015 decision of the Bureau of Safety and Environmental Enforcement ("BSEE") denying Taylor Energy's departure request. *See* ECF No. 93. This IBLA Ruling is relevant to this matter. Because that administrative proceeding is no longer pending before the IBLA, Interior's primary jurisdiction defense to this case has been rendered moot. Taylor Energy has decided not to seek a judicial review of this final agency decision,[1] and, to the extent that any technical or factual issues falling within the agency's special competence existed and warranted this Court's deferral (which Taylor Energy denies), the IBLA has now fully resolved them.

## B. Clarification

Subsequent to the November 20, 2018 Washington Post article and in response to it, the Court ordered "the parties to submit a joint status report detailing all official orders relevant to the issues before this court" and to "explain how the Trust Agreement Fund is being used to further the Coast Guard's orders, and whether the case is now moot." ECF No. 94.[2] The Court differentiated between "one order requiring that Taylor develop a plan to capture and remove oil from the MC-20 site" and "another order requiring Taylor to execute a plan to capture and remove oil from the MC-20 site that was approved by the Coast Guard." *Id.* (emphasis added). Because the Court refers to orders (plural), Taylor Energy wishes to clarify exactly what orders

---

[1] Taylor Energy has decided not to seek judicial review of this IBLA Ruling because the administrative record does not contain the post May 2015 sound science directed by the Unified Command that fully supports Taylor Energy's basis for the departure request – specifically, the Sheen Source Location Work Group Reports dated November 17, 2017 and the Rum Punch Mixing Model Analysis dated February 2018. *See* ECF No. 62-2.

[2] Taylor Energy disagrees with Interior's assertions that it has "gone well beyond the Court's request" in this filing. Its position set forth here does no more than directly respond to the Court's questions and provide the necessary factual context for its responses. Beyond that, Taylor Energy will refrain from addressing Interior's continuing practice of mischaracterizing Taylor Energy's position and the limited scope of this breach of contract matter arising under the Tucker Act.

the Washington Post story was referencing.   There is only one order that has been issued to Taylor Energy by the Coast Guard since 2012.   In light of the numerous errors contained in the Washington Post story, Taylor Energy attaches a copy of Administrative Order Number 19-001 issued by the Coast Guard on October 23, 2018 (the "Admin. Order") and avers that it is the best evidence of its contents.   *See* attachment "1."   No other orders have been issued to Taylor Energy by the Coast Guard since 2012.   *See* ECF No. 72 at pp. 9-10 of 45.   Notably, for purposes of this matter, Taylor Energy has not received any orders from Interior.

Based upon the Admin. Order, on November 16, 2018, the Coast Guard issued a "Notice of Federal Assumtion(sic)" to Taylor Energy (the "Notice").   *See* attachment "2."   This Notice made reference to and attached a "Decision Memorandum" ("Memorandum"), also dated November 16, 2018.   *See* attachment "3."   Other than attachments 1-3 and the IBLA Ruling, Taylor Energy is not aware of any other official action taken by the Coast Guard or Interior arguably relevant to the issues before this Court.   And, as can be seen by a review of these three documents, they only address "containment," not "decommissioning."[3]   It is Taylor Energy's position that "containment" activities are <u>exclusively</u> directed by the Coast Guard.   Interior has no role.   *See* ECF No. 87 at pp. 170, 187-190.   Rather, it is Taylor Energy's position that, in the words of Interior's counsel, there are two separate "paths."   *Id.*   The Coast Guard addresses path one – containment activities – which fall outside the scope of the Trust Agreement.   As a result, Taylor Energy must pay for containment activities by use of its funds outside the trust without any entitlement to seek reimbursement from its funds held in trust.   Interior addresses path two – decommissioning activities – covered by the Trust Agreement and for which Taylor Energy is entitled to seek reimbursement from its funds held in the trust.   *See* ECF No. 87 at pp. 62-64,

---

[3] The Administrative Order's reference to development of a "more permanent solution" is speculative and that "more permanent solution" need not, and very well may not, be Obligations under the Trust Agreement.

187-190; *see also* attachments 7 and 8 *infra*.

## C. <u>Background</u>

In order to provide the Court with the proper context of the Administrative Order and Taylor Energy's response, it provides the following background.

On December 20, 2018, Taylor Energy filed an action against the Coast Guard and the Federal On-Scene Coordinator for the MC-20 Site, Captain Luttrell, seeking to vacate the Admin. Order. *See* attachment "4" (w/o exhibits) (the "Luttrell Complaint"). Taylor Energy filed this matter in the United States District Court for the Eastern District of Louisiana and it was assigned case No. 18-14046. As set forth more fully in the Luttrell Complaint, this lawsuit seeks the District Court's review and setting aside of final agency action, the Admin. Order, taken by the Coast Guard in which it abruptly reversed course on its longstanding prior position based predominantly on an unverified and "fundamentally flawed" theory[4] that contradicts the well-established scientific facts that underlie the Unified Command's prior response actions at the MC-20 Site.

Specifically, Taylor Energy seeks an order vacating, holding unlawful and setting aside the Admin. Order, and all actions, findings and conclusions made pursuant thereto, including the "Notice" and the "Memorandum," as being in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution as well as arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, as required by the Administrative Procedure Act. *See* attachment "4" at ¶¶ 75-85. The Luttrell Complaint also alleges that the Coast Guard's recent actions arbitrarily and capriciously ignored a decade's worth of comprehensive and consensus scientific studies conducted for the Unified Command in response to adverse

---

[4] *See* attachment "4" at ¶¶ 3, 46-47, 89.

publicity.   Moreover, the lawsuit further alleges the Coast Guard took this action without adequate justification, without any advance notice to Taylor Energy, and without providing Taylor Energy with a meaningful opportunity to review and comment on the theoretical findings on which the Coast Guard based the Admin. Order.

Additionally, on December 20, 2018, Taylor Energy filed an action against Couvillion Group, LLC ("Couvillion"), the contractor unilaterally selected by the Coast Guard to design, construct, and install a containment system at the MC-20 Site.  *See* attachment "5" (w/o exhibits) (the "Couvillion Complaint").   This matter was filed in the United States District Court for the Eastern District of Louisiana and it was assigned case No. 18-14051.   This lawsuit concerns activities currently being performed, and to be performed, at Taylor Energy's expense from non-Trust Agreement funds, by Couvillion, including Couvillion's design, construction and installation of a subsea "Rapid Response" containment system that is to be attached to and fully supported by Taylor Energy's downed platform jacket, which is partially buried and lies on the seabed in federal waters under approximately 475 feet of water at the MC-20 Site.[5]   Taylor Energy has placed Couvillion on notice that it will hold Couvillion responsible for any damages, environmental or otherwise, that might arise out of Couvillion's reckless, willful, and grossly negligent activities at the MC-20 Site.   Taylor Energy has grave concerns about the adverse environmental consequences of Couvillion's reckless actions.

Taylor Energy fears that Couvillion's lack of professional qualifications and unfamiliarity with the site and the longstanding Unified Command Administrative Record, as well as with the comprehensive scientific studies, have the potential to cause catastrophic environmental damage.

---

[5] Although decommissioning of Taylor Energy's jacket was originally covered by the "Obligations" under the Trust Agreement, by letter dated April 30, 2008 Interior formally granted a "departure" to Taylor Energy authorizing it to leave the jacket in place.  *See* attachment "6" at MMS 2 Decision.  *See also* ECF No. 87, at pp. 9-10 (brief description of downed jacket).   Nor does the Coast Guard's Admin. Order seek removal of the jacket.

In the lawsuit, Taylor Energy seeks damages against Couvillion for its unauthorized use of Taylor Energy's property.  Taylor Energy also seeks injunctive relief against Couvillion, permanently enjoining Couvillion and/or any parties acting in concert with or at the direction of Couvillion from undertaking any activities at the MC-20 Site affecting Taylor Energy's property. *See* attachment "5" at ¶¶ 43-50.

### D.  Taylor Energy's Response

Since the parties presented oral argument to the Court on September 27, 2018, there have been a number of developments.  It is Taylor Energy's position that none of the actions taken by the Coast Guard, the FOSC, or by Taylor Energy in response to the Coast Guard's and FOSC's actions, has any relevance to the breach of contract issues pending here.[6]  Rather, those actions confirm Taylor Energy's main argument in this Tucker Act litigation because, notwithstanding the Coast Guard's actions related to containment, Interior still has not authorized Taylor Energy to "diligently pursue" the remaining Obligations under the Trust Agreement and still seeks to "freeze" Taylor Energy's funds held in trust indefinitely.  This action, therefore, is not moot.

Simply put, none of the Coast Guard's actions relate to the Trust Agreement's "Obligations" or the $432 million frozen in trust.  In addition to the Coast Guard not being a party to the Trust Agreement or a party to this litigation, all the Coast Guard's actions concern actions to "contain" oil releases at the MC-20 Site; they have nothing to do with "decommissioning" measures.

Both Taylor Energy and Interior agree that the funds held in trust, under the terms of the Trust Agreement, cannot be used to fund the containment and monitoring measures required

---

[6] Accordingly, Interior's selective, incomplete and misleading description of Taylor Energy's newly filed litigation against the Coast Guard, Captain Luttrell and Couvillion, all of which deal with "containment," are not relevant to the issues in this case.

under the Admin. Order, the Notice, and the Memorandum.  *See infra* at IIC; *see also,* ECF No. 87 at pp. 62-64, 187-190.  Furthermore, to ensure that Interior had not changed its position, following receipt of the Admin. Order, on October 24, 2018, Taylor Energy's counsel wrote to Interior's counsel seeking reconfirmation of Taylor Energy's understanding of "DOJ/DOI's position" as to whether "any of the approximately $432 million held in the trust account under the Trust Agreement [would be allowed] to be used to reimburse Taylor for its expenses in connection with complying with the Administrative Order."  *See* attachment "7."

In response, by letter dated October 29, 2018, Interior's counsel reconfirmed DOJ/DOI's position "that the Trust funds cannot be used for containment activities."  *See* attachment "8." Specifically, Interior's counsel stated that, "because Administrative Order 19-001 requires, in part, that Taylor 'institute a containment system to capture, contain, and remove oil from the erosional pit near the former Dome C location,' the use of Trust funds to comply with Administrative Order 19-001 is not permitted under the terms of the Trust Agreement."  *Id.*

Indeed, at the September 27, 2018 Court hearing, your Honor directly asked Interior's counsel if the "trust funds [can] be used to address plumes coming out of the wells" and whether they are "[c]overed by the Trust Agreement?"  In response, Interior's counsel said "No," reiterating that putting a containment dome over the plumes to stop leaks from hitting the water's surface is <u>not</u> covered by the Trust Agreement.  *See* ECF No. 87 at pp. 62-64.  As set forth in more detail below, this dialogue provides a direct response to the Court's question and establishes that the funds held in trust under the Trust Agreement cannot pay for the performance of the directives by the Coast Guard set forth in the Admin. Order or for the activities by Couvillion set forth in the Notice and Memorandum.  Accordingly, this Tucker Act litigation is <u>not</u> moot.

### E.  "How the Trust Agreement Fund
### Is Being Used to Further the Coast Guard's Orders.…"

As set forth above, in direct response to your Honor's question, the funds held in trust under the Trust Agreement are <u>not</u> being used and, under the terms of the Trust Agreement <u>cannot</u> be used "to further the Coast Guard's orders."  The terms of the Trust Agreement expressly limit their use to funding the performance of the "Obligations" as defined at paragraph 1.2(d) of the agreement, *i.e.* "… the duties and costs of the Settlor pertaining thereto to abandon wells, remove the platform and other facilities, clear the seafloor of obstructions, and take corrective action associated with wells as set forth in Schedule A attached hereto.…"  Schedule A lists five categories of Obligations, which all relate to decommissioning, not containment.  *See* ECF No. 1 Complaint at pp. 65-66 of 77.  Nothing the Coast Guard has ordered or directed, or has the authority to order or direct, falls within this definition of "Obligations."  And again, the Coast Guard is not a party to the Trust Agreement and not a party to this case.

### F.   "Whether the Case Is Now Moot"

The short and direct answer is "no."  And, importantly, as set forth below, Interior agrees. *See infra* at IIC.  (The Coast Guard's "orders do not currently require that Taylor undertake any of the activities identified in the Trust (for example, plugging and abandoning wells) and thus do not implicate the Trust funds.")[7]  *See id.*  Again, no action by the Coast Guard and, more specifically, the Admin. Order, Notice and Memorandum, has any relevance to the "Obligations" under the Trust Agreement nor any relevance to the conduct of Interior in its performance of the Trust Agreement, which Taylor Energy asserts is wrongful and constitutes breach of contract.

As this Court is aware, Taylor Energy's Complaint contains four counts as follow:

---

[7] Interior's position that in the future it "<u>may</u>" take certain action that "<u>may</u>" moot this case are rank speculation and pure conjecture.  ("…a permanent solution to the discharge of oil <u>might</u> include plugging and abandoning wells at the site …")  This speculation is just a continuation of Interior's strategy of delay and obfuscation.

**ONE**

"The Government Has Breached the Trust Agreement by Its Unilateral Insertion of an Indefinite Term for Taylor's Performance"

**TWO**

"Request for Dissolution Based on Impossibility of Performance"

**THREE**

"Request for Reformation or Partial Rescission Based on Mutual Error"

**FOUR**

"The Government Has Breached Its Obligation of Good Faith and Fair Dealing"

Each of these counts arises out of the Trust Agreement.  Moreover, each count is based upon Interior's position "as set forth in the US Views document and the BSEE web postings" issued during May 2015 where Interior, for the first time, announced:  (a) its decision "to suspend Taylor's performance of its remaining Obligations indefinitely and potentially in perpetuity" (ECF No. 1, Complaint at ¶¶ 78-80); (b) its intention "to hold Taylor's funds in the Trust Account indefinitely, and possibly in perpetuity" (*Id.* at ¶ 97) and; (c) its refusal "to direct the release of Taylor's funds held in the Trust Account notwithstanding that performance of the remaining Obligations under the Trust Agreement is legally impossible and contrary to federal law and regulations" (*Id.* at ¶ 108).  The issues before this Court concern the conduct and actions of Interior, not the Coast Guard.

Accordingly, and contrary to Interior's counsel's representation at the September 27, 2018 hearing, there is still no "task in front" of Taylor Energy arising from the Trust Agreement. *See* ECF No. 87 at p. 26.  And Interior admits that there is no directive by Interior to "perform" under the Trust Agreement.  Furthermore, notwithstanding the actions taken by the Coast Guard

in the Admin. Order, Notice and Memorandum, Interior has not allowed Taylor Energy to "diligently pursue" the remaining "Obligations" under the Trust Agreement and rather seeks to "freeze" Taylor Energy's funds in trust indefinitely.  Moreover, Interior's general references to "more studies" and future potentialities herein is nothing but speculation that has absolutely no impact on this case.[8]  This is simply a perpetuation of the Interior's consistent references to some possible indefinite future occurrence, which forms the basis for Taylor's claims in the first place. Furthermore, Interior's argument below that if "BSEE (or the Coast Guard) were to order Taylor to undertake the decommissioning efforts described in the Trust … Counts II through IV … would be moot" is of no moment, because this simply has not happened and may never happen. At bottom, Interior breached the Trust Agreement in May 2015, and nothing can serve to cure such breaches and compensate Taylor Energy for the monetary damages it has already suffered and continues to suffer as a result of such breaches.

Remarkably, Interior's counsel was steadfast at oral argument in contending that, notwithstanding the "notification" to Taylor Energy in the US Views document and BSEE web postings, Taylor Energy, rather than Interior, had breached its obligation to perform under the Trust Agreement.  *See* ECF No. 87 at pp. 163-170.  And here, for the first time in a written submission, Interior alleges a prospective breach by Taylor Energy.  *See infra* at notes 13 and 14. This serious allegation is not only belied by Interior's failure to assert this contention in any of its written responses in this litigation, but also by the express provision of the Trust Agreement that requires written notice to Taylor Energy of any alleged "Event of Default" and be given an

---

[8] Indeed, what if "more studies" do not support the conclusions of Dr. Garcia and/or otherwise continue to confirm the consensus results of CERA?  Interior completely ignores this potential.

opportunity to cure the alleged default.  *See* ECF No. 1, Trust Agreement at ¶ 4.8 (pp. 56-57 of

77).  *See also* ECF No. 87 at pp. 190-191.  Interior has provided neither.

Instead, Interior's position today remains completely in accord with the two primary

"consensus" conclusions/recommendations set forth in the 2013 Consensus Ecological Risk

Assessment Report ("CERA Report").  Section 6.3.7 of the CERA Report states:

> "Recommendations
>
> \*   \*   \*
>
> - Do not pursue additional well intervention because the ecological risks outweigh the possible benefits.
>
> - Do not pursue dredge/dispose or dredge/cap options because the ecological risks outweigh the possible benefits."

*See* ECF No. 1 Complaint at ¶¶ 48-53.

Again, Interior has not directed Taylor Energy to take any action inconsistent with these

"consensus" recommendations.  Furthermore, Interior's reference to ongoing studies – paralysis

by analysis – is speculative and not properly supported to override the long-standing

comprehensive consensus scientific conclusions.  Because no actions by the Coast Guard cover

the "Obligations" under the Trust Agreement, Taylor Energy's claims before this Court are not

"mooted" by any action the Coast Guard has taken or may take.  This conclusion cannot be

credibly disputed by Interior given that both parties agree that the funds remaining in the trust are

not to be used to respond to any order or directive from the Coast Guard addressing

"containment."  *See infra* IIC.

### G.  The IBLA's Departure Request Ruling

The recent Ruling by the Interior Board of Land Appeals ("IBLA") reviewing BSEE's

denial of Taylor Energy's request for a "departure" from regulatory requirements is further

support for the conclusion that, at present, Interior is not ordering or directing Taylor Energy to

perform any decommissioning activities.[9]  And here Interior admits it is not presently ordering Taylor Energy to perform any further decommissioning and may never do so.  *See infra* at IIB.

As the Court is aware, on October 30, 2018, the IBLA affirmed the May 11, 2015 decision by BSEE to deny Taylor Energy's departure request.  *See* ECF No. 93.[10]  The relevance of this IBLA Ruling to this matter is twofold.  First, because there is no longer a proceeding pending before the IBLA, Interior's primary jurisdiction defense to this litigation has been rendered moot.  Secondly, numerous statements of the IBLA fully support the positions asserted by Taylor Energy in this litigation.  Indeed, the IBLA Ruling cited with approval BSEE's acknowledgement that Taylor Energy is not being directed by Interior to take any action.

At the September 27, 2018 Court hearing, there was serious disagreement over Interior's construction of the US Views document.  The parties disputed whether the Government's conduct as set forth in the May 11, 2015 US Views document and BSEE web postings "notified" Taylor Energy of the Government's decision to suspend Taylor Energy's performance of the Trust Agreement Obligations indefinitely.  It is Taylor Energy's position that, through the US Views document and BSEE web postings, Interior announced to Taylor Energy that it had indefinitely suspended, perhaps in perpetuity, Taylor Energy's performance under the Trust Agreement.  *See e.g.,* ECF No. 87 at 34.  In contrast, at the hearing, Interior's counsel took the position that Taylor Energy's performance under the Trust Agreement had not been suspended and that there was "more that Taylor could do" under the Trust Agreement.  *See e.g.,* ECF No.

---

[9] And whether "Taylor's obligation to decommission its wells is the default status quo by regulation (*see* 30 C.F.R. Part 250, subpart Q)" (*see infra* at IIB), is irrelevant to this case.  As addressed extensively at the September 27, 2018 hearing, this litigation does not seek to affect Taylor Energy's regulatory rights and responsibilities.

[10] As noted above, Taylor Energy has decided not to seek judicial review of this IBLA Ruling because the administrative record does not contain the post May 2015 sound science directed by the Unified Command that fully supports Taylor Energy's basis for the departure request – specifically, the Sheen Source Location Work Group Reports dated November 17, 2017 and the Rum Punch Mixing Model Analysis dated February 2018.  *See* ECF No. 62-2.

87 at pp. 23-26 ("task in front of them"), 54-55 ("The Government never said stop.") and 170. Despite Interior's counsel's representations to the Court to the contrary, to date, Interior admits that it has not ordered Taylor Energy to perform any decommissioning activities covered by the Trust Agreement. *See infra* at IIC. And it may never have the scientific support to do so. Any contention to the contrary is complete speculation.

Notably, the IBLA's Ruling fully supports Taylor Energy's assertions with respect to Interior's May 2015 notification to Taylor Energy that it had indefinitely suspended Taylor Energy's performance of the Trust Agreement Obligations:

- Preliminary, although Interior's counsel repeatedly attempted to discredit and run away from the CERA Report conclusions (ECF No. 87 at pp. 37, 53-54, 61-62) and even suggested that there was "a lack of bona fide good science in terms of the analysis at the MC20 site" (ECF No. 87 at p. 163), the IBLA, upon its review and examination of the full Administrative Record before it, repeatedly <u>reaffirmed</u> CERA's two primary conclusions that the environmental risk outweighs the environmental benefit with respect to drilling additional intervention wells and removal of the sediment. IBLA Ruling at pp. 289-290, 297, 299-301 (ECF No. 93). Interior's statement here that the FOSC's actions are "a clear refutation of the 'consensus' CERA report . . . ." (*see infra* at IIA.1) is contrary to Interior's admission in the IBLA Ruling.

- In its Ruling, the IBLA expressly recognized that BSEE's rationale for denial of Taylor Energy's request for a departure with respect to removal of the sediment was because "at some point in the future . . . such removal" may "become necessary" and that, in denying Taylor Energy's departure request, "BSEE did not require Taylor to drill any intervention wells or remove any contaminated sediment." *Id.* at 291.

- The IBLA thus affirmed BSEE's decision due to "the possibility that future plugging and abandonment work and/or the removal of contaminated sediments" "may be required." *Id.* at p. 291-92.

- The IBLA, however, cautioned that "our affirming the Decision does not mean Taylor must begin drilling intervention wells to plug and abandon the Wells, only that it is not now relieved of its obligation to do so.  We are not unmindful that the environmental costs currently outweigh the environmental benefits of additional intervention wells and that the rule at 30 C.F.R. § 250.1703(f) requires all decommissioning activities to be conducted in a manner that 'does not cause undue or serious harm or damage to the human, marine, or coastal environment.'" *Id.* at p. 297.  This is directly contrary to the position that Interior alleges here. *See infra* IIA.1.

- Similarly, the IBLA premised its decision to affirm BSEE's denial of Taylor Energy's request for a departure related to removal of the contaminated sediment on its finding that "BSEE is not now ordering Taylor to remove or cap the sediment" and thus that "the environmental *status quo ante* will be maintained for the foreseeable future ...." *Id.* at 298; *see also id.* at p. 299 ("We are not faced with a BSEE decision requiring the removal of contaminated sediment, for which the environmental costs currently outweigh any environmental benefits.").

Accordingly, this Court now has before it the benefit of the agency's special competency on any technical and factual issues that existed (which Taylor Energy denies), and there is no longer any reason to defer to the agency to allow it to assess "in the first place" by use of "its

technical assessment capabilities and its statutorily prescribed discretion . . . whether further well interventions or other decommissioning activities should proceed."[11]

Pursuant to its technical assessment, the IBLA has confirmed that Interior suspended Taylor Energy's performance of further well interventions and other decommissioning activities and that Taylor Energy's performance of those activities must remain suspended indefinitely to maintain the environmental *status quo ante* "for the foreseeable future" in accordance with the consensus conclusions of the CERA Report and to ensure compliance with the requirement that decommissioning activities must not risk causing undue harm to the human, marine or coastal environment.   Because Interior has issued a final agency decision with respect to Taylor Energy's departure request and given that Taylor Energy has not sought judicial review of that final action, there can be no doubt from a primary jurisdiction perspective that this Court is the proper authority to address the legal issues presented in this action and that it is time for this Court to deny Interior's Motion to Dismiss and proceed to the merits on Taylor Energy's breach of contract claims.

### H.  The IBLA's Ruling Affirming Denial
### of Taylor Energy's Request for Disbursements from the Trust Account

On October 29, 2018, the IBLA issued a final order that affirmed two decisions of the Bureau of Ocean Energy Management ("BOEM") denying Taylor Energy's assertions that the agency erroneously denied reimbursement of approximately Ten Million Dollars from the trust fund to reimburse Taylor Energy for decommissioning activities it had taken at the MC-20 Site. *See* attachment "9."  These funds are part of the funds presently being held in the trust account "frozen" by Interior's actions.  *See* ECF No. 1, Complaint at p. 31 of 77 at n. 7 and ECF No. 72 at p. 10.

---

[11] ECF No. 60 at p. 17 (Defendant's Reply in Support of Its Motion to Dismiss).

On December 20, 2018, Taylor Energy filed two actions in connection with the IBLA's Ruling affirming BOEM's denial of the disbursements requested by Taylor Energy.  First, Taylor Energy initiated an action in the United States Court of Federal Claims, Case No. 18-1949.  This is a breach of contract case filed pursuant to the Tucker Act that involves two decisions by BOEM (a successor agency to the MMS), affirmed by the IBLA, that deny Taylor Energy's requests for disbursement of its funds under the Trust Agreement related to decommissioning work performed and insurance proceeds received by Taylor Energy.  As required by 30 C.F.R. § 590.8, Taylor Energy timely appealed these two decisions to the IBLA, and both decisions subsequently were affirmed by the IBLA on October 29, 2018.  As detailed in the Complaint, Interior's decisions are contrary to the plain and clear terms of the parties' three agreements (including the Trust Agreement) and unlawfully withheld Taylor Energy's funds to "secure" obligations that Taylor Energy had already completed.  As a result, the United States has breached the agreements and Taylor Energy is suffering and will continue to suffer monetary harm.  Pursuant to Taylor Energy filing a Notice of Directly Related Case, this matter has been transferred to Your Honor.

Secondly, Taylor Energy initiated an action in the United States District Court for the Eastern District of Louisiana, Case No. 18-14065.  This District Court case is substantially similar to the above-described Tucker Act case filed in this Court and was filed as a protective measure in an abundance of caution in the event that this Court lacks subject matter jurisdiction. This case filed in the District Court was brought under the Administrative Procedure Act ("APA") and challenges the IBLA Ruling, alleging that the agency's action was arbitrary and capricious, an abuse of discretion, and contrary to law.

## II. <u>THE RESPONSE OF THE UNITED STATES</u>

Taylor misstates the nature of the Department of Justice's representation in this case. Contrary to the incorrect assertions by Taylor in the sections of this report that it has drafted suggesting that Department of Justice attorneys in this case merely speak on behalf of the Department of the Interior, the statements of the Justice attorneys to this Court, in all previous filings and in this report, pertain to the positions of the Coast Guard as well as the Department of the Interior.  Most importantly, attorneys for the Department of Justice speak before this Court in the first instance for the collective entity, the United States.

The Court asked that we provide a status report detailing all official orders relevant to the issues before this Court.  *See* Order (Nov. 26, 2018).  Taylor has gone well beyond the Court's request and proffered substantive briefing on a host of unrelated merits questions.  While the United States disagrees with a number of the arguments and representations contained in Taylor's surplus argumentation, for purposes of this status report the United States will refrain from detailed rebuttals and focus on the questions posed by the Court.[12]  If the Court would like further briefing regarding the United States' position on any issues presented in Taylor's portion of this filing, we would certainly provide that information upon the Court's request.  The United States' description of the Coast Guard's current official orders to Taylor relevant to the issues of this case and a description of the context in which those orders were issued are provided below.

---

[12] For example, the United States disagrees with Taylor's representations regarding, among other things: (1) the premise that the United States has directed Taylor not to pursue the fulfillment of its legal obligations; (2) the suggestion that the United States has concluded that performance is legally impossible or that the risks outweigh the benefits; and (3) the characterizations of the IBLA's ruling affirming the denial of Taylor's departure request, which speaks for itself.

### A. The United States' Statement Concerning Coast Guard Activities And Orders Regarding Taylor and MC-20

#### 1. Order No. 19-001 Required Taylor To Install A Containment System

On October 23, 2018, with regard to the response to the ongoing discharge of oil at the MC-20 site, the United States Coast Guard's Federal On-Scene Coordinator (FOSC), Captain Kristi Luttrell, served Taylor with Administrative Order 19-001 ("Order 19-001"). *See* Attachment 1.[13]  Order 19-001 required Taylor to "institute a containment system to capture, contain, and remove oil" discharging into the Gulf of Mexico "while a more permanent solution to stopping the source is developed."  Attach. 1 at 1.  Order 19-001 told Taylor where to deploy the containment system, the volume of oil the system must be able to contain (between 250 and 750 barrels per day), and that the "containment system must eliminate the surface sheen and avoid the deficiencies associated with prior containment systems." *Id.* at 2.  Furthermore, Taylor was required to present two containment proposals at the November 2018 Unified Command Meeting scheduled for November 6 through November 9, 2018. *Id.*  Finally, attached to Order 19-001 were an eleven-page summary of scientific studies concerning the MC20 discharge and a one-page summary of the site conditions and questions to be considered by vendors in proposing a containment system. *Id.* at 4-14.

Order 19-001 is directly relevant to the Trust and Taylor's complaint in this Court because in that Order the FOSC (on behalf of the Federal Government through her presidentially delegated statutory authority under the Clean Water Act (CWA)) has determined that one or more wells is actively leaking.  The FOSC also took the position that the worst case discharge of oil is now on the order of hundreds of barrels per day and she instructed Taylor to plan for a

---

[13] Taylor filed Order 19-001 as an exhibit to the complaint it filed in the United States District Court for the Eastern District of Louisiana against the FOSC and the Coast Guard. *See Taylor Energy Company, LLC. v. Captain Kristi M. Luttrell, et al.*, No. 2:18 cv-14046 (E.D. La) (filed Dec. 20, 2018).

discharge of 250 barrels per day.  This statement by the FOSC is a clear refutation of the "consensus" CERA report repeatedly invoked by Taylor.  See above at 11-12 (Taylor's statements citing the CERA Report at § 6.3.7 and Taylor's complaint at ¶¶ 48-53).  Consequently, the premises upon which Taylor relied in deciding to halt further plugging and abandoning activities are no longer valid.[14]  To be clear however, the Government never directed Taylor to stop pursuing plugging and abandonment activities.  *See, e.g.,* Hearing Tr. (Sept. 14, 2018) at 167:4 – 168:7.[15]

Furthermore, Order 19-001 specifically states that "temporary containment and recovery of oil . . . is needed and feasible ***while a more permanent solution to stopping the source is developed.***"  Attach. 1 at 1 (emphasis added).  Actions undertaken to provide a permanent solution to stop the source of the oil leak certainly could include the decommissioning activities of plugging and abandoning the wells at MC-20.

Certainly, Taylor is the Responsible Party for the oil being discharged from MC-20.  It is the United States' position that the oil emanating from MC-20 is from actively leaking wells.  Taylor is obligated under the CWA to stop that discharge; *i.e.,* Taylor is obligated to set forth a solution to essentially plug and abandon the wells at MC-20 under the CWA, as well as pursuant to regulations of the Department of the Interior.  The premise that the United States has

---

[14] Taylor incorrectly suggests that, in the United States' May 2015 "U.S. Views Document," the Government required Taylor "'to suspend Taylor's performance of its remaining Obligations indefinitely and potentially in perpetuity.'"  See above at I.F. at 9-10.  Taylor's quotation and other similar quotations immediately following this are not from the U.S. Views document, or other Government documents, but rather from Taylor's own complaint.  The U.S. Views document did not require or order Taylor to suspend performance; rather, as we noted in the September 14, 2018 hearing, the U.S. Views document states that "'Taylor Energy must continue to fulfill its obligations to respond to the ongoing oil spill and must comply with the Coast Guard's orders.'"  Hearing Tr. at 167:13-18 (quoting the U.S. Views document (Exhibit M to Defendant's motion to dismiss) at paragraph 17).

[15] The IBLA decision recognized that BSEE's May 2015 denial of Taylor's request for a departure from its obligations to plug and abandon the MC-20 wells was not in error because BSEE was seeking to obtain "a greater understanding of the undersea environment (*e.g.,* greater certainty on the cause of continuing hydrocarbon releases that result in the sheen."  *See* Attach. 9 at 193 IBLA 297.  Certainly, BSEE's understanding has been affected significantly by the studies that took place in 2017 and the summer of 2018.

instructed Taylor not to fulfill those obligations, or that the United States has the burden to instruct Taylor on when and how to meet them, is invalid.

Should Taylor fail to meet its obligations as the Responsible Party, the FOSC is entirely within her authority to federalize the source control portion of the response (*i.e.,* stopping the discharge of oil altogether) as well as the temporary containment portion of the response, which as further detailed below, was recently federalized by the FOSC.  In pursuing actions to stop the discharge of oil, the FOSC can hire a contractor to be paid by the Oil Spill Liability Trust Fund (OSLTF) and Taylor will be obligated to reimburse the OSLTF.  Should the activities undertaken involve the decommissioning activities outlined in the Trust (for example, plugging and abandoning the wells), those activities could be reimbursed from the Trust pursuant to the Trust's default provisions.[16]

Taylor administratively appealed Order 19-001 on October 24, 2018.  *See* Attachment 10, Letter from William W. Pecue II to Captain K.M. Luttrell (Oct. 24, 2018).  Captain Luttrell responded to Taylor's request the following day, denying Taylor's request for reconsideration of Administrative Order 19-001.  *See* Attachment 11, Letter from Captain K.M. Luttrell to Taylor Energy Company (Oct. 25, 2019).

### 2.    The Coast Guard Ultimately Chose Couvillion To Construct The Containment System

A meeting of the Unified Command took place in New Orleans from November 6, 2018, to November 9, 2018.  Prior to that meeting, Coast Guard and Bureau of Safety and Environmental Enforcement (BSEE) personnel solicited proposals for a containment system and

---

[16] Should Taylor refuse to comply with any material provision of the Trust Agreement, including its obligations to "permanently plug and abandon 25 wells drilled from Platform A," the United States is entitled, under the default provisions of the Trust, "to perform any uncompleted Work, at the risk and liability [of Taylor], and direct the Trustee to distribute to [the United States] the Trust Funds to pay or reimburse [the United States] for any expenses incurred or to be incurred in performing the Work."  *See* Complaint at Exhibit 1 (Trust Agreement) at § 4.8(c) and Schedule A (Work Cost Estimates) at § 1.

a plan for more permanent solutions to stopping the source from contractors using the same criteria provided to Taylor.  During the Unified Command Meeting, but outside the presence of Taylor, Federal personnel reviewed such proposals to see if any would turn out to be superior to Taylor's proposals.  Taylor could not attend these meetings because of the requirements of the Procurement Integrity Act, 41 U.S.C. § 423.  Taylor presented its proposal to the Federal personnel separately.

Couvillion Group's proposal was ultimately determined by the FOSC to be superior to Taylor's because: (1) Couvillion's proposal would accomplish containment in a more timely fashion; (2) Couvillion controlled all vessels necessary for its response and Taylor did not; (3) Couvillion's system was adjustable; (4) it involved no surface components to demobilize in the event of a storm and possessed sufficient storage capacity to withstand storm events; (5) it would not disturb the seabed, potentially disturbing entrained oil; and (6) Couvillion's system would avoid sediment loading issues that were a cause of the failure of the prior system.  *See* Attach.  3 (Decision Memorandum No. 16565 of Captain K.M Luttrell (Nov. 16, 2018) at 1-3).[17]

Taylor was invited to Coast Guard Sector New Orleans on November 13, 2018, to view a presentation by Couvillion regarding its containment proposal.  Following the presentation, the Coast Guard informed Taylor that it would be required to execute an agreement with Couvillion regarding construction of the containment system.  Further, the Coast Guard required Taylor to execute this commercial contract by November 15, 2018.  Although Couvillion provided Taylor with a proposed escrow agreement before the deadline, Taylor did not agree to Couvillion's proposed terms and, instead, Taylor provided an alternative draft of the agreement.  Among the provisions in dispute was a provision Taylor inserted requiring Couvillion to indemnify Taylor

---

[17] Taylor also filed this memorandum as an exhibit to its complaint against the FOSC and Coast Guard in the Eastern District of Louisiana.

for damages arising out of the response – a provision inconsistent with the CWA and the Oil

Pollution Act (OPA).  On November 15, 2018, Taylor informed the FOSC that it would be

unable to execute an agreement by the deadline.  By November 16, 2018, negotiations between

Taylor and Couvillion had completely ceased, as the parties could not agree on specific

contractual terms.

On November 16, 2018, the FOSC provided Taylor with two documents: the Decision

Memorandum (Attach. 3), and a Notice of Federal Assumption ("Notice"), resulting in the partial

assumption of response actions by the Coast Guard pursuant to Section 311(c) of the CWA.  *See*

Attachment 2, Notice of Federal Assumption, issued by Captain Luttrell (Nov. 16, 2018).[18]

The Coast Guard and Couvillion are now working to install the new containment system

that will collect the oil as it is discharged from the seafloor at MC-20.  The schedule for

installing the containment system will be highly-dependent upon the weather conditions in the

Gulf of Mexico.  The collection of the oil and gas from the source should provide important

additional information concerning the nature and amount of hydrocarbons leaking from MC-20,

which in turn will be relevant to, among other things, the assessment of whether the oil originates

from an active reservoir release or, as Taylor argues, merely from residual oil trapped in the sea

floor sediments.

Taylor's requirement to conduct overflights of the site and respond to recoverable oil

remains in effect.  Furthermore, the FOSC's decision to partially federalize the response did not

"relieve [Taylor] of [its] financial responsibilities and [its] obligation to abate the source of the

discharge."   Attach. 3 at 1.  The Trust funds at issue in this litigation are not directly available

for the expenditures necessary to comply with the Coast Guard's containment and monitoring

---

[18] The Notice of Federal Assumption was also filed by Taylor as an exhibit to its complaint against the FOSC and the Coast Guard in the Eastern District of Louisiana.

requirements.  However, a permanent solution to the discharge of oil might include plugging and abandoning wells at the site, which would likely involve the expenditure of funds by Taylor that could then be reimbursed by the Trust, pursuant to the Trust's terms.  Any plugging and abandoning of wells to stop the discharge of oil would be coordinated with BSEE and might fulfill Taylor Energy's regulatory decommissioning responsibilities as the former leaseholder.

### B.   The United States' Statement Concerning BSEE's Activities In Obtaining Additional Information To Be Used In Its Process Of Deciding The Compliance Activities That Taylor May Be Required To Undertake

As noted in the Coast Guard's Administrative Order 19-001, the United States is also pursuing "a more permanent solution to stopping the source."  Attach. 1 at 1.  As the United States informed the Court in our response to Taylor's motion for summary judgment with respect to Count I, BSEE and National Oceanic and Atmospheric Administration (NOAA) scientists spent seven days at the MC-20 site this past September to obtain further data concerning the oil flow release rate and to better determine the chemical nature of the oil and gas being released for purposes of discerning its source.  Def's Opp. Mot. Summ. J. at 14; *see id.*, Ex. 6, Decl. of David Fish (Sept. 11, 2018).  Initial results from the study confirm prior indications that there are at least four discrete plumes emanating from the erosional pit at the northeast side of the jacket.  Two of the plumes are predominantly oil, whereas the other two are predominantly gas.  Completed chemical analyses indicate that the gas being released is thermogenic (*i.e.,* from a deep reservoir) and the oil in the water column is less degraded than the oil in the seafloor sediments, suggesting (contrary to Taylor's arguments) that the releases of oil and gas are not from the sediment.  At this time, analysis of the flow rate (using measurements from the site of the release on the seafloor) is still underway, but all indications are that it is far greater than alleged by Taylor.  BSEE and NOAA are continuing to diligently analyze the data from the 2018

Case 1:16-cv-00012-NBF   Document 97   Filed 02/15/19   Page 25 of 31

survey, including the chemical analyses of the oil and gas being released from MC-20 and the

data concerning the oil flow rate, and anticipate that the final peer-reviewed study results will be

available by early summer.  BSEE will use those results to inform its decision-making on how to

proceed in regard to issuing an order to Taylor to plug and abandon the remaining wells using

the remaining Trust funds.  It is anticipated that a decision in that regard will be made by the end

of the summer.

Although BSEE has not issued an express order requiring Taylor to decommission its

wells at MC-20, Taylor's obligation to decommission its wells is the default status quo by

regulation (*see* 30 C.F.R. Part 250, Subpart Q) and terms of its lease, and BSEE has expressly

rejected Taylor's request for a departure from those requirements.  As we informed the Court,

the Interior Board of Land Appeals (IBLA) recently upheld the appropriateness of BSEE's denial

of Taylor's departure request.  *See* Def. Notice of IBLA Decision in IBLA No. 2015-17 (Oct. 31,

2018) (attaching IBLA decision dated October 30, 2018).  Given the foregoing, BSEE anticipates

that, within a matter of months (e.g., by the end of the summer), it will be in a position to make a

decision regarding next steps in the proper enforcement of Taylor's decommissioning obligations

secured by the Trust funds.

**C.   It Is The United States' Position That Taylor's Claims Are Not Currently Moot But May Become So Within A Matter Of Months As The Coast Guard And BSEE Obtain Further Evidence Concerning The Amount And Nature Of The Oil Leaking From MC-20**

The Court also requested that we inform the Court whether Taylor's complaint is now

moot given the Coast Guard's recent orders to Taylor.  *See* Order (Nov. 26, 2018).  The United

States believes that the Coast Guard's current orders, in isolation, do not moot Taylor's

complaint because these orders do not currently require that Taylor undertake any of the

activities identified in the Trust (for example, plugging and abandoning the wells) and thus do

not implicate the Trust funds.  We believe, however, that within the next several months, the United States will be in a position to make decisions regarding appropriate next steps with regard to activities eligible for funding from the Trust.

Certainly, if BSEE (or the Coast Guard) were to order Taylor to undertake the decommissioning efforts described in the Trust – for example, to plug and abandon any of the remaining unplugged wells at MC-20 – Counts II through IV (impossibility of performance, mutual error, and breach of the obligation of good faith and fair dealing) of Taylor's complaint would be moot.  These three counts are dependent upon Taylor's allegations (which the United States disputes) that the United States "will not currently authorize" additional decommissioning work at MC-20 and that it "has determined" that additional work "should not be performed under current circumstances and with currently available technology, given that the environmental risks of performance outweigh the environmental benefits and given the exceedingly low overall annual probability – only once in 1,742 years – of a spillage event from one or more of the MC20 wells."  Complaint at ¶ 104 (regarding the breach of the duty of good faith and fair dealing).[19]  *See also id.* at ¶ 95 (alleging mutual mistake because the United States and Taylor "mutually erred as to their contractual cause when they agreed that it was more environmentally beneficial than risky for Taylor to perform the Obligation to plug and abandon the remaining sixteen unplugged wells at MC20"); *id.* at ¶ 86 (alleging impossibility of performance because when the parties "entered into the Trust Agreement in 2008, they could not have reasonably foreseen that Taylor's performance of decommissioning activities at MC20 to plug and abandon

---

[19] As noted above, Taylor has an ongoing obligation to decommission its wells and it has not been instructed by the United States not to undertake decommissioning activity, including plugging and abandonment activities that could stop the oil discharging from MC-20.  See above at 25.

the remaining sixteen wells . . . would risk causing undue or serious harm to the human, marine and/or coastal environment.").

A decision by either BSEE or the Coast Guard to order Taylor to undertake additional plugging and abandonment activities would reflect their determination that, given the current rate of oil release from MC-20 and the nature of the oil being released (as indicative of an active release from a reservoir), these additional plugging and abandonment activities were not unduly risky.

Taylor suggests that there is bright-line delineation between the Coast Guard and BSEE with respect to their respective "jurisdictions" over containment activity (not involving activities specifically identified in Schedule A of the Trust) and decommissioning activity (that could involve activities identified in Schedule A).  See above at I (D) (Taylor Energy's Response) at pp. 7-8.  Taylor has overstated the delineation.  Currently, the Coast Guard is directing the containment activities, having federalized this component of the efforts to respond to the MC-20 oil leak.  In connection with the Coast Guard's containment activities (for example, the activities of Couvillion to install a system to funnel and separate the oil leaking from MC-20), the costs of those activities will be borne by Taylor, but funds will not come from the Trust.  Separately, BSEE is undertaking scientific analysis of data collected during the summer of 2018, and anticipates getting other pertinent data from the containment activities.  BSEE may, upon its conclusive review of that data, require that Taylor undertake decommissioning activities (such as plugging and abandoning) that may allow Taylor to seek reimbursement for the costs of those activities from the Trust.  This is reflective of the normal working relationship between the Coast Guard and BSEE.

Nonetheless, although both containment and decommissioning activities can proceed in parallel (and that is the current stance of the two agencies), there is no ultimate jurisdictional barrier between the Coast Guard and BSEE with respect to the capacity of either agency to require Taylor to undertake containment activities or decommissioning activities.  Thus, either agency possesses the jurisdictional authority to (1) require Taylor to contain the oil once it is leaked from any MC-20 well or (2) require that Taylor address the source of oil discharging from MC-20 in the first instance.

If the United States were to issue an order to Taylor to undertake additional plugging and abandonment at MC-20, Count I of Taylor's complaint would also be moot.  In Count I, Taylor alleges that, in May 2015, the United States inserted an indefinite term for Taylor's performance.  If an order requiring Taylor to undertake decommissioning activities were to issue, a significant component of Taylor's argument that Taylor is facing an indefinite time for performance would be removed.  Specifically, Taylor argues that the United States unilaterally inserted an indefinite term into the Trust in May 2015 which "breached the Trust Agreement by  . . . suspend[ing] Taylor's performance of its remaining Obligations indefinitely."  If an order to plug and abandon were to be issued, Taylor would not face a continued suspension of performance (even assuming, incorrectly, Taylor's argument that it has no continuing obligation pursuant to Outer Continental Shelf Lands Act regulations to set forth its own plans and actions for decommissioning).  Instead, Taylor would face specific performance requirements that Taylor would not be entitled to ignore under BSEE regulations and which would be eligible for reimbursement from the Trust, and at that point Taylor's "indefinite term" claims would be moot.

## III. <u>CONCLUSION</u>

### A. <u>The United States' Conclusion</u>

The United States did not understand this Court's directive that the parties provide a status report to also be an opportunity for the parties to re-litigate the pending motion to dismiss. Thus, we will not engage in Taylor's attempts to do so here.  Our positions directly addressing the topics of the Court's request for a status report are set forth above and we respectfully request that the Court consider our statements, made on behalf of the United States.

### B. <u>Taylor Energy's Conclusion</u>

Taylor Energy's position is that, notwithstanding the Coast Guard's Admin. Order and directives discussed in the November 20, 2018 Washington Post article, Interior – the only defendant in this litigation and the only governmental agency that is a party to the Trust Agreement – has illegally determined that trust funds covering the decommissioning obligations must remain "frozen."  Try as it might in this filing to conflate the distinct agencies of the "United States," the Coast Guard is not a party to this breach of contract case, and the containment and monitoring that is the subject of the Admin. Order is distinct from the Obligations under the Trust Agreement, which is the subject of this case.  And, although Interior's counsel represented to your Honor that "both" containment and decommissioning activities would be ordered, no decommissioning activities have been ordered.  ECF No. 87 at p. 170.[20]  Consequently, Taylor Energy respectfully requests that the Court deny Interior's pending Motion to Dismiss and allow Taylor Energy the opportunity to prove its contract breach allegations against Interior.

---

[20] And, again, in the event Interior does issue an order directing "decommissioning," at some time in the indefinite future, and represented to be no earlier than six months from now, such after the fact action will not serve to cure Interior's wrongful breach of contract conduct nor the monetary damages already incurred and being incurred by Taylor Energy.

Respectfully submitted,

/s/ Carl D. Rosenblum
CARL D. ROSENBLUM, T.A.
ALIDA C. HAINKEL
LAUREN C. MASTIO
Jones Walker LLP
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8000
Facsimile: (504) 589-8296
crosenblum@joneswalker.com


And



PAUL A. DEBOLT
Venable LLP
600 Massachusetts Ave, N.W.
Washington, D.C. 20001
Telephone: (202) 344-4000

**Attorneys for Plaintiff,**
**Taylor Energy Company LLC**

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

/s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director


/s/ John H. Roberson
JOHN H. ROBERSON
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 353-7972
Fax: (202) 514-8640
Email:  John.Roberson@usdoj.gov

**Attorneys for Defendant,**
**The United States**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 15th day of February, 2019, a true and correct copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record participating in CM/ECF by operation of the court's electronic filing system.

*/s/ Carl D. Rosenblum*