# United States Court of Appeals
# for the Federal Circuit

---

**TAYLOR ENERGY COMPANY LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2019-1983

---

Appeal from the United States Court of Federal Claims
in No. 1:16-cv-00012-NBF, Senior Judge Nancy B. Fire-
stone.

---

Decided: September 3, 2020

---

SETH P. WAXMAN, Wilmer Cutler Pickering Hale and
Dorr LLP, Washington, DC, argued for plaintiff-appellant.
Also represented by CATHERINE CARROLL, SAMUEL M.
STRONGIN; ALIDA C. HAINKEL, LAUREN C. MASTIO, CARL D.
ROSENBLUM, Jones Walker LLP, New Orleans, LA; PAUL A.
DEBOLT, Venable LLP, Washington, DC.

JOHN HUGH ROBERSON, Commercial Litigation Branch,
Civil Division, United States Department of Justice, Wash-
ington, DC, argued for defendant-appellee. Also repre-
sented by ETHAN P. DAVIS, STEVEN JOHN GILLINGHAM,
ROBERT EDWARD KIRSCHMAN, JR.

————————————

Before LOURIE, MOORE, and O'MALLEY, *Circuit Judges.*

O'MALLEY*, Circuit Judge.*

Under the Outer Continental Shelf Lands Act ("OCSLA" or the "Act"), the Federal Government regulates oil and gas operations on the Outer Continental Shelf ("OCS").[1] 43 U.S.C. § 1301. "[A]ll law on the OCS is federal law, administered by federal officials." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1886 (2019). The Act grants the federal government complete "jurisdiction, control, and power of disposition" over the OCS, while states have no "interest in or jurisdiction" over it. And, although the Act deems an adjacent state's laws to be federal law on the OCS to the extent they are "applicable and not inconsistent" with other federal laws and regulations, state law cannot be adopted as surrogate federal law if federal law addresses the relevant issue. *Parker Drilling*, 139 S. Ct. at 1889 (citing 43 U.S.C. § 1333(a)(2)(A)).

The Court of Federal Claims recognized this relationship in the underlying proceedings. It dismissed Taylor's state law breach of contract claims because, *inter alia*, the disputed "contractual" requirements addressed in the agreement at issue were already governed by OCSLA regulations. Citing *Rodrigue v. Aetna Casualty & Surety*, 395 U.S. 352 (1969), the Claims Court explained that state law cannot undercut a lessee's regulatory obligations on the OCS. Only two months later, the Supreme Court affirmed the precedent upon which the Claims Court relied in

————————————

[1]    The Outer Continental Shelf comprises "all submerged lands lying seaward and outside of the area of lands beneath navigable waters" within the Gulf of Mexico or "any of the Great Lakes as they existed at the time such State became a member of the Union." 43 U.S.C. § 1331(a).

*Parker Drilling Management Services, Ltd. v. Newton*, holding that "OCSLA makes apparent that federal law is exclusive in its regulation of the OCS." 139 S. Ct. at 1889 (quotations omitted). "[T]o the extent federal law applies to a particular issue, state law is inapplicable." *Id.*

Despite the Court's clear holding in *Parker Drilling*, Taylor argues on appeal that the Claims Court's Rule 12(b)(6) dismissal was erroneous. It contends that the agreement somehow transformed Taylor's regulatory obligations into separate contractual obligations, and that a breach of these independent contractual obligations, under Louisiana contract law, may dissolve the security interest and decommissioning requirements mandated by OCSLA federal regulations. We disagree. The Court's precedent, particularly *Parker Drilling*, establishes that, for OCS-based claims, state law cannot contravene federal law. Despite Taylor's attempt to disguise its regulatory obligations as contractual ones, the Court's precedent applies in these circumstances. Accordingly, we reject Taylor's efforts to circumvent its regulatory duty to address the 14-mile oil slick flowing from its leaking wells by purporting to assert claims under Louisiana state law.

Because OCSLA regulations address the arguments underlying Taylor's contract claims, we conclude that Louisiana state law cannot be adopted as surrogate law and that Taylor's complaint fails to state a claim upon which relief may be granted. We therefore affirm.

## I. BACKGROUND

### A. A Lessee's Statutory and Regulatory Obligations on the Outer Continental Shelf

The Department of the Interior ("DOI") and its administering arms, the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE"), promulgate and enforce the regulations necessary to administer oil and gas leases under the

OCSLA.  43 U.S.C. §§ 1334, 1348.  Oil and gas producers, moreover, are subject to regulations promulgated under the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), which provide the organization and procedures for responding to oil pollution.  *See* 40 C.F.R. § 300.  Together, these regulations highlight two themes: OCS lessees are (1) held to certain regulatory obligations under federal law; and (2) strictly liable for any pollution generated by their oil and gas operations.

A company holding a lease to oil and gas wells on the OCS accrues certain "pollution prevention" obligations.  30 C.F.R. § 250.300(a).  Among these is the obligation to "decommission"—winding down operations on the OCS after the lease ends.  30 C.F.R. §§ 30 C.F.R. § 250.1700(a) (defining decommissioning as "[e]nding oil, gas, or sulphur operations" and "[r]eturning the lease or pipeline right-of-way to a condition that meets the requirements of regulations of BSEE and other agencies that have jurisdiction over decommissioning activities.").  To fulfill its decommissioning obligations, an OCS lessee must, among other duties, permanently plug all wells; remove all platforms and other facilities; decommission all pipelines; and clear the seafloor of all obstructions.  30 C.F.R. § 250.1703(b)–(e).  A lessee must complete its decommissioning obligations within one year after the lease terminates, unless BSEE authorizes alternate procedures or departures.[2] 30 C.F.R. §§ 250.1725, 250.141.

To ensure that lessees have the financial means to satisfy their regulatory obligations under the OCSLA, lessees must maintain a bond or other security instrument.  30 C.F.R. § 556.900.  For example, BOEM will not issue a new lease or approve the assignment of an existing lease until

---

[2]    The alternate procedures must provide a level of safety and environmental protection that equals or surpasses the regulatory requirement.  30 C.F.R. § 250.141(a).

the lessee maintains a "lease or area-wide" bond with the Regional Director. 30 C.F.R. § 556.900(a). *See also* 30 C.F.R. § 556.105 ("Regional Director means the BOEM officer with responsibility and authority for a Region within BOEM."). This is not the only type of security interest a lessee might expect to maintain, however. BOEM may determine, for example, that "additional security" is necessary "to ensure [a lessee's] compliance with the obligations under [its] lease," and has broad discretion to determine the supplemental amount. 30 C.F.R. §§ 556.901(d)–(e). In adjusting the amount of additional bond required, the agency may consider "cumulative decommissioning obligations." 30 C.F.R. § 556.901(c) ("[T]he authorized officer may accept a lease surety bond in an amount less than the prescribed amount, but not less than the amount of the cost for decommissioning."); 30 C.F.R. § 556.901(e) ("The Regional Director will consider potential underpayment of royalty and cumulative decommissioning obligations.").

BOEM may alternatively authorize lessees to establish "lease-specific abandonment accounts" to satisfy their decommissioning obligations. 30 C.F.R. § 556.904. Funds deposited into a lease-specific abandonment account must be "pledged to meet [the lessee's] decommissioning obligations" and cover "all decommissioning costs as estimated by BOEM within the timeframe the Regional Director prescribes." 30 C.F.R. § 556.904(a)(1)–(2). Funds may not be withdrawn without the written approval of the Regional Director. 30 C.F.R. § 556.904(a).

An OCS lessee's duties are not limited to preventative and decommissioning measures, moreover. Under the Clean Water Act, facility owners are strictly liable for any discharge of oil in navigable waters unless an exception

applies.[3]  33 U.S.C. § 1321 (1982).  The Oil Pollution Act further establishes that a lessee whose facilities discharge oil is considered a "responsible party," and is liable for all removal costs.  *See* 33 U.S.C. § 2702.  A responsible party for an offshore facility is responsible for up to all removal costs plus $75,000,000.  33 U.S.C. § 2704(a)(3).

B.  Taylor's OCS Leases and the MC-20 Trust Agreement

In 1994, Taylor became the lessee and operator of three leases covering areas on the OCS.  *Taylor Energy Co. v. United States*, 142 Fed. Cl. 601, 605 (Fed. Cl. 2019) ("*Taylor Energy*"); J.A. 37.  The leases, which were set to expire on June 28, 2007, incorporated then-present and any later-enacted OCSLA-related regulations. J.A. 193, 199, 205. They also required Taylor to leave the leased area "in a manner satisfactory to the [Regional] Director."  J.A. 196, 201, 209. During the lifetime of these leases, Taylor and its predecessor drilled twenty-eight wells, each connected to a single oil platform called MC-20.  *Taylor Energy*, 142 Fed. Cl. at 605.  In 2004, prior to the leases' expiration, Hurricane Ivan toppled Taylor's platform onto the ocean floor, resulting in significant damage to the wells and rendering them inoperable.  *Id.*  Taylor surveyed the wreckage and discovered oil leaking from the area, but took no actions to stop the leaks at the time.  J.A. 290–91.

Approximately three years later, Taylor's MC-20 leases expired.  J.A. 39 § 16.  Accordingly, DOI's Mineral Management Service ("MMS")—the precursor agency to BSEE and BOEM—ordered Taylor to decommission all the wells at MC-20 within one year.  J.A. 39.  At that point, twenty-five of the twenty-eight wells at MC-20 needed to be decommissioned.  J.A. 38.  Due to complications from the hurricane

---

[3]    33 U.S.C. § 1321(c)(4)(A) lists the exemptions from liability, which do not apply to the facts underlying this appeal.

damage, Taylor wrote to MMS requesting a departure from the default one-year decommission period. J.A. 825–29. *See also* 30 C.F.R. § 250.1710. It asked for an "indefinite time extension" for the completion of its well-abandonment and structure-removal obligations, insisting that it would keep MMS informed as to its progress. J.A. 826. MMS rejected Taylor's request for an "indefinite term," but it did not require Taylor to complete its MC-20 decommissioning obligations within one year.

By 2008, Taylor had sold and assigned all of its remaining OCS leases. J.A. 40. MMS, which held approval authority over the assignment of OCS leases, allowed the assignment but placed a condition on the sale: Taylor needed to set aside part of the sale proceeds to fund all decommissioning obligations at MC-20. J.A. 40. Accordingly, on March 19, 2008, Taylor as the "Settlor," MMS as the "Beneficiary," and JPMorgan Chase Bank as the "Trustee" executed a trust agreement ("the Trust Agreement"). J.A. 72. The Trust Agreement also incorporates an Agreement to Provide Additional Bond ("the Bond Agreement"), which provides details about the "additional bond" required by MMS. J.A. 93.

As described by the document, the purpose of the agreement is to provide financial security for "certain obligations to plug and abandon wells, remove a portion of the platform and facilities, clear the seafloor of obstructions, and take corrective action associated with wells and facilities on [MC-20]." J.A. 72, 74. Schedule A provides the cost estimates for Taylor's regulatory obligations, including: (1) plugging and abandoning twenty-five wells; (2) removing the platform deck; (3) clearing the seafloor of obstructions; (4) removing pipelines; and (5) removing contaminated soil. J.A. 41 ¶ 25; J.A. 97–98. Notably, the Trust Agreement incorporates OCSLA decommissioning regulations in two areas. First, Schedule A states that Taylor's work "will conform to MMS regulations contained in 30 CFR 250 Subpart Q . . . and Subpart C." J.A. 97.

Second, the Trust incorporates the terms of the MC-20 leases, which each expressly incorporate OCSLA regulations. J.A. 193, 199, 205. For Taylor to receive reimbursement for completing its decommissioning obligations, the government must confirm the work was conducted "in material compliance with all applicable federal laws and . . . regulations . . . [and with] the terms and conditions of the Lease(s)." J.A. 86. The Trust Agreement, however, also includes a choice of law provision that it "shall be governed by and construed in accordance with the laws of the State of Louisiana without giving effect to that state's conflict of laws rules." J.A. 94 ¶ 6.9.

Under the Bond Agreement, Taylor deposited $466,280,000 into a trust account based on MMS's "Area-wide Bond Order," and an additional $200,000,000 in compliance with MMS's "Supplemental Bond Order." J.A. 2389. The Bond Agreement states that the account was established "in accordance with the requirements of 30 C.F.R. § 256.56 [now 30 § 556.904]"—the regulation governing lease-specific abandonment accounts. J.A. 2392. Notably, it stipulates that "[n]either acceptance of this Agreement by MMS nor fulfillment of this Agreement by Taylor shall limit Taylor's abandonment obligations on the Leases nor MMS's right to require additional bonding to guarantee performance of Taylor's [decommissioning obligations." J.A. 2391.

## C. Taylor's Decommissioning Efforts

Following the termination of Taylor's MC-20 leases, Taylor attempted to fulfill its decommissioning obligations. This, however, proved to be difficult. The unique wreckage that resulted from the hurricane hampered "conventional plugging and abandonment techniques." J.A. 39. Thus, the Coast Guard, Taylor, and MMS established a "Unified Command" to direct all response efforts to contain and clean up the spill at MC-20. J.A. 39. Through the Unified Command, the participants performed studies and created

plans to best perform clean-up at MC-20. The government ultimately approved a departure from certain standard decommissioning procedures, allowing Taylor to plug and abandon wells by drilling intervention wells. J.A. 45–46. From April 2008 until March 2011, Taylor drilled intervention wells on nine of the twenty-five wells. J.A. 47–48.

### D. The CERA and FRACE Workshops

In 2012, the Unified Command established two working groups to study the risks associated with drilling intervention wells and the conditions of the contaminated soil. J.A. 49, 51. After the working groups completed their assessment, the Unified Command created a workshop to conduct a Consensus Ecological Risk Assessment ("CERA") and evaluate the potential ecological impacts of responses. J.A. 275–76. The CERA workshop released a report in July 2013 (the "CERA Report"), concluding that the risks associated with the planned procedures outweighed any ecological benefits of performing those tasks. J.A. 52, 263–324.

After the CERA workshop, the Unified Command conducted a Final Risk Assessment and Cost Estimate ("FRACE") workshop. J.A. 54. The purpose of the FRACE workshop was to reach a conclusion on the "remaining risk posed by the MC-20 site and the estimated cost to mitigate that risk." *Id.* The FRACE workshop considered expert studies from both Taylor and the government, *id*, and relied on an assumption that only a few gallons a day were leaking from the MC-20 site. At the end of the workshop, the government requested additional time to reach a conclusion but did not take further action. J.A. 55.

### E. The "United States Views" Document

In March 2014, Taylor began taking steps to relieve itself of its decommissioning obligations and recover the remaining funds in the trust account. Relying on the FRACE workshop and its supporting documents, Taylor filed two departure requests with BSEE: (1) to grant departures

from further intervention well decommissioning for the remaining sixteen wells; and (2) to grant a departure or alternative procedure authorizing Taylor to leave any contaminated soil at MC-20 in place.[4] J.A. 56–57; J.A. 575.

On May 11, 2015, BSEE denied Taylor's requests. J.A. 574–78. The agency first explained that the FRACE workshop's assumptions regarding the daily oil leakage appeared to be incorrect. It observed that "there continues to be an oil sheen on the sea surface" and that "the average reported daily oil volume on the sea surface over the past seven months has been over two barrels [or 84 gallons]." J.A. 575. BSEE also noted that Taylor had not provided clear evidence that "hydrocarbons are coming from decontaminated sediment and not from leaking or unplugged wells." J.A. 576. The agency further explained that Taylor's requests for departure were denied because of the "continuing discharge of oil from the MC-20 site," "Taylor's inability to contain the discharge," and "the possibility that future plugging and abandonment work and/or the removal of contaminated sediments may be required." J.A. 57, 578.

Three days after BSEE denied Taylor's departure request, BSEE, BOEM, the Coast Guard, and the Department of Justice jointly issued a two-page document describing the United States' views on the status of the ongoing oil leaks and Taylor's obligations at MC-20 ("the U.S. Views document"). J.A. 56, 565–66. The U.S. Views document notes that the ongoing oil discharge far exceeds the CERA and FRACE workshops' assumption of an oil discharge comprising a few gallons a day. J.A. 565. The document makes clear that the United States does not agree with the CERA report's conclusions, J.A. 566, and that Taylor's decommissioning efforts up until then had been deficient. J.A. 566 (explaining that even if "proper well

_____

[4]    At this point, BSEE and BOEM had replaced MMS via new legislation.

plugging and abandonment is not currently technologically feasible, there is still more that can be done to control and contain the oil that is discharging from the well site"). It acknowledges Taylor's request to recover the remaining $432 million in the trust account but concludes that reduction in funding is unwarranted because the cost of decommissioning the remaining wells likely exceeds the amount held in the Trust. *Id.* Because "[i]t would be contrary to the public interest and inappropriate under applicable law to provide Taylor Energy a release of liability," the document determines that "Taylor Energy must continue to work to permanently stop the ongoing spill." *Id.* at 565–66.[5]

## F. Taylor's IBLA Appeal

On July 9, 2015, Taylor filed a notice of appeal of the BSEE denial with the Interior Board of Land Appeals ("IBLA"). J.A. 440–44. This too, was denied. J.A. 3334–53.

With respect to BSEE's refusal to relieve Taylor of its duty to plug and abandon the MC-20 wells, the IBLA explained that the agency was entitled to defer any action on decommissioning while it "consider[ed] additional research studies" for further improvements in decommissioning the remaining wells. J.A. 3348. "To preclude BSEE from awaiting changes in technology and a better understanding

---

[5] The existence of the U.S. Views document and the opinions and conclusions on which it was based directly refutes Taylor's claim at oral argument that "it is undisputed that Taylor Energy can take no further measures to decommission the MC-20 site without doing more environmental harm than good." *Taylor Energy Co., LLC v. United States*, No. 19-1983, Oral Arg. at 0:33–0:55, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=19-1983.mp3.

of the undersea environment improperly constrains its statutory and regulatory authority over offshore well decommissioning and unnecessarily limits its overriding responsibility to protect the environment from the adverse consequences of offshore drilling and production." J.A. 3349. The IBLA concluded that BSEE had a rational basis, supported by the administrative record, to decline relieving Taylor of its regulatory obligation to permanently plug and abandon the wells at that time.

The IBLA also found that BSEE had a rational basis for denying Taylor's request to leave contaminated sediment in place. J.A. 3351. It explained that BSEE properly denied Taylor's request because, based on the evidence contained in the record, the agency remained convinced that the contaminated sediment posed a continuing threat to the undersea environment. J.A. 3349. "Given uncertainty regarding the source of the sheen, its continuing presence on the surface, and a potential need for Taylor to remove contaminated sediment in the future," the IBLA concluded that BSEE's denial was supported by the administrative record. J.A. 3351. Notably, the IBLA characterized the trust account as a "lease-specific abandonment account," created "to provide a secure source of funding for decommissioning undertaken by Taylor or by BSEE (in the event of default by Taylor)." J.A. 3337. Taylor did not appeal the IBLA decision.[6]

_____

[6] An IBLA decision must be appealed to a United States district court. 5 U.S.C. §§ 701–06 (1976). Neither the Claims Court nor this court is empowered to review IBLA decisions. *See also Underwood Livestock, Inc. v. United States*, 89 Fed. Cl. 287, 290 (2009), *aff'd*, 417 Fed. Appx. 934, 939 (Fed. Cir. 2011) (holding that the Claims Court and the Federal Circuit do not have jurisdiction to review IBLA decisions). In addition, both this court and the Supreme Court have recognized the binding effect of

II. Procedural History

Rather than appeal the IBLA decision to federal district court, Taylor filed suit against the government in the Court of Federal Claims. Taylor's complaint asserts four claims involving Louisiana state law: (1) breach of the Trust Agreement for inserting an indefinite term (Count I); (2) request for dissolution of the trust account based on impossibility of performance (Count II); (3) request for reformation or recission based on mutual error (Count III); and (4) breach of the duty of good faith and fair dealing (Count IV). J.A. 60–70. In response, the United States filed a 12(b)(1) motion to dismiss for lack of jurisdiction based on the six-year statute of limitations. The government also moved to dismiss under Rule 12(b)(6) for failure to state a claim.

The Claims Court denied the United States' 12(b)(1) motion but granted the Rule 12(b)(6) motion and dismissed the case. With respect to the government's 12(b)(6) motion, the court determined that Taylor's indefinite period claim (Count I) failed to state a claim upon which relief could be granted. Applying Louisiana law, the court explained that "no particular language is required to create a trust" and the Trust Agreement "without question established a trust." *Id.* at 610 (citing La. Stat. Ann § 9:1753). The court further noted that, under Louisiana law, a trust without an explicit term has a default expiration of "fifty years from the creation of the trust." *Id.* at 610 (quoting La. Stat. Ann. § 9:1831(4)). Thus, the court reasoned that the Government could not be held liable for inserting an indefinite

IBLA decisions on related lawsuits before the Claims Court. *United States v. Utah Constructions and Mining Co.*, 384 U.S. 394, 422–23 (1966); *Aulston v. United States*, 823 F.2d 510, 514–15 (Fed. Cir. 1987).

term until 2058—fifty years after the creation of the trust.[7]
*Id.* The Claims Court then concluded that, for the same
reason, the government could not be held liable for breach-
ing its implied duty of good faith and fair dealing (Count
IV) until fifty years had passed. *Id.* at 610–11.

The court then determined that Taylor's remaining
claims of impossibility and mutual mistake (Counts II and
III) failed to state a claim because "Taylor's federal obliga-
tions under the Trust Agreement are not governed by state
law." *Id.* at 611. The court noted that the Trust Agreement
"was established to fulfill Taylor's federal regulatory obli-
gations," and that these obligations do not terminate until
the Department of Interior says they may. *Id.* The Claims
Court explained that a finding of impossibility or mutual
mistake would "second guess the IBLA" and independently
relieve Taylor of its regulatory obligations. *Id.* at 611
("[U]ntil Taylor is relieved of its federal decommissioning
obligations by Interior, this court cannot find on its own
that it is 'impossible' for Taylor to comply with its Trust
Agreement obligations or that the Trust Agreement was
entered based on a mutual mistake."). It then rejected Tay-
lor's argument that the court must "separate Taylor's reg-
ulatory obligations under the Trust Agreement from its
regulatory obligations under the OCSLA," explaining that

---

[7]    The parties disputed whether the Claims Court
should apply Louisiana law or federal law in interpreting
the disputed provisions of the Trust Agreement. *Taylor
Energy*, 142 Fed. Cl. at 609. The Claims Court, however,
declined to address this issue, explaining that it was "a
matter that d[id] not have to be presently resolved." Ra-
ther, it concluded that, "to the extent the Trust Agreement
regarding the length of performance or term must be con-
strued using Louisiana law . . . Taylor's claim that the
Trust Agreement is a contract under Louisiana law is not
supported." *Id.* at 610.

such an argument "ignores the fact that the Trust Agreement was entered into to ensure compliance with Taylor's federal regulatory obligations." *Id.* at 612. The Claims Court dismissed Taylor's complaint in its entirety under Rule 12(b)(6) and denied Taylor's motion for summary judgment as moot.

Taylor appealed the Claims Court's determination. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## III. DISCUSSION

"This court reviews *de novo* whether the Court of Federal Claims possessed jurisdiction and whether the Court of Federal Claims properly dismissed for failure to state a claim upon which relief can be granted, as both are questions of law." *Turping v. United States*, 913 F.3d 1060, 1064 (Fed. Cir. 2019) (quoting *Wheeler v. United States*, 11 F.3d 156, 158 (Fed. Cir. 1993)).

Taylor argues that the Claims Court erred in dismissing Counts II and III of its complaint because, under Louisiana state law, it plausibly stated a claim for dissolution based on impossibility and reformation based on mutual error. Appellant Br. 37–40. It contends that Counts I and IV properly alleged that the Trust Agreement includes an implicit term requiring performance within a "reasonable time," pursuant to La Civ. Code Art. 1778. And it maintains that the Claims Court's reliance on Louisiana *trust* law was erroneous because Louisiana *contract* law applies. *Id.* at 55.

We need not reach any of those arguments. In the context of OCS-based claims, state law does not apply if federal law addresses the relevant issue. As evident from the

text of the Trust Agreement, the issues underlying Taylor's claims are governed by federal law.[8]

## A.

"The purpose of the Lands Act was to define a body of law applicable to the seabed, the subsoil, and the fixed structures . . . on the outer Continental Shelf." *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 355 (1969). That this law was to be federal law "is made clear by the language of the Act." *Id.* at 355–56. The OCSLA denies states any interest in or jurisdiction over the OCS, and it deems the adjacent state's laws to be federal law only in limited circumstances. *Parker Drilling*, 139 S. Ct. at 1886. Section 1333(a)(2)(A) provides:

> *To the extent that they are applicable and not inconsistent* with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of

---

[8]     The government also argues in its responsive brief that the Trust Agreement is a regulatory instrument in its entirety, such that "no contractual remedy can be available for any breach by the government." Appellee Br. 44–45; *id.* at 41–53. *See also* J.A. 3337 (finding that the trust account is a lease-specific abandonment account as defined in the governing OCSLA regulations). Although this argument is compelling, *see, e.g.*, *Anderson v. United States*, 344 F.3d 1343 (Fed. Cir. 2003) (holding that regulatory boilerplate provisions, added by the government as a regulator, are not contracts), the government appeared to concede during oral argument that the Trust Agreement *is* a contract. *See Taylor Energy Co., LLC v. United States*, No. 19-1983, Oral Arg. at 18:55–19:25, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=19-1983.mp3. Accordingly, although this issue may have been dispositive, we decline to address it.

each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the Continental Shelf . . . .

43 U.S.C. § 1333(a)(2)(A) (emphasis added). Section 1333(a)(3) emphasizes that "[t]he provisions of this section for adoption of State law as the law of the United States shall never be interpreted as a basis for claiming any interest in or jurisdiction on behalf of any State for any purpose over the" OCS.

In *Parker Drilling Management Services, Ltd. v. Newton*, the Supreme Court clarified the meaning of the phrase, "to the extent that they are applicable and not inconsistent with other federal law," under § 1333(a)(2)(A). 139 S. Ct. at 1888. The Court concluded that "state laws can be 'applicable and not inconsistent' with federal law under § 1333(a)(2)(A) only if federal law does not address the relevant issue." *Parker Drilling*, 139 S. Ct. at 1887–89. It rejected the respondent's argument that state law is inconsistent "only if it would be pre-empted under [the Court's] ordinary pre-emption principles." Such an interpretation, explained the Court, is unsupported by the statutory text. *Id.* at 1888. It noted that OCSLA "extends all federal law to the OCS, and instead of also extending state law writ large, it borrows only certain state laws." *Id.* at 1889. And, it explained, "[g]iven the primacy of federal law on the OCS and the limited role of state law, it would make little sense to treat the OCS as a mere extension of the adjacent State." *Id.*

Taylor asserts that *Parker Drilling* "does not alter the analysis of Taylor Energy's claims." Appellant Br. 35 n.10. It alleges that *Parker Drilling* "adopted the rule of the Fifth

Circuit, which has repeatedly held that state law, as surrogate federal law, governs breach-of-contract claims on the OCS." *Id.* And it argues that, at most, we should remand the case to the Claims Court to consider "the impact of *Parker Drilling*" in the first instance. *Id.*

We disagree. *Parker Drilling* makes clear that its holding accords with the standard "long applied by the Fifth Circuit" that "state law only applies to the extent it is necessary to fill a significant void or gap in federal law." 139 S. Ct. at 1886 (internal quotations omitted); *id.* at 1889 (citing *Continental Oil Co. v. London Steam-Ship Owners' Mut. Ins. Assn.*, 417 F.2d 1030, 1036 (1969)). In so stating, the Court did not broadly exempt its holding from "breach-of-contract claims on the OCS." This makes sense. "All law on the OCS is federal, and state law serves a supporting role, to be adopted only where there is a gap in federal law's coverage." *Parker Drilling*, 136 S. Ct. at 1892. Thus, when interpreting an OCS contract, state contract law applies only to the extent it is "applicable and not inconsistent" with federal law.[9]

## B.

Against this legal backdrop, it is clear that Louisiana state law applies only where there is a "gap" in federal law. This application of the law, however, dooms Taylor's appeal. All of the issues underlying Taylor's claims—*e.g.*, the duration of Taylor's decommissioning obligations, the

---

[9] Indeed, we note that the Fifth Circuit case upon which Taylor relies acknowledges that "Louisiana contract law governs the interpretation of the [OCS] contracts at issue, to the extent that law is applicable and not inconsistent with OCSLA or with other Federal laws and regulations." *Total E&P USA, Inc. v. Kerr-McGee Oil & Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (internal quotations omitted).

possibility of completing such tasks, and the reimbursement process—are addressed by OCSLA regulations.

For instance, Counts I and IV of Taylor's complaint are premised on the application of La Civ. Code Art. 1778, which requires completion of a party's contracted performance within a "reasonable time" when the agreement is silent as to the term.  J.A. 60–63.  But federal law already addresses the amount of time available to an OCS lessee for completion of its decommissioning obligations.  A lessee generally must complete its decommissioning obligations within a year, but BSEE has the authority to modify the required term at any time.  30 C.F.R. §§ 250.1725, 250.141.  A lessee, moreover, remains liable for decommissioning until all of its wells have been successfully decommissioned to regulatory standards, *or* the lessee has obtained express departures from those requirements.  30 C.F.R. § 250.1701(a).  Accordingly, La. Civ. Code Art. 1778, which would effectively limit the duration of a lessee's liability in conflict with the OCSLA, does not provide the rule of decision on the OCS.  To the extent Taylor's OCS-based claims rely on that law, they necessarily fail.

Similarly, Counts II and III of Taylor's complaint rely on La. Civ. Code Art. 1876 and 1877, which provide that a contract is dissolved "[w]hen the entire performance owed by one party has become impossible," J.A. 64–68, but the satisfaction and feasibility of a lessee's decommissioning obligations is already addressed by federal law, 30 C.F.R. §§ 250.1703, 250.1753–250.1754.  In addition, as discussed above, a lessee's liability does not end until "each obligation is met" or BSEE authorizes an express departure.  30 C.F.R. §§ 250.1701, 250.1725, 585.103.  Therefore, Louisiana state law addressing the "impossibility" of a lessee's decommissioning obligations is not adopted as federal law and does not apply.

Finally, to the extent Taylor's OCS-based claims rely on La. Civ. Code Art. 1759 to allege that Taylor is entitled

to recover the remaining trust funds, J.A. 68, federal law already provides guidance on the financial security related to a lessee's decommissioning obligations. 30 C.F.R. § 556.900 *et seq.* As provided by 30 C.F.R. § 556.900, lessees must maintain a bond or security instrument to finance their regulatory obligations under the OCSLA. BOEM is authorized to order "additional security" to ensure a lessee's compliance with its decommissioning obligations. 30 C.F.R. 556.901(d)–(e). And with respect to a "lease-specific abandonment account," such as the one formed by the Trust Agreement, funds may not be withdrawn without the written approval of the BOEM regional director. 30 C.F.R. § 556.904. Accordingly, Louisiana state law does not apply to the maintenance of a lessee's OCSLA financial security.

Indeed, the Trust Agreement itself acknowledges the applicability of OCSLA regulations to the terms of the agreement. It incorporates the terms of the MC-20 leases, as well as the "applicable federal regulations related to such Leases." J.A. 74. Schedule A also reaffirms the relevance of federal law, explaining that Taylor's "work plan and obligations under this Trust [A]greement will conform to MMS regulations contained in 30 C.F.R 250 Subpart Q . . . and Subpart C." J.A. 97. The incorporated Bond Agreement, moreover, provides that the trust account was established in accordance with the lease-specific abandonment account requirements of 30 C.F.R. § 256.56 [now 30 C.F.R. § 556.904]. J.A. 2392. The Trust Agreement's repeated references to the OCSLA regulations erase any doubt that federal law governs the issues underlying the agreement.

Taylor presents two arguments to the contrary—both of which are premised on a misreading of precedent and inconsistent with the Court's holding in *Parker Drilling*.

First, Taylor alleges that state law applies because the Trust Agreement formed separate contractual obligations answerable only to state contract law. Appellant Br. 43.

Notably, Taylor does not dispute that federal law addresses the issues underlying these "contractual" duties. Rather, citing to the D.C. Circuit's decisions in *Noble Energy*, Taylor maintains that when the government and a lessee enter into a contract, the government's breach can release the lessee from its contractual obligations, regardless of whether they are otherwise mandated by regulation. Appellant Br. 43; *see Noble Energy, Inc. v. Salazar ("Noble I")*, 671 F.3d 1241 (D.C. Cir. 2012); *Noble Energy, Inc. v. Jewell ("Noble II")*, 650 F. App'x 9 (D.C. Cir. 2016). In other words, Taylor argues that the creation of the trust agreement somehow transformed its regulatory obligations into independent contractual obligations, which are no longer subject to federal law. Appellant Br. 43. And, because the Trust Agreement's choice of law provision refers to "the laws of the State of Louisiana," Taylor reasons that all of its claims are subject to Louisiana state contract law. Appellant Br. 43.

Taylor's reliance on *Noble Energy* is unfounded. There, the lessee, Noble, acquired a lease to drill for oil on roughly six thousand acres of submerged lands off the coast of California. *Noble I*, 671 F.3d at 1242. It drilled one exploratory well, but temporarily plugged and abandoned the well for twenty-seven years. *Id.* During those years, Noble applied for and received several suspensions on its lease.[10] *Id.* In 1999, two years into its last suspension's four-year term, a district court set the suspension aside based on new amendments to the Coastal Zone Management Act. *Id.* The new amendments required suspensions to be consistent with state management plans and Noble's suspension had not been assessed for consistency with California's

----

[10]    A suspension extends the life of a lease, which is generally five years, and defers the lessee's obligation to produce oil. *Noble I*, 671 F.3d at 1242 (citing 43 U.S.C. §§ 1334(a)(1), 1337(b)(2) & 5).

coastal management plan. *Id.* Accordingly, it was revoked. Reviewing the Court of Claims' judgment in a suit brought by Noble against the government based on these facts, we held the government effectively had repudiated the lease agreements by applying a newly enacted law not foreseen by the original lease. *Id.*; *Amber Res. Co. v. United States,* 538 F.3d 1358 (Fed Cir. 2008) Noble received restitution for the breach of contract and was discharged from all obligations arising from its lease agreements. *Noble I,* 671 F.3d at 1243. Among its discharged contractual duties was the obligation to "remove all devices, works, and structures from the premises no longer subject to the lease." *Id.*

Subsequently, MMS contacted Noble and ordered it to complete its decommissioning obligations. *Id.* at 1243–44. Noble refused. *Id.* at 1344. It argued that the government's breach discharged the lessees from any obligations recited in the contract, including its obligation to "conduct, arrange or pay for the plugging and abandonment of the 320 # 2 exploratory well." *Id.* Noble then sued the Secretary of the Interior and MMS in federal district court, seeking injunctive and declaratory relief. *Id.* The district court determined, however, that the common law doctrine of discharge did not relieve Noble of its regulatory obligation to plug its well permanently because that obligation was not created by the lease, but by federal regulation.

After initially remanding the case to the agency for clarity on the scope of § 250.1700 *et seq.*, the D.C. Circuit affirmed. *Id.* at 1245–46; *Noble II,* 650 F. App'x at 11. It relied on BSEE's explanation that the regulations governing a lessee's decommissioning obligations, 30 C.F.R. § 250.1700 *et seq.*, operate independently from any lease agreement and impose an independent obligation on Noble to permanently plug the well. "Because the regulations impose an obligation to plug Well 320-2 regardless of the government's breach of the lease contract, Noble's argument fail[ed]." *Noble II,* 650 F. App'x at 11.

Stripped of Taylor's mischaracterized depiction, the *Noble Energy* cases do little for the appellant. The underlying facts are different here (in *Noble Energy*, the government breached a *lease agreement* by subjecting the lessee to *new "court-mandated" rules*); a significant portion of the D.C. Circuit's analysis addresses the meaning and scope of § 250.1700 *et seq.*, (which is not at issue here); and most importantly, Noble was still required to complete its regulatory decommissioning obligations. *Noble Energy* does not suggest that a lessee may be relieved of its regulatory obligations in the event of a breach, just because those obligations were incorporated into the trust agreement. Rather, *Noble Energy* holds that a party must comply with its contractual duties if they are mandated by federal law, even if the contract is ultimately dissolved.

Taylor's second argument—that state contract law principles apply to contracts between the government and a private party, even where the contract incorporates regulatory duties—also mischaracterizes the case upon which it relies. Appellant Br. 41 (citing *Mobil Oil Exploration & Producing Southeast v. United States*, 530 U.S. 604, 607 (2000)).

In *Mobil Oil,* two oil companies sought restitution of a $156 million up-front payment they made to the Government in exchange for ten-year renewable lease contracts. *Mobil Oil*, 530 U.S. at 607. Under the governing agreements, the leases would provide the lessees with rights to explore and develop oil off the North Carolina coast, so long as the companies received certain permissions governed by certain federal statutes. 530 U.S. at 610–612. While the companies attempted to obtain the necessary permissions, the Outer Banks Protection Act ("OBPA") came into effect, prohibiting approval of any exploration plan or drilling permit unless several *new* requirements were met. *Id.* at 612. Because the Secretary could not approve the plans until these new regulations were met, the petitioners' plans were delayed and later denied. Petitioners brought

a breach of contract lawsuit in the Claims Court. The court ruled in favor of the petitioners, we reversed, and the Supreme Court reversed our judgment.

Because the Secretary denied the lessee's plans for failure to comply with the new OBPA regulations, the Court concluded that the government violated the contracts. *Id.* at 618. It explained that the OBPA changed the pre-existing contract-incorporated requirements in several ways, that the changes were of a kind that the contracts did not foresee, and that the government communicated its intent to violate the contracts when it expressed its intent to follow OBPA. *Id.* at 619–621. After concluding that the companies did not receive significant post-repudiation performance, the Court ordered the government to refund certain sums to the companies. *Id.* at 624.

*Mobil Oil* has little relevance in the present appeal. In *Mobil Oil*, the government repudiated the lease agreement because its denials relied on *newly created* statutory authority, outside of those statutes and provisions incorporated in the original lease agreement, *id.* at 615. In contrast, BSEE's refusal to grant Taylor's departure request is in compliance with the OCSLA, and the Trust Agreement specifically references the OCSLA regulations that govern the parties' contractual duties. *Mobil Oil* says nothing about the application of state law to provisions governed by federal regulation at the time the parties entered into the original lease agreement. To the extent Taylor asserts that *Mobil Oil* stands for the proposition that state law *is* applicable in such circumstances, any such holding was certainly abrogated by *Parker Drilling*.

Because Taylor fails to state a claim to relief that is plausible on its face, its complaint must be dismissed. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III.  CONCLUSION

For these reasons, the Claims Court's order dismissing Taylor's complaint is affirmed.

**AFFIRMED**

### COSTS

Costs to Appellee.